UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LONDON

**CAPITAL CASE**

CIVIL ACTION NO. 04-CV-185-KKC

BENNY LEE HODGE                                                                          PETITIONER

VS:                          **MEMORANDUM OPINION AND ORDER**

GLENN HAEBERLIN, Warden                                                      RESPONDENT

\* \* \*   \* \* \*   \* \* \*

This matter is ripe for a decision on the petition of Benny Lee Hodge, who is under a sentence of death, for writ of habeas corpus pursuant to 28 U.S.C. §2254, the respondent[1] having filed an answer and memorandum of law on behalf of the Commonwealth of Kentucky.  For the following reasons, the Court will deny the petition.

**BACKGROUND**

On the night of June 16, 1985, an elderly couple named Edwin and Bessie Morris, aged 65 and 69, were murdered in their home in Gray Hawk, a small community in Jackson County, Kentucky.  The next morning, one of the Morrises' grown children discovered the bloody scene. Edwin Morris's body was found lying on the kitchen floor, gagged, with his hands tied behind his back, and with a pillow near his head.  Bessie Morris's body was found on a bed in a bedroom with her hands tied behind her back and her feet tied together, a pillow also being found near her body. The Morrises had both been shot multiple times.  They had also been robbed, a subsequent count revealing the loss of $35,000.00 in cash, a diamond cluster ring, a set of diamond earrings, and a .38

_____

[1] Petitioner is serving his sentences at Kentucky State Penitentiary in Eddyville, Kentucky, where Respondent Glenn Haeberlin oversees his incarceration.

caliber handgun.

A Jackson County Grand Jury indicted the petitioner and co-defendants Donald Bartley and Roger Dale Epperson, charging them with the Morrises' murders, robbery, and burglary.  After a change of venue from Jackson to Laurel County, Petitioner Hodge was tried 1987, with Donald Bartley becoming a witness for the Commonwealth.  According to Bartley's testimony, the three men first began preparation for the crimes in the preceding week, by having Epperson's wife rent a campsite under an assumed name for their use; they had all purchased gloves so as to leave no fingerprints; on the day of the murders, they borrowed someone else's van to hide their true identities should anyone see the vehicle at the Morrises' home; and Bartley's co-defendants also armed themselves, Petitioner Hodge with a .38 caliber handgun and Epperson with a 9-mm pistol.

When the men reached the Morrises' house, Bartley swore, he stayed outside to keep a lookout.  However, he was able to view some of the proceedings in the kitchen through a glassed-in patio, so he could testify to the following.  Petitioner and Epperson went to the door and were admitted by the Morrises.  Bartley saw both Petitioner and Epperson draw their weapons, then hit Mr. Morris, dropping him to the kitchen floor.  This witness claimed that he saw nothing else, but then heard shots, after which Hodge and Epperson came out of the house with their pockets stuffed with money and also with a sack containing more money, Mr. Morris's handgun, and the other valuables.

Additionally, Bartley swore that afterwards Hodge informed him that he had used his .38 in committing the murders.  According to his testimony, the three men disassembled Epperson's 9-mm pistol, wiped all three handguns clean of fingerprints, and threw them from a bridge into a river in the Daniel Boone National Forest.  (Even with Bartley's later cooperation, the police were never able to recover the weapons.)  The three men returned the van and went back to the campsite, where

2

they burned several items which could be traced to them, including all of their gloves and Petitioner

Hodge's blood-stained pants and white tennis shoes.

      A jury convicted Benny Lee Hodge on all charges and he was sentenced to death.  Those

convictions and sentences were vacated, however, with the agreement of the Attorney General of

the Commonwealth, on the ground that the trial court had not conducted individual *voir dire* on the

issue of pre-trial publicity.  *Hodge v. Commonwealth*, 88-SC-713-MR (Ky. 1991); s*ee also Morris*

*v. Commonwealth*, Ky., 766 S.W.2d 58 (1989).

      Petitioner's re-trial[2] occurred in October of 1996, again in Laurel County, the trial court

having refused the petitioner's motion for another change of venue.  Hodge was represented by Oleh

R. Tustaniwsky and Clay Bedford, of the Kentucky Department of Public Advocacy.   As in the

previous trial, proceedings were conducted in conformity with Kentucky's bifurcated death penalty

scheme.  *See* Kentucky Revised Statute ("KRS") 532.025.  It provides that in the guilt phase, first

the prosecution and then the defense present evidence bearing only on whether the defendant is

guilty.  After the jury's deliberations and a finding of guilt, the penalty phase of the trial then begins,

the jury this time hearing evidence bearing upon aggravating and mitigating circumstances about

the crime or the defendant.  If the jury finds the existence of one or more aggravating circumstances

beyond a reasonable doubt, it is authorized to recommend the death penalty; and the trial court must

then fix a sentence within the limits prescribed by law.  *Id.*

      After a few days of *voir dire* to seat a jury, the prosecutor made his opening statement setting

---

    [2]   Co-defendant Roger Epperson had also been convicted on all counts.  He, too, was re-tried in 1996 and
was again convicted and sentenced to death.  Earlier this year, his direct appeal to the Kentucky Supreme Court was
been decided against him, the state's highest court affirming his convictions and death sentences, although the
mandate has not yet issued and the opinion is not yet final for purposes of citation.  *Epperson v. Commonwealth*, ___
S.W.3d ___, 2006 WL 434216 (Ky. February 23, 2006).

out the evidence the Commonwealth intended to present, and Hodge's counsel then presented his opening statement, revealing the position of the defense, *i.e.*, "There's absolutely no evidence to connect Mr. Hodge to these killings, except for the testimony of felons."  Record No.36 at 33.  The Commonwealth then began calling witnesses, the first being Jerry Morris, one of the victims' sons, who testified about his discovery of the crimes.  Robert Stephens, a detective with the Kentucky State Police, testified next, about the crime scene and investigation.  Through him, a videotape of the scene and numerous pictures were introduced as evidence.

Co-defendant Bartley refused to testify at the re-trial, however.  At a pre-trial hearing, he appeared with counsel and repeatedly refused to respond to the court's questions, claiming his Fifth Amendment right to not incriminate himself.  He based this claim upon his having filed a Kentucky Criminal Rule ("RCr") 11.42 motion to vacate, set aside, or correct his conviction in the trial court, a motion then pending and scheduled to be heard soon.  The trial judge made the finding that Bartley was, therefore, unavailable, and the jury was read a redacted transcript[3] of his 1987 testimony, wherein he had identified both Hodge and Epperson as the killers while he stood look-out.

This time, the Commonwealth was able to present the live testimony of Hodge's former wife, Sherry Hamilton, who had been married to him at the time of the 1987 trial and had not testified. She had divorced him in 1990, however, and at the 1996 re-trial she became the strongest witness in implicating the petitioner as the killer.  She swore  that on the evening after the murders, while watching television news about the crime with Bartley and Hodge, Bartley began "jumping around saying, 'That's what we did, man.  They're talking about us.'"  Record No. 37 at 194-95.

Hamilton further testified that later that same night, after making Bartley leave the room,

---

[3]  The testimony was read as if it were a deposition and all references to the previous trial were omitted.

4

Hodge told her, "That's what we did last night," and proceeded to give her details, as follows. He said that he and Bartley, not Epperson, had been the two who entered the Morrises' residence. He shot Edwin Morris following a scuffle, when Morris reached for his gun on top of the refrigerator. Bartley then took Bessie Morris into the bedroom and shot her. When Bartley emerged from the bedroom, Petitioner Hodge asked him if Mrs. Morris was dead and Bartley replied that he thought she was. To be sure she was dead, the petitioner went into the bedroom and shot Mrs. Morris again.

Hamilton also testified that her ex-husband usually carried a .38 caliber handgun and that Bartley usually carried a 9-mm handgun. Additionally, she stated that Epperson and his wife had bought a car with the proceeds of the theft and that Hodge had given her the stolen diamond ring and earrings, which she subsequently sold to a "fence" in Tennessee. Upon cross-examination, this witness admitted that she was a convicted felon and that she had previously lied about the Morrises' murders in order to protect Hodge.

The Commonwealth called 12 more witnesses in its case in chief. Kentucky's Associate Chief Medical Examiner testified that Edwin Morris had suffered a blunt force trauma to his head resulting in fractures in his skull. He had also been shot twice, one bullet grazing his forehead and ending up under the house, and the other one, to the right side of the head, remained lodged in his head and was fatal. The examiner further testified that even if the bullet wound had not been fatal, Mr. Morris would have suffocated from the gag. Bessie Morris died of two gunshot wounds to the back, either of which would have been fatal, but death did not immediately result from either. One bullet was recovered from her body and the other had passed through her body. The bullets, other physical evidence, and photographs of the victims were introduced during his testimony.

A state ballistics expert testified that the bullets recovered from the victims' bodies had been fired from the same weapon, which could have been either a .38 caliber or a .357 caliber handgun.

5

Additional bullets, recovered from the crawl space under the kitchen floor where Edwin Morris's body was found and from the box springs of the mattress on the bed where Bessie Morris's body was found, were all 9-mm Lugar bullets, which appeared to have been fired from a semi-automatic pistol.[4]  The two pillows found near the bodies contained gunshot residue consistent with their use to muffle the sound of the shootings.

Additional witnesses included another of the Morrises' sons, who testified to his parents' businesses and tendency to keep large sums of money in the home; a Forest Service representative with records of the rental of the campsite from which the three defendants operated; the person from whom the co-defendants borrowed a van for the crime; and witnesses to the van's being seen hastily leaving the Morris property at the time of the crimes.  During the case in chief, the Commonwealth was also able to introduce more physical evidence, including the pillows found near the victims and the gag, bullets, and electrical cord used to commit the crimes.

For Hodge's defense, counsel presented seven witnesses and a video deposition.  First, seriology and fingerprint experts testified to there being no evidence of Hodge's blood or fingerprints at the scene.  On cross-examination, however, the prosecution made the point that Hodge had not submitted a blood sample.  The parties stipulated that no fibers from the scene had been traced to Hodge.  Ex-Kentucky State Police officers from the time were called, one establishing that none of the miscellaneous unidentified hairs at the scene were Hodge's and the other, the "case officer," testifying about the investigation.  The latter admitted that there had been alternative theories of the crime in the early stages of the investigation and that Bartley's statements made early in the investigation differed from those in his later testimony.

_____

[4]  This witness also testified that at least two of the 9mm bullets were fired from the same weapon and the third could have been fired from the same weapon.

One of the defense witnesses was Elizabeth Shaw, Hodge's prior attorney, who had several conversations with Sherry Hamilton in 1986, when Hamilton was Hodge's wife and Shaw was preparing for his first trial on the Morris murders. When Hodge's counsel called Ms. Shaw to the stand at the re-trial and asked what Hamilton told her about who confessed to committing the Morrises' murders, the Commonwealth objected on the ground that whatever Shaw would say Hamilton had told her would be hearsay. The trial court sustained the Commonwealth's objection, ruling that such testimony would be "double hearsay" and was therefore, impermissible.

After the courtroom was cleared, Ms. Shaw testified by avowal to two separate conversations with Sherry Hamilton. Hamilton told her of Bartley's first confession, when she, Bartley, and Hodge were all watching the news coverage. Sherry Hamilton also told her of a later occasion when she and Bartley were alone and he purportedly told her that he himself had killed Mr. Morris with the .38 gun for which Mr. Morris was reaching on top of the refrigerator; and that he had also shot Mrs. Morris with both that gun and the 9-mm pistol he had brought.

When a subpoenaed defense witness named Tammy Gentry failed to appear, her testimony was permitted via a video-taped deposition. Gentry testified therein that she was once incarcerated with Bartley, who told her that he, not Hodge or Epperson, had murdered the Morrises. Further, he received special favors from his custodians there and bragged that he had entered into a plea bargain which would include his being back out on the street in only 8 years. On cross-examination, this witness, too, admitted that she was a convicted felon with many aliases.

The defense also introduced into evidence certified records of Bartley's guilty plea and convictions and his later motion for shock probation, which was supported by the Commonwealth, based on his assistance in the prosecutions of his co-defendants. The petitioner did not testify.

At 9:15 on the morning of October 29, 1996, the trial court began reading its instructions to

7

the jury.  After the prosecution and defense's closing arguments, three alternate jurors were excused and the jury retired to deliberate at 11:30 a.m.  At 1 p.m., the jurors returned and requested to hear certain testimony again; they heard portions of the testimony of Bartley, Hamilton, Gentry, and the man from whom the men borrowed the van.  The jury began deliberations again at 4:12 p.m. and had reached a verdict by 5:30 p.m.  The jury convicted Benny Lee Hodge on all counts.  The individual members of the jury were polled and attested to their decision.

The penalty phase of the trial began the next morning.  The Commonwealth presented only one witness, a parole officer testifying about the petitioner's prior convictions and presenting certified records thereof.  These convictions included armed robbery, escape, and a felonious assault, all committed in Tennessee in the 1970's, for which Hodge was sentenced to a total of 20 years; and in Letcher County, Kentucky, in 1986, convictions for robbery in the first degree, burglary in the first degree, criminal attempt to commit murder, and capital murder, for which he was sentenced to a total of 60 years on the lesser offenses and death for the murder.[5]

The defense presented eleven mitigation witnesses.  Members of Hodge's family, including his mother and three sisters, testified to his rough treatment by a series of stepfathers when he was growing up.  They and his two daughters all swore to their love for him as a good person.  An ex-wife and a man with whose family Benny often stayed added their views of him as a family man. A boyhood contemporary, who had spent time with the petitioner when they were both in a reform school, testified to Hodge's being beaten there.  An ex-juvenile judge related an investigation into complaints of atrocious conduct visited upon children at that reform school, although he did not

---

[5] Hodge's Kentucky convictions were all handed down in one criminal case occurring in 1986.  Because these convictions had been affirmed by the time of this re-trial, under Kentucky law, they could be used against him.  *Hodge and Epperson v. Commonwealth*, 809 S.W.2d 835 (Ky. 1991), *cert. denied*, 502 U.S. 1037 (1992).  The Court will discuss this Letcher County case *infra*.

recall if Hodge was one of the complainants. Also appearing was an eighth grade teacher, who described the young Hodge as a well behaved and respectful child.

At the end of the day, the jury had found several aggravating factors with regard to each murder and recommended that Benny Lee Hodge receive the maximum punishment for each of his crimes. Pursuant thereto, on November 22, 1996, the trial court formally sentenced the petitioner to two death sentences for the two counts of murder; twenty years' imprisonment for first degree robbery; and a consecutive twenty years' imprisonment for the first degree burglary.

Petitioner's convictions and sentences underwent mandatory review by the Kentucky Supreme Court, which unanimously upheld the convictions and sentences.[6]   *Hodge v. Commonwealth*, 17 S.W.3d 824 (Ky. 2000) [hereinafter *Hodge I*]. After the mandate issued, the Governor of the Commonwealth set an execution date of June 15, 2000. Kentucky's High Court then stayed the execution for the petitioner to seek review with the United States Supreme Court. His Petition for Writ of Certiorari was denied by the Supreme Court on November 27, 2000. *Hodge v. Kentucky,* 531 U.S. 1018 (2000). At this time, the Kentucky Department of Public Advocacy contracted with private counsel, the same attorneys who represent Hodge today, to represent him in a collateral attack on the conviction and sentence.

Six weeks later, on January 5, 2001, Hodge's current attorneys filed a "Preliminary Motion Pursuant to RCr 11.42," in the trial court. An RCr 11.42 motion to vacate is Kentucky's procedure for collaterally attacking a conviction and/or sentence for reasons which are not accessible on direct appeal, such as ineffective assistance of counsel. One month later, on February 2, 2001, same new counsel filed a formal, detailed RCr 11.42 motion on Hodge's behalf. This included his challenges

---

[6]  For his appeal, Petitioner Hodge's attorneys were Assistant Public Advocates Marie Allison and John Palombi.

to his trial counsel's performance and also a request for the grant of 120 days thereafter in which to file amendments, a motion which the Commonwealth opposed.

On June 12, 2001, the Laurel Circuit Court overruled Hodge's request and denied all relief, its Order including a ruling that Hodge's claims could be resolved from the trial record without an evidentiary hearing. The petitioner again appealed the result obtained in the trial court. On August 21, 2003, the Kentucky Supreme Court issued an opinion affirming the denial of Hodge's Rule 11.42 motion in all respects. After amending its opinion for technical corrections, the Kentucky Supreme Court denied Hodge's petition for rehearing on October 23, 2003. *Hodge v. Commonwealth*, 116 S.W.3d 463 (Ky. 2003) [hereinafter *Hodge II*]. Hodge filed a petition for writ of certiorari in the United States Supreme Court, which was denied on March 8, 2004. *Hodge v. Commonwealth*, 541 U.S. 911 (2004).

On May 3, 2004, Hodge initiated the instant action by filing two motions, the first to have his RCr 11.42 attorneys appointed counsel for filing for habeas relief herein and the second to proceed *in forma pauperis*. After these motions were granted, the petitioner filed his petition for writ of habeas corpus, wherein he submits 38[7] claims of error. Thereafter, this Court granted him a stay of execution. Since that time, the warden has responded, and at the petitioner's request, relevant trial proceedings have been transcribed and are in the instant record as docket entries 32-41.

Another Prior Trial

Other facts about Hodge's background bear noting. Approximately 7 weeks after the Morrises' murders, the following occurred in another Kentucky county:

---

[7] The petition contains 37 enumerated claims but has two sections which are both numbered 34. In responding to the claims point by point, the respondent has renumbered the second 34 to be 35 and then renumbered all claims thereafter, arriving at a total of 38 claims in the petition. This appears to be a sensible solution for all parties and the Court has considered the last five claims as renumbered, 34-38.

10

On August 8, 1985, Donald Bartley and Hodge entered the home of the victim and her father [the Ackers] posing as F.B.I. agents. Once inside, Hodge produced a gun and tied the father while Bartley took the daughter into a back bedroom and tied her. Both the father and the daughter had their heads covered. Epperson, who had been waiting in an automobile outside the home, was radioed and told to enter. The three men ransacked the house until a safe was found and the father was forced to open it. Almost $2 million in cash, some weapons and jewelry were found by the three men. Hodge is charged with then killing the daughter by stabbing her twelve times in the back with a large kitchen knife, while Epperson and Bartley choked the father into unconsciousness with an electric cord. The three men then left the home. All three were arrested in Florida and returned to Kentucky for trial. Bartley turned prosecution witness and gave a detailed statement identifying both Hodge and Epperson as principals in the crimes.
. . .
While in jail in Florida, Hodge confessed his role in the murder and robbery . . . .

*Hodge and Epperson v. Commonwealth*, 809 S.W.2d 835, 838 (Ky. 1991), *cert. denied, Hodge v. Kentucky*, 502 U.S. 1037 (1992).

This was known as "the *Acker* case," named for Dr. Acker, who had been seriously injured, and his daughter Tammy Acker, who had been murdered, "prominent members of the community in which the case was tried." *Id.* Hodge and Epperson were tried together in Letcher Circuit Court, and Bartley "testified fully" against them. *Id.* A jury convicted both co-defendants of murder, attempted murder, first degree robbery and first degree burglary. At the time of the 1996 re-trial for the Morris murders, Hodge's and Epperson's convictions in the *Acker* case had been affirmed on appeal and were final.[8] *Hodge and Epperson v. Commonwealth*, 809 S.W.2d 835 (Ky. 1991), *cert. denied*, 502 U.S. 1037 (1992).

The *Acker* case had extensive publicity, upon which the Kentucky Supreme Court commented (*id.*), and which added to the concern of Hodge's re-trial court about whether *Acker* pre-

---

[8]  Upon the co-defendants' later collateral attacks, pursuant to RCr 11.42, however, the district court's denial of relief on their ineffective assistance of counsel and jury tampering claims was reversed and the case remanded to the trial court to hold an evidentiary hearing. *Hodge v. Commonwealth*, 68 S.W.3d 338 (Ky. 2002).

trial publicity had tainted the jurors.

## HABEAS CORPUS CRITERIA

### Prerequisites for Federal Habeas Corpus Review

Before addressing the merits of any claim in a proceeding pursuant to 28 U.S.C. §2254, the Court must find that certain prerequisites for granting relief are present. Specifically, the Court must find that the petitioner: (1) is in "custody;" (2) has exhausted the remedies available to him in state court; and (3) did not waive or forfeit the right to present a particular issue by failing to follow state court rules to ensure that the state courts would review that issue on appeal. The first of these is satisfied because the petitioner is in custody at the Kentucky State Penitentiary, under a sentence of death. The next two prerequisites call for some discussion.

As to the requirement that the petitioner exhaust his state court remedies, the Supreme Court of the United States has made exhaustion a long-standing prerequisite in habeas proceedings. *See Murray v. Carrier*, 477 U.S. 478, 489 (1986). The rationale for the Court's exhaustion requirement has been that the state court should normally have an opportunity to pass on the constitutional claim prior to the federal habeas review. *Duckworth v. Serrano*, 454 U.S. 1, 3 (1981). This is not jurisdictional, but an issue of comity between federal and state courts. *Id.* at 4. However, "a federal habeas court need not require that a federal claim be presented to a state court if it is clear that the state would hold the claim procedurally barred." *Harris v. Reed*, 489 U.S. 255, 263 n.9 (1989).

The Anti-terrorism and Effective Death Penalty Act of 1995 ("AEDPA"), §104 of Public Law 104-132, effective April 24, 1996, made substantial changes in the habeas statutes, including making exhaustion a statutory requirement. 28 U.S.C. §2254(b)(1) now specifically bars habeas consideration on any issue "unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State . . . ." *Id.* That subsection of the statute contains a few limited

12

exceptions to the exhaustion requirement,[9] but they are not applicable herein.  The statute also provides that the state may waive the exhaustion requirement, but must do so expressly.  28 U.S.C. §2254(b)(3).  Additionally, since 1996, the habeas statute has permitted denial of an application for a writ of habeas corpus on the merits, "notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."  28 U.S.C. §2254(b)(2).

For a claim to be considered exhausted, "the habeas petitioner must have 'fairly presented' to the state courts the 'substance' of his federal habeas corpus claim."  *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (quoting *Picard v. Connor*, 404 U.S. 270, 275, 277-78 (1971)); *see also Stanford v. Parker*, 266 F.3d 442, 451 (6th Cir. 2001) ("Where a petitioner has not fully and fairly presented a federal claim to the state's highest court . . . , a federal court ordinarily will not consider the merits of that claim"); and *Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998) ("the doctrine of exhaustion requires that a claim be presented to the state courts under the same theory in which it is later presented in federal court").

Finally, a doctrine accompanying the exhaustion requirement is the doctrine of procedural default, upon which the respondent relies with regard to several of the petitioner's claims herein.  Briefly stated, if a petitioner does not raise an issue to the state courts, the claim has not been

---

[9]  The subsection specifically provides, as follows:

(b)(1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that --
> (A) the applicant has exhausted the remedies available in the courts of the State; or
> (B)(i) there is an absence of available State corrective process; or
>     (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. §2254(b)(1).

exhausted, but is deemed defaulted, and habeas court review is barred. Procedural default may occur if the state prisoner fails to present an issue to a state appellate court at his only opportunity to do so or if he fails to comply with a state procedural rule that required him to have done something at trial to preserve his claimed error, such as making a contemporaneous objection or filing a motion for a directed verdict. *See United States v. Frady*, 456 U.S. 152, 167-169 (1982).

For the doctrine of procedural default to apply and thus bar this habeas review, the habeas court must find that (1) there is a firmly established state procedural rule applicable to the petitioner's claim must exist and the petitioner did, in fact, fail to follow it; (2) the state courts actually enforce the rule and did so against the petitioner; and (3) the state's procedural forfeiture is an "adequate and independent" ground on which the state can rely to foreclose review. *See Bowling v. Parker*, 344 F.3d 487, 498 (6th Cir. 2004) (citing *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986), *cert. denied*, 535 U.S. 940 (2002)), *cert. denied*, 543 U.S. 842 (2004). For example, Kentucky requires a proper objection in order to preserve an issue for appeal and it enforces the requirement. RCr 9.22; *Todd v. Commonwealth*, 716 S.W.2d 242 (1986).

The state court's reliance on the state procedural rule must be unambiguous for it to block the federal court's review. *Bowling v. Parker*, 344 F.3d at 498. If a state court does not expressly rely on a procedural deficiency in the state proceedings, however, then a federal court may conduct habeas review. *Caldwell v. Mississippi*, 472 U.S. 320, 327 (1985). To constitute an "adequate and independent" ground barring review by the habeas court, the state rule must be firmly established and regularly followed. *See Lee v. Kemna*, 534 U.S. 362, 375 (2002); *Johnson v. Mississippi*, 486 U.S. 578, 587 (1988); and *James v. Kentucky*, 466 U.S. 341, 348 (1984).

If the *Maupin* factors are established, procedural default bars the habeas court's review of a defaulted claim, unless one of two exceptions to the doctrine are found to exist. The first is the

14

cause and prejudice test. It turns on whether the petitioner demonstrates both cause for not having obeyed the state rule and actual prejudice to him. *Coleman v. Thompson*, 501 U.S. 722, 729 (1991); *see also Wainwright v. Sykes*, 433 U.S. 72-87 (1977). If the petitioner cannot demonstrate cause, the court will not reach the prejudice component; if he shows cause, however, then he must also show prejudice. If he fails to meet the cause-and-prejudice criteria, then the petitioner can obtain review of the defaulted claim only if he shows that failure to reach the claim will result in a "fundamental miscarriage of justice," *i.e.*, a constitutional violation resulted in the conviction of one who is actually innocent. *Coleman*, 501 U. S. at 750-51; *Murray v. Carrier*, 477 U.S. at 496.[10]

The U.S. Supreme Court has noted that the procedural default doctrine is necessary to protect the integrity of the federal exhaustion rule. *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999). Again, the requirement of giving state courts the first opportunity to cure a constitutional claim stems from the desire for comity between the state and federal court systems and from the understanding that state courts are obliged to follow federal law. *Id.* at 844-45. A state court need not fear reaching the merits of a federal claim in an alternative holding, however. *Harris v. Reed*, 489 U.S. at 264, n. 10. The adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment even when the state court also relies on federal law. *Id.; see also Mason v. Mitchell,* 320 F.3d 604, 635 (6th Cir.2003).

In the instant case, under Kentucky law, Benny Lee Hodge had two vehicles for bringing

---

[10] Because Hodge has not presented an actual innocence claim, the Court need not need to examine the standards therefor herein. The Court will only note that the U.S. Supreme Court has explicitly tied the miscarriage of justice exception to a petitioner's innocence. *Sawyer v. Whitley*, 505 U.S. 333 (1992); *Schlup v. Delo*, 513 U.S. 298 (1995). Thus, a petitioner who has procedurally defaulted a claim and cannot establish legal cause and prejudice must assert a constitutional error along with a claim of innocence, *i.e.*, "reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." *Id.* at 321. *See also Bousley v. United States*, 523 U.S. 614, 620 (1998)

his claims of error and thus exhausting his state court remedies.  First, he brought his direct appeal of right.  Because he was sentenced to death, a state statute provides that this appeal goes directly to the Kentucky Supreme Court.  KRS §532.075.  His later collateral attack was *via* Kentucky's RCr 11.42, which is the state vehicle for ineffective assistance of counsel claims and which, after it was denied, also went directly to the state's High Court for review.

Therefore, all federal claims which were raised in the petitioner's direct appeal and his RCr 11.42 proceeding are reviewable because they were exhausted in the state courts.  Some claims herein, the Commonwealth  contends, were not properly presented in the state courts, however, and so they are barred from consideration by this Court on habeas review, absent a showing of cause and prejudice or a miscarriage of justice.  *See Wainwright v. Sykes*, 433 U.S. at 87-88.

The petitioner having no further remedy "available in the courts of the State," he has now come to this Court, pursuant to 28 U.S.C. §2254.  28 U.S.C. §2254(b)(1)(A).

<u>Assertion of Federal Claims</u>

The habeas statute dictates that a district court may entertain "an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State Court *only* on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. §2254(a) (emphasis added); *Rose v.  Hodges*, 423 U.S. 19, 22 (1975) (per curiam).

Therefore, the threshold question in any federal habeas petition, therefore, is whether the petition even raises federal claims.  To the extent that the petitioner complains of a ruling under state law, habeas relief is not available.  Rather, state courts' interpretations of state law are binding on federal habeas courts.  *Wainwright v. Goode*, 464 U.S. 78, 84 (1983); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).  "Federal Courts are not forums in which to relitigate state trials."  *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983); *see also Herrera v. Collins*, 506 U.S. 390, 401 (1993).

16

<u>Standards of Review</u>

　　　　　With regard to entertaining a petitioner's federal claims on the merits, another change made by the AEDPA in 1996 was in the standards which federal courts must use in reviewing a habeas petitioner's federal claims.  Amended 28 U.S.C. §2254 now calls for a greater level of deference to state courts' determinations than before, the statute specifically mandating as follows:

> An application for writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in the state court proceedings unless the adjudication of the claim–
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. §2254(d)(2000).  "[AEDPA] tells federal courts:  Hands off, unless the judgment in place is based on an error grave enough to be called unreasonable."  *Herbert v. Billy*, 160 F.3d 1131, 1135 (6th Cir.  1998).

　　　　The amended provisions of §2254(d) apply to all habeas corpus petitions filed after the AEDPA effective date, April 24, 1996.  *Woodford v. Garceau*, 538 U.S. 202 (2003); *Michael Wayne Williams v. Taylor*, 529 U.S. 420, 428 (2000).  Because the instant petition was filed after that date, these are the standards which must be applied herein.

　　　　The Supreme Court of the United States has assisted the courts by interpreting the language of §2254(d)(1) in Terry *Williams v. Taylor*, 529 U.S. 362 (2000).  Justice O'Connor, writing for the majority, acknowledged that in this portion of the AEDPA, Congress had "placed a new restriction on the power of federal courts to grant writs of habeas corpus to state prisoners." *Id.* at 399.  She then examined §2254(d)(1) in detail and found that it defines two separate categories of cases in

which a state prisoner may obtain habeas relief with respect to a federal claim adjudicated on the merits in state court.

The High Court first described what "contrary to . . . clearly established Federal law" means, writing that in order for the habeas writ to issue, a state court decision must be "contrary to" Supreme Court precedent in the sense that

> the state court arrive[d] at a conclusion opposite to that reached by this Court on a question of law . . . [or] the state court confront[ed] facts that are materially indistinguishable from a relevant Supreme Court precedent and arrive[d] at a result opposite to ours.

*Id.* at 405. As to the second alternative in subsection (d)(1), a state court decision rests on an "unreasonable application of" clearly established federal law if "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

Thus, under Congress's 1996 statute, the federal habeas court may grant the writ on an adjudicated claim only if it finds a state court ruling is either contrary to or an unreasonable application of U.S. Supreme Court law. Under the Supreme Court's interpretation of the statute, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams,* 529 U.S. at 411.

Moreover, the Court has determined that the reasonableness of the state court's opinion must be judged by an objective standard, rather than a subjective one. "Stated simply, a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409. The Sixth Circuit has cautioned that "even if this court 'believe[s]' that a state court incorrectly applied federal law, [it]

18

must refuse to issue the writ of habeas corpus if [it] finds that the state court's decision was a reasonable one.' *Machacek v. Hofbauer*, 213 F.3d 947, 953 (6th Cir. 2000) . . . ." *Simpson v. Jones*, 238 F.3d 399 (6th Cir. 2000).

In conducting its review of the state courts' rulings on federal claims, therefore, the district court first has to determine what was the "clearly established federal law as determined by the Supreme Court of the United States" (§2254(d)(1)) at "the time of the relevant state court decision" *(Williams*, 529 U.S. at 412). In the instant case, Hodge's case first became final, after his direct appeal, when the United States Supreme Court denied his certiorari petition, on November 27, 2000.

Generally, any claim that would require the application of a new rule of constitutional law, decided after the petitioner's conviction became final is barred. *Teague v. Lane*, 489 U.S. 288 (1989). *Teague*'s general non-retroactivity principle has narrow exceptions to the bar, which can be examined if necessary to fundamental fairness. *See Caspari v. Bohlen*, 510 U.S. 383, 396 (1994); *Graham v. Collins*, 506 U.S. 461, 467 (1993). This Court, therefore, is not permitted to rely on Supreme Court cases decided after the state courts' decisions, unless a *Teague* exception applies.

The Supreme Court has further directed that its cases need not be cited, nor must there even be "awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002). This Court is not permitted to rely on any decision by any court other than the U. S. Supreme Court in evaluating the state courts' decisions. Under AEDPA, any references to a U. S. Supreme Court decision after the time the petitioner's conviction became final and any references to federal circuit court decisions are largely irrelevant. *Williams v. Coyle*, 260 F.3d at 703. Nonetheless, a sister court has recently pointed out that the decisions of lower federal courts can be useful in assessing the reasonableness of the state court's resolution of an issue. *Phillips v. Renico*, 2005 WL 1030415 (E.D. Mich. 2005).

19

Additionally, for questions of fact, such as credibility determinations, habeas relief is unavailable unless the federal court finds that the state court's conclusion is "an unreasonable determination of the facts in light of the evidence presented in the State court proceedings."  28 U.S.C. §2254(d)(2).  In examining the state court's findings of fact, another statute provides that factual findings are entitled to the presumption of correctness and that the habeas applicant has the burden of rebutting that presumption by clear and convincing evidence.  28 U.S.C. §2254(e)(1).[11]

Therefore, for every federal claim adjudicated on the merits in state court, this Court must determine whether the state court's decision was "contrary to, or involved an unreasonable application of," Supreme Court precedent, or "was based on an unreasonable determination of facts in light of the evidence presented" during the state court proceeding.  28 U.S.C. §2254(d)(1); *Alley v. Bell*, 307 F.3d 380, 385 (6th Cir. 2002).  See a fuller discussion of these standards by the United States Court of Appeals for the Sixth Circuit in *Williams v. Coyle*, 260 F.3d 684 (6th Cir. 2001), *cert. denied*, 536 U.S. 947 (2002); and *Coe v. Bell*, 209 F.3d 815, 822-23 (6th Cir.), *cert. denied*, 529 U.S. 1084 (2000).

Finally, even when the habeas court concludes that a federal constitutional error occurred during the trial, habeas relief is not automatically justified.  The court must also consider whether the error prejudiced the applicant or was harmless, a doctrine which has specific parameters and was not changed in 1996.  Habeas relief is not warranted unless the error "had substantial and injurious

---

[11]  The applicable subsection reads as follows:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. §2254 (e)(1).

effect or influence in determining the jury's verdict so as to deprive the petitioner of his right to a fair trial in violation of due process." *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993); *Calderon v. Coleman*, 525 U.S. 141 (1998); *see also Alley v. Bell*, 101 F.Supp.2d 588, 653-54 (W.D.Tenn. 2000), *affirmed*, 307 F.3d 380 (6th Cir. 2002), *cert. denied*, 540 U.S. 839, 1086 (2003).

The Court has grouped the following discussion of the petitioner's 38 claims in chronological order, rather than in the numerical order of the petitioner's presentation. The Court has, however, retained the petitioner's original numbers for identification purposes.

### ISSUE OF VENUE

10.   The Trial Court's Failure To Grant Petitioner's Motion For Change Of Venue Denied Petitioner His Rights Under To A Fair Trial And Impartial Jury As Guaranteed By *Irvin v. Dowd*, 366 U.S. 717 (1961) And *Sheppard v. Maxwell*, 384 U.S. 333 (1966).

As noted by the Kentucky Supreme Court, the pre-trial publicity in 1985 and 1986 was extensive, particularly about the *Acker* case, which involved a prominent doctor, the savage murder of his daughter as a young woman, and robbery of millions of dollars. This crime, also in a small rural community in eastern Kentucky, occurred only a few months after the Morris crimes and seemingly at the hands of the same three defendants. In the *Morris* case at issue herein, prior to his 1987 trial, the petitioner had been granted a change of venue, the trial court moving the trial from Jackson County, where the murders had occurred, to Laurel County. When his conviction there was overturned for the trial court's failure to conduct *voir dire* on the pre-trial publicity, Hodge's re-trial was eventually scheduled for 1996, the petitioner again to be tried in Laurel County.

In September of 1994, the petitioner's counsel moved for a change of venue away from the Laurel County site, based upon a statistician's opinion survey of that year. The motion was denied. In 1996, the motion for a change of venue from Laurel County was renewed at the last pre-trial

21

hearing, the petitioner again relying on published articles from the earlier decade, the 1994 survey, and an affidavit from the same statistician, who contended therein that if the same survey were conducted 1996, the results would not be significantly different from the results two years earlier. Record No. 32 at 31.

The Commonwealth presented two witnesses in opposition to the motion. The Laurel County Clerk testified that he had not heard much about the murders in recent years, that there had been a significant influx of new inhabitants in the county, and that he believed that fair and reasonable jurors from that population could be seated. The editor of the local newspaper testified that he also had not heard much about the case in the intervening years. The Court denied the motion for a change of venue with the caveat that the issue could be revisited at *voir dire*. *Id*. at 33.

In support of this claim, the petitioner points to the *voir dire* responses of 28 potential jurors who admitted that they had heard of the case or Benny Lee Hodge or the Morrises' murders and were excused for cause. He argues that in the face of so many such responses, the Court had an obligation to fashion another remedy. The appropriate remedy should have been a change of venue, based on pre-trial publicity and a reasonable likelihood that the publicity would prevent a fair trial for Hodge.

<u>Response</u>

The respondent contends that the Kentucky Supreme Court rejected this claim on direct appeal, and its treatment of the issue is not contrary to or an unreasonable application of Supreme Court law. Further, the state court's determination that a jury or an individual juror could be impartial are findings of fact which are subject to the presumption of correctness on habeas review, the respondent referencing *Patton v. Yount*, 467 U.S. 1035 (1975), and the recent discussion of the principles of *Patton v. Yount* in *Ritchie v. Rogers*, 313 F.3d 948 (6th Cir. 2002).

22

**Discussion**

Pursuant to the Sixth and Fourteen Amendments, a criminal defendant is guaranteed the right to an impartial and unbiased jury. *See Morgan v. Illinois*, 504 U.S. 719, 727 (1992). On the petitioner's direct appeal, the Supreme Court of Kentucky discussed the facts and the law regarding the petitioner's desire for a change of venue in detail:

> . . . The [1994] survey purported to show that citizens of Laurel County were more familiar with this case than were citizens of Warren County, the venue to which Appellant desired to have his case removed. Although 57% of Laurel County respondents stated they had read, heard or seen something about the Morris murders, only 10% could name Appellant as being one of those charged. Upon being informed that "Benny Hodge had been charged, convicted and sentenced to death on November 7, 1987 for the murders of Edwin and Bessie Morris," only 28% stated that they were aware of that fact and only 20% were aware that the convictions had been reversed for a new trial. Even after being advised of Appellant's prior convictions of these murders, only 29% stated they thought he was guilty.
> . . . .
> There is no statutory entitlement to a second change of venue. KRS 452.240; *Taylor v. Commonwealth,* Ky., 821 S.W.2d 72 (1990), *cert. denied,* 502 U.S. 1100 . . . (1992), *overruled on other grounds, St. Clair v. Roark,* 10 S.W.3d 482 (Ky. 1999). Furthermore:
>
>> [T]he mere fact that jurors may have heard, talked, or read about a case does not require a change of venue, absent a showing that there is a reasonable likelihood that the accounts or descriptions of the investigation and judicial proceedings have prejudiced the defendant.... Prejudice must be shown unless it may be clearly implied in a given case from the totality of the circumstances.
>
> *Montgomery v. Commonwealth,* Ky., 819 S.W.2d 713, 716 (1991) [additional citations to state law omitted] . . . . A trial judge's decision not to change venue "is given great weight because he is present in the county and presumed to know the situation." *Nickell v. Commonwealth,* Ky., 371 S.W.2d 849, 850 (1963). The fact that a previous trial generated publicity does not automatically require a change of venue for the re-trial, particularly when, as here, a substantial passage of time has occurred between the trials. *Patton v. Yount,* 467 U.S. 1025 . . .(1984). It is significant that (1) even though Appellant had been previously tried and convicted in the Laurel Circuit Court of the Morrises' murders, only 10% of Laurel County respondents to the "venue survey" initially were aware that Appellant was *accused* of the crimes; and (2) even after being informed of Appellant's previous conviction of the murders, only 29% opined that he was guilty. We find no error in the trial judge's denial of

23

Appellant's initial motion for a change of venue.

Appellant renewed his motion to change venue on the morning of trial *before* the jury selection process began, but did not renew his motion at the conclusion of voir dire.

*Hodge I*, 17 S.W.3d 835-36 (emphasis of the Kentucky High Court). The Court then concluded, "Since a presumptively impartial jury was seated to try Appellant's case, and since Appellant did not renew his motion for change of venue after the jury was selected, the issue becomes whether the trial judge erred in failing to sustain any of Appellant's motions to excuse prospective jurors for cause." *Id.* at 836.

This Court finds the Kentucky Supreme Court's decision on the venue issue to be consistent with U.S. Supreme Court law, including the dictates of *Patton v. Yount*. In contrast, the cases relied upon by the petitioner are clearly distinguishable and inconsistent with the facts herein. In *Irvin v. Dowd*, the defendant was accused of murdering a family of six in a small community and 46 exhibits showed a "barrage" of local newspaper headlines and articles, cartoons, and pictures which had been "unleashed" on the defendant, all occurring during the four to five months between the crime and the trial. 366 U.S. at 725. The Court examined the nature and number of such coverage, including the announcement that the defendant had confessed and references to him thereafter as "the confessed slayer of six." *Id.*

The *Irvin* Court found that "the force of this continued adverse publicity caused a sustained excitement and fostered a strong prejudice among the people" in the county where trial was to be held; and that the nature and number of *voir dire* testimonies demonstrating bias ("370 prospective jurors or almost 90% of those examined on the point . . . entertained some opinion as to guilt") confirmed the community's "deep and bitter prejudice." *Id* at 726. Therefore, the case warranted reversal of the murder conviction and sentence of death. The *Sheppard* case required reversal for

24

even more extreme media conduct.[12]

No such evidence supporting actual bias appears in the instant record, however.  In the case *sub judice*, the sensational murders and accompanying media coverage had occurred in another case, *i.e.*, the *Acker* case, not the *Morris* case.  Moreover, the murders had occurred more than 10 years before the re-trial and the original trial's news coverage was 9 years earlier.  The Commonwealth's two witnesses on the change of venue motion were local officials who were in a position to know the current populace well, and they both testified to there being no reason the 1996 proceeding could not seat an impartial jury.  Moreover, the Kentucky High Court considered the statistical data, as did the *Irvin* Court; made findings of fact as to that venue; and found a change of venue for fairness not required.  The Court finds that the factual findings, by law presumed correct, have not been rebutted.

This Court also finds that the Kentucky Supreme Court identified the Supreme Court law of the time, reasonably applied that law, and made a decision which was not contrary to that body of law, including *Irvin v. Dowd*, *Sheppard v. Maxwell*, or  *Patton v. Yount*.  In fact, in *Patton* there was a lapse of only 4 years before a re-trial (compared to the 10 years herein), and yet the trial court similarly had found that the *voir dire* testimony and the rest of the record revealed no "huge . . . wave of public passion" which would have made a fair trial unlikely.  467 U.S. at 1033.  The Supreme Court of the United States affirmed, finding that the passage of time between Yount's first and second trials rebutted any presumption of prejudice that existed at the time of the original trial.

---

[12] A reading of *Sheppard* reveals an even greater media free-for-all demanding justice for the victim, Mrs. Sheppard, a philandering doctor's wife.  The extreme attention on the case began, with the discovery of her body, bludgeoned to death in her bedroom, on July 4, 1954, and media coverage proliferated prior to the doctor's trial, only a matter of months later.  Moreover, the trial was held in a courtroom virtually controlled by the media, still bent on sensationalism.  By December of 1954, Dr. Sheppard had been convicted.  The Supreme Court of the United States granted him relief from the conviction, finding that the trial court had failed to protect him from inherently prejudicial publicity which saturated the community and from the press' disruptive influences in the courtroom itself.  Such is clearly not the factual situation presented herein.

25

Accordingly, the trial court's denial of a change of venue in the case *sub judice* cannot serve as a basis for relief for Petitioner Hodge. This Court, like Kentucky's trial and appellate courts, next moves on to the responses of the individual jurors during *voir dire*.

### JURY ISSUES

<u>Supreme Court Law</u>

In the afore-discussed case of *Irvin v. Dowd,* the U.S. Supreme Court was dealing with the issue of the impartiality of a trial jury as a whole. In the later *Patton v. Yount*, the Court referred to its earlier *Irvin* decision and refined the inquiry as to the partiality of an individual juror. "That question is not one of law and fact. Rather it is plainly one of historical fact: [1] did a juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and [2] should the juror's protestation of impartiality have been believed." 467 U.S. at 1036.

A challenge for cause is designed to remove a juror who is partial to one side or who has formed an opinion prior to hearing the evidence. With regard to assessing the partiality of an individual juror, "the determination is essentially one of credibility, and therefore largely one of demeanor." *Id.* at 1038. The Supreme Court further stated that "[i]t is here that the federal court's deference must operate, for while the cold record aroused some concern, only the trial judge could tell which of these answers was said with the greatest comprehension and certainty." *Id.* at 1040.

Partiality can come from several sources, two of which were of paramount concern herein. One is pre-trial publicity, which was at issue in *Irvin v. Dowd*. The Court did, indeed, hold that adverse pre-trial publicity can create a presumption of prejudice and that such a presumption of prejudice that jurors' claims to the contrary should not be believed. Then the *Patton v. Yount* Court found that the record of publicity therein, the passage of four years, and the *voir dire* testimony did not reveal such a wave of public passion as to make a fair trial by the empaneled jury unlikely and

26

relief was denied.  In every claim about such pre-trial coverage, "the relevant question" is whether the challenged jurors had such fixed opinions that they could not judge his guilt impartially.  *Patton*, 467 U.S. at 1035.

Strong views about the death penalty may also bias a potential juror.  The U.S. Supreme Court has directed that a juror who would automatically vote of the imposition of the death penalty without weighing the aggravating and mitigating evidence presented must be removed for cause, and a failure of the trial court to do so rises to the level of constitutional error sufficient to grant habeas relief.  *Morgan v. Illinois*, 504 U.S. at 728-29.  Upon a defendant's request, the trial court must inquire into prospective jurors' views on capital punishment.  *Id.* at 729-34.

"[T]he proper standard . . . is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)). The Supreme Court has elaborated on these inquiries, explaining that the party seeking exclusion of a particular potential juror has the burden to show that the person lacks impartiality.  *Wainwright*, 469 U.S. at 412.

The United States Supreme Court has refused to hold that the mere existence of a preconceived notion as to the guilt or innocence of an accused is sufficient to rebut the presumption of correctness.  *Irvin*, 366 U.S. at 723.  A juror may have an initial opinion and still serve.  "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."  *Id.*

The High Court has also long cautioned that the trial court's finding on the force of a prospective juror's opinion ought not be set aside by the reviewing court, unless the prejudice is "manifest." *Irvin*, 366 U.S. at 723-24 (quoting *Reynolds v. United States*, 98 U.S. 145, 156 (1878)).

27

Further, "the trial court's resolution of such questions is entitled, even on direct appeal, to 'special deference' . . . The respect paid such findings in a habeas proceeding certainly should be no less." *Patton,* 467 U.S. at 1038 (footnotes and citations omitted).

Even before the enactment of the AEDPA, in judging whether the trial court erred in failing to exclude a juror on the ground of claimed bias, the U.S. Supreme Court explained that demeanor and credibility of the juror during *voir dire* are essential, and so "deference must be paid to the trial judge who sees and hears the juror." *Wainwright v. Witt*, 469 U.S. at 425-26. This is because the trial judge's "predominant function in determining juror bias involves credibility findings whose basis cannot be easily discerned from an appellate record." *Id.* at 429; *see also, Ristaino v. Ross*, 424 U.S. 589, 594-95 (1976) ("the determination of impartiality, in which demeanor plays such an important part, is particularly within the province of the trial judge").

Because juror impartiality is a factual determination, state courts' findings have long been entitled to a presumption of correctness. *Wainwright v. Witt*, 469 U.S. at 428-29. As noted above, in the past, trial judge's finding of impartiality could be overturned only upon a showing of manifest error. *Patton,* 467 U.S. at 1031. Since AEDPA, however, a petitioner's burden to rebut that presumption is even higher. Now he must rebut the presumption by clear and convincing evidence. *Compare* 28 U.S.C. §2254(e)(1) (clear and convincing evidence needed to overcome the presumption) with the pre-AEDPA language of *Patton v. Yount*, 467 U.S. at 1036.

This Court now turns to the testimony of the individuals in the jury pool whom the defense challenged for cause after in-chambers *voir dire* but whom the trial court did not remove.

<u>Hodge's Jury Selection</u>

Petitioner Hodge's trial judge stated that he had 78 potential jurors in the pool and that he, himself, would "ask as many questions as possible." Record No. 32 at 60. After questioning the

28

jury pool as a group, he would reserve three issues for individual *voir dire* in chambers.  He would give a list of witnesses to the individuals who survived the group questioning and ask them about any relatives, friendships, knowledge, etc.  Then he would move on to their attitudes about the death penalty, and, finally, he would ask what they knew of the *Morris* case or Benny Lee Hodge from pre-trial publicity.  Then counsel could question further.

Transcripts of the *voir dire* conducted in chambers reveal that the trial court carried out its plan, being the main questioner, initiating the three types of inquiries, and then turning the inquiry over to the parties.  With regard to the publicity issue, the judge first stated to each potential juror that he was going to take up the topic of "pre-trial publicity," and he then asked each one directly, ". . . whether it be old or recent, have you ever read anything in the newspaper, have you ever read anything in print form, have you heard anything on the radio, seen or heard anything on television about this case we're about to try?"  *See e.g.*, Record No. 35 at 9.

In introducing the topic of each juror's view on capital punishment, the judge began similarly, stating as follows, "The next area I want to talk to you about are some penalty matters."  He then told each juror the four penalties which could be imposed for the murders charged, and concluded his inquiry by asking, "Would you be able to consider all of those ranges if you were a juror?"  *Id*. at 5.

In the end, excluding those excused on motion of the Commonwealth after *voir dire*, 28 prospective jurors were excused for cause either *sua sponte* or at the defense's request.  *Hodge I*, 17 S.W.3d at 836.  The petitioner claims that his motions to have others excused for cause were wrongly denied.  The first of these was Mona Nance.

11.    The Failure Of The Trial Court To Grant Petitioner's Motion To Remove Juror Mona Nance For Cause Because She Had Formed An Opinion Of Guilt Violated Petitioner's Sixth and Fourteenth Amendment Due Process Rights

<u>Guaranteeing A Fair Trial And An Impartial Jury</u>.

The petitioner moved to strike Juror No. 56, Mona Nance, for cause, because she testified that she remembered the crimes, even remembering specifics about the case.  She also testified that she had formed an opinion, stating that "everybody thought they were guilty" at the time.  Additionally, it was her opinion that she should not be chosen as a juror because "I am a bad witness . . . juror."  The defense motion to strike was denied.  D.E. 34 at 25-26.  Nance sat on the jury which convicted and sentenced the instant petitioner.

According to the petitioner, because a criminal defendant is entitled to an impartial jury and this juror was not impartial, his Sixth Amendment rights were violated, the petitioner citing *Irvin v. Dowd*, 366 U.S. at 722.

<div align="center">Response</div>

The respondent stresses that a state court's determination as to whether a juror is impartial is reviewed under the presumption of correctness as a finding of fact, and he cites to well-known Supreme Court precedent, including the above-discussed opinions, including *Patton*, *Wainwright*, and also *Mu'Min v. Virginia*, 500 U.S. 415 (1991).

<div align="center">**Discussion**</div>

The Kentucky Supreme Court wrote with regard to this claim:

Juror No. 56, a widow, stated that "years and years ago" she and her late husband had read some newspaper articles about these murders and that the articles led them to believe that the persons involved were guilty.  However, without any prompting, she added that she was unaware of what evidence was offered at trial and that her opinion might have been different if she had heard the evidence.  She had not read any recent articles about the murders and had not seen any television reports about the case.  She could not recall Appellant's name being mentioned.  She stated that she did not have a present opinion as to Appellant's guilt or innocence and that he was presumed innocent until proven guilty by the evidence.

Although we held in *Marsch v. Commonwealth*, Ky., 743 S.W.2d 830 (1987) that the

<div align="center">30</div>

failure to excuse jurors who had previously expressed opinions was reversible error, we also held in that case that "the formation and expression of [an] earlier opinion may not, standing alone, be sufficient to require disqualification." *Id.* at 833. Juror No. 56 had formed her initial opinion shortly after the murders occurred "years and years ago" as a reaction to newspaper accounts. She recognized the difference between newspaper accounts and trial testimony and expressed her adherence to the presumption of innocence. Juror No. 56 was not rehabilitated by a "magic question," *Montgomery v. Commonwealth, supra,* at 718,[13] but immediately and spontaneously qualified her candid admission of her previously held opinion. As in *Foster v. Commonwealth*, Ky., 827 S.W.2d 670 (1991), *cert. denied*, 506 U.S. 921 . . . (1992), even though this juror had previously expressed an opinion of guilt, the trial judge decided that she had put that opinion aside. "Taken in the full context of [her] answers, the trial judge's decision was not erroneous." *Id.* at 675.

*Hodge I,* 17 S.W.3d at 836. Recognizing that the seating of a biased juror requires reversal of the conviction, this Court has examined Ms. Nance's *voir dire* carefully.

With regard to Nance's opinion, after she stated that she remembered the crimes in the 1980's, she was questioned further and she stated that she remembered , "Just robbery, murder, and money." Record No. 34 at 20. Still later, she responded that "it seemed like some people were killed one place and another in another place . . . . I don't know that much about it, really, you know. I really don't." Record No. 34 at 21-22.

When defense counsel questioned Ms. Nance about her current opinion on the defendants' guilt, this juror responded as follows:

A. Well, I don't know that they are or aren't . . . . I don't even know, why we're having a trial, you know. Does that answer it? So I can't say yes or no.
Q. Okay.
A. What my opinion is. You mean just right now?
Q. Yes.
A. Okay. You know, him having read the charges, okay, well, they're innocent until they prove them guilty, isn't that the way?
Q. Yes.
A. But I was just stating my opinion from years ago now, okay? Because the charges you read, I would have to listen to the evidence.

---

[13] Referenced earlier in *Hodge I*, the full citation is *Montgomery v. Commonwealth*, 819 W.W.2d 713, 716 (1991).

. . .
Q. Have you heard anybody talk about Mr. Hodge, Benny Hodge?
A. No.

*Id.* at 23-24. With regard to considering death among the possible penalties, Ms. Nance responded

in the affirmative, three times, that she would be able to consider all four possible penalties.

The petitioner has not rebutted the presumption of correctness of the trial court's factual

determination that Nance was impartial. 28 U.S.C.A. §2254(e)(1). Nor has he demonstrated that

the Kentucky courts' determination with regard to Nance's impartiality resulted in a decision which

was based on an unreasonable determination of the facts in light of the evidence presented. 28

U.S.C. §2254(d)(2).

Nor was the state's decision contrary to or involve an unreasonable application of clearly

established federal law as determined by the Supreme Court. 28 U.S.C. 2254(d)(1). This Court is

satisfied that the Kentucky courts' conclusions about this juror comport with *Patton*, *Wainwright*,

and also *Lockhart v. McCree*, 476 U.S. 162 (1986), wherein the U.S. Supreme Court wrote as

follows:

> [T]he Constitution presupposes that a jury selected from a fair cross section of the
> community is impartial, regardless of the mix of individual viewpoints actually
> represented on the jury, so long as the jurors can conscientiously and properly carry
> out their sworn duty to apply the law to the facts of the particular case.

*Id.* at 184. The instant petitioner is not entitled to habeas relief on this claim.

12.    The Trial Court's Failure To Strike Jurors That Possessed Views That Would
Substantially Impair His Ability To Consider A Lesser Sentence Violated
Petitioner's Rights As Guaranteed By *Morgan v. Illinois*, 504 U.S. 415 (1992), And
Denied Petitioner His Right To Due Process And A Fair Trial Because Petitioner
Was Forced To Use His Peremptory Challenges To Remove Them From The Jury.

The petitioner next focuses on jurors' attitudes about the death penalty and complains of his

unsuccessful motions to disqualify three additional potential jurors, Betty Thurman, Billy Messer,

32

and Randall Thompson.  He points to specific statements which each made in *voir dire* in support of his claim that their responses showed that their ability to be fair was substantially impaired. Because the trial court did not remove them for cause, the petitioner argues, he was purportedly "forced" to use three of his peremptory challenges to eliminate these jurors.  He claims that the trial court's refusal to strike these jurors violated his rights under due process and *Morgan v. Illinois*.

With regard to Betty Thurman, Juror No. 10, the petitioner claims that she "waffled" on whether she could consider the minimum penalty, stating that she would "consider it . . . maybe." She testified that if it was intentional murder, "I would find it extremely hard to go easy," and that this was something she felt strongly about.  Record No. 34 at 63-64.

Billy Messer, Juror No. 51, purportedly stated that in a case with two intentional murders, he could not consider the minimum 20 year sentence, "I would go higher than that."  Record No. 35 at 67-68.

When asked about his ability to give equal consideration to all four penalties, Randall Thompson, No. 74, responded that he would rather be put to death than sit on death row and he thought it was more humane to be put to death than serve time.  *Id* at 35-53.

It is the petitioner's position that Mr. Messer and Ms. Thurman were substantially impaired in their ability to follow the instructions and  consider the minimum sentence.  He also claims that in his responses Mr. Thompson showed that he was "'substantially impaired' in considering the death penalty as the maximum sentence."

<u>Response</u>

The respondent points to the rejection of these claims on the merits by the Supreme Court of Kentucky, in *Hodge I*, 177 S.W.3d at 836, and emphasizes that, like the petitioner's previous claim, the state court's finding of impartiality requires this Court's  deference.  Moreover, its ruling

is not contrary to nor an unreasonable application of then-existing U.S. Supreme Court precedent.

Additionally, the respondent claims that even if the court's refusal to strike these jurors was erroneous, no federal constitutional error occurred, because these jurors were removed from the jury panel by a peremptory challenge. They did not take part in making the conviction and sentence decisions. In support of this contention, the respondent cites two cases containing the United States Supreme Court's rulings on such challenges, *Ross v. Oklahoma*, 487 U.S. 81 (1988), and *United States v. Martinez-Salazar*, 528 U.S. 304 (2000).

## Discussion

The Supreme Court of Kentucky decided the following about Billy Messer:

Juror No. 51 . . . acknowledged that he would consider the full range of penalties, but balked at the prospect of imposing the minimum sentence of twenty years as punishment for committing two intentional murders. Nevertheless, he stated that he would not automatically exclude consideration of the minimum penalty and would consider the full range of penalties. While a juror is disqualified if he or she cannot consider the minimum penalty, *Grooms v. Commonwealth*, Ky., 756 S.W.2d 131 (1988), excusal for cause is not required merely because the juror favors severe penalties, so long as he or she will consider the full range of penalties. *Bowling v. Commonwealth*, Ky., 873 S.W.2d 175 (1993), *cert. denied*, 513 U.S. 862, . . . (1994).

> Voir dire examination occurs when a prospective juror quite properly has little or no information about the facts of the case and only the most vague idea as to the applicable law. At such a time a juror is often presented with the facts in their harshest light and asked if he could consider imposition of a minimum punishment. Many jurors find it difficult to conceive of minimum punishment when the facts as given suggest only the most severe punishment . . . . A per se disqualification is not required merely because a juror does not instantly embrace every legal concept presented during voir dire examination.

*Mabe v. Commonwealth* Ky. 884 S.W.2d 668, 671 (1994). Juror No. 51 stated that he would follow the law and consider the full range of penalties. That is all that is required on this issue. The trial judge was not required to excuse him for cause.

*Hodge I*, 17 S.W.3d at 837. With regard to Randall Thompson, the Kentucky Supreme Court wrote as follows:

34

> Juror No. 74 stated that if he were the defendant, he would prefer death to life in prison. However, he also stated that he would not automatically vote for the death penalty, but would vote for whatever penalty was justified by the facts of the case. *Compare Morgan v. Illinois*, 504 U.S. 719 . . . (1992). He specifically stated that he would seriously consider the full range of penalties. The trial judge was not required to excuse Juror No. 74 for cause.

*Id.* The Kentucky High Court thus found no error in the decision that Messer or Thompson were not unconstitutionally biased; it did not discuss the impartiality of Betty Thurman, Juror No. 10, separately.

The finding that Messer and Thompson were impartial was not an unreasonable determination in light of the evidence in the entirety of the court record. Mr. Messer responded more than a dozen times, to both the judge and defense counsel, that his consideration of the death penalty would "depend[] on the evidence," and then reiterated that he would consider all four penalties. Record No. 35 at 62-66. Mr. Thompson admitted, "I have questions of my own" about the death penalty. *Id.* at 52. However, when told about the range of penalties and asked "Could you vote for the one that you felt was justifiable? If you felt like the minimum sentence was justified in the case, could you vote for that?" he also answered "Sure" more than once. *Id*. at 45-46.

Juror No. 10, Ms. Thurman, is not individually addressed in the Kentucky Supreme Court's opinion. The state's high court did affirm the trial court's findings on all the jurors challenged herein, without mentioning her. With no appellate discussion regarding her, this Court looks to the next lower court, in this case, the trial court's, reasoned decision on the merits. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991). However, since the AEDPA in 1996, the review will be deferentially, as part of its evaluation as to whether the state court decision was an unreasonable determination of the facts or was contrary to or an unreasonable application of U.S. Supreme Court law. *See Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000), *cert. denied*, 532 U.S. 947 (2001).

Although Ms. Thurman did state that she would lean toward the death penalty early on, when she was later questioned by the defense, she responded, "I don't know whether I would lean toward it. I can certainly consider it. It would not be out of the realm that I could consider it. Lean toward it, I would have to hear more than just intentional murder." Record No. 34 at 55. Still later, she stated that she would consider all of the penalties.

In sum, the trial court found that these three jurors were impartial and this finding is not an unreasonable determination of fact in light of the record before it. These challenged jurors had answered that they would listen to the evidence and would decide the matter based upon the evidence presented to them rather than adhering to any earlier opinion or bias. That is all that *Morgan* and other Supreme Court law require. *Morgan*, 504 U.S. at 738; *Wainwright*, 469 U.S. at 426. The Kentucky Supreme Court correctly identified relevant U.S. Supreme Court law and reasonably applied it.

The petitioner's complaint that his constitutional rights were violated because he was forced to use peremptories to remove these three undesirable jurors is meritless. The U. S. Supreme Court has held that peremptory challenges, while important, are not a constitutional right. *See Lewis v. United States*, 146 U.S. 370, 376 (1892). It was in *Ross v. Oklahoma*, 487 U.S. at 83-85, that the Supreme Court of the United States first addressed the exact issue of whether the trial court's error in refusing to exclude a potential juror for cause required reversal because the defendant had to exercise a peremptory challenge to exclude the juror. The defendant had argued that if the trial court had properly excluded the juror, the resulting jury panel may have been different. *Id.* at 87. The High Court held that such a possibility did not mandate reversal. "[P]eremptory challenges are not of constitutional dimension. They are a means to achieve an impartial jury. So long as the jury that sits is impartial, the fact that the defendant has to use a peremptory challenge to achieve that result

36

does not mean the Sixth Amendment was violated." *Id.* at 88.

More recently, months prior to the Kentucky Supreme Court's decision in *Hodge I*, the U.S. Supreme Court held that when a defendant objects to a trial court's denial of his for-cause challenge, the defendant may choose to either remove the challenged juror peremptorily and forgo a later Sixth Amendment challenge or allow the juror to sit, preserving the Sixth Amendment claim for appeal. *United States v. Martinez-Salazar*, 528 U.S. at 310.   "[A] defendant's exercise of peremptory challenges . . . is not denied or impaired when the defendant chooses to use a peremptory challenge to remove a juror who should have been excused for cause." *Id.* " When a potential juror should have been excused for cause but is not, the defendant has not been deprived "of any rule-based or constitutional right [if he] elects to cure [the] error by exercising a peremptory challenge, and is subsequently convicted by a jury on which no biased juror sat." *Id.  Martinez-Salazar* is relied upon in another case arising from this Court, *Baze v. Parker*, 371 F.3d 310, 326-27 (6th Cir. 2004), *cert. denied*, 125 S.Ct. 1670 (2005).

The Kentucky courts' decisions about Jurors 10, 51, and 74 are not unreasonable determinations in light of the evidence in the state court record; nor are they contrary to or involve any unreasonable application of clearly established U.S. Supreme Court law of the  time, including *Morgan*, *Ross*, and *Martinez-Salazar*.   Therefore, this clam cannot form the basis for habeas relief.

13.   The Failure Of The Trial Court To Grant Motions To Strike For Cause Potential Jurors Debra Taylor, Doris Robinson, And Mary Taylor Denied Petitioner His Right To Due Process Because Petitioner Had To Remove These Jurors With Peremptory Challenges.

When the trial judge refused to excuse these three additional jurors based upon pre-trial publicity, the petitioner had to use three more peremptory challenges to have them stricken.

The petitioner first complains that Debra Taylor, Juror No 5, stated that the name "Benny

Hodge" was familiar to her, and she recalled reading about the case; she even recalled something about a trial. Record No. 34 at 27-45.

Doris Robinson, Juror No. 63, responded that she had read about the crimes when they happened and she remembered that the victims' home was entered and they were killed. She also recalled the names of Epperson and Hodge but stated that she did not know if they were guilty. Record No. 35 at 16-33.

Mary Taylor, No. 73, recalled having seen the petitioner's name and having heard other people talking about the case as "a bad case." Additionally, she stated that in the early 1980's, neighbors of hers who were also good friends were murdered by intruders. The unsuccessful defense motion to remove her for cause was based on both pre-trial publicity and her personal experience with friends being murdered. *Id.* at 2-15.

Again, the petitioner claims that the trial court's actions in refusing to excuse these three people for cause violated his due process rights.

<u>Response</u>

Again the respondent repeats his position, *i.e.*, that the Kentucky Supreme correctly disposed of this issue and that the removal of these jurors by peremptory challenges does not state a federal claim. He incorporates his preceding argument by reference.

**<u>Discussion</u>**

The Kentucky Supreme Court first noted that Doris Robinson, No. 63, had recognized certain names and admitted to hearing about the case, but then also noted that she had not formed an opinion as to Defendant Hodge's guilt or innocence. Similarly, it wrote as follows about No. 73, Mary Taylor:

. . . Juror No. 73 also recognized Appellant's name. She did not know any of the

38

details of the case, but had heard it was a "bad case."  Two of her neighbors had been
murdered fifteen years prior to this trial.  She did not have an opinion as to the
Appellant's guilt or innocence and stated that the murders of her neighbors would
not affect her decision in this case.

*Hodge I,* 17 S.W.3d at 838.  The Kentucky court concluded, "The mere fact that Jurors Nos. 63 . .

. and 73 possessed some prior knowledge of the case did not warrant their excusal for cause."  *Id.*

Additionally, the fact that Juror No. 73's[14] neighbors were murdered did not warrant her excusal.

*Id.*

Juror No. 5, Debra Taylor, was not individually discussed in the appellate opinion.  As it did

with Juror No. 10 in the immediately preceding claim, this Court looks to the trial court's decision

about her impartiality as it were implicitly affirmed when the state supreme court concluded that no

jury error occurred.  Ms.  Taylor's responses show that she did not remember specifics from the

preceding decade, and she swore not to have formed an opinion about Hodge's guilt or to know the

outcome of the trial.  Moreover, twice she stated that she had no opinion as to Mr. Hodge's guilt,

and she promised that she would base her decisions as a juror on what was presented  in the

courtroom and not on past information.  Record No. 34 at 41-44.

The Kentucky High Court concluded as follows:

"The fact that a prospective juror may have some knowledge of a case does not
establish objective bias."  *Foley v. Commonwealth*, Ky., 953 S.W.2d 924, 932
(1997), *cert. denied*, 523 U.S. 1053, 118 S.Ct. 1375, 140 L.Ed.2d 522 (1998); *see
also Jacobs v Commonwealth*, Ky., 870 S.W.2d 412 (1994).

There is no per se rule that mere exposure to media reports about a
case merits exclusion of a juror.  To the contrary, in order to merit
disqualification of a juror, the media reports must engender a
predisposition or bias that cannot be put aside, requiring the juror to

---

[14]  Mary Taylor also revealed that she noticed Hodge's name was because Hodge is her maiden name.
Additionally, she stated that she had read nothing beyond "scanning" the headlines because "I don't like to read stuff
like that."  *Id*. at 12.

> decide a case one way or the other . . . .  There is no constitutional prohibition against jurors simply knowing the parties involved or having knowledge of the case.
>
> The Constitution does not require ignorant or uninformed jurors; it requires impartial jurors.  While it may be sound trial strategy for an attorney to exclude anyone with knowledge of the facts or the parties, such a result is not mandated by the Constitution.

> *McQueen v. Scroggy*, 99 F.3d 1302, 1319-20 (6th Cir. 1996), *cert. denied sub nom.*, *McQueen v. Parker*, 520 U.S. 1257 . . . . (1997).  The mere fact that Jurors Nos. 63, 72 and 73 possessed some prior knowledge of the case did not warrant their excusal for cause. . . . The fact[] that . . . Juror # 73's neighbors had been murdered did not warrant excusal. . . .  *Stoker v commonwealth*, Ky.,  828 S.W.2d 619 (1992). . . .

*Hodge I,* 17 S.W.3d at 838 (additional citations to Kentucky decisions omitted).

Again, this Court adheres to the U.S. Supreme Court's ruling that because these jurors were struck by the defense, the use of peremptory challenges to remove these three jurors was the choice of the defense and no constitutional violation occurred.  *Martinez v.  Salazar*, 528 U.S. at 310.

Even if these potential jurors' testimonies are viewed individually, however, they fail to warrant habeas relief.  As far back as *Irvin v. Dowd*, the United States Supreme Court held that the Constitution did not require that "jurors be totally ignorant of the facts and issues involved. . . .  It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." 366 U.S. at 1642-43.  The Kentucky state courts' decisions about these jurors' impartiality are not unreasonable determinations in light of the record; nor are they contrary to or an unreasonable application of established federal law, *i.e.*, *Irvin v. Dowd*, *Morgan v. Illinois*, 504 U.S. at 719, and *Ross v. Oklahoma*, 487 U.S. at 83-85.

14.   The Trial Court's Failure To Allow Petitioner's Counsel To Ask Certain Questions On Voir Dire Violated Petitioner's Rights To Due Process And Interfered With His Right To Reliable Sentencing.

The petitioner complains that his list of *voir dire* questions was rejected pre-trial and that at

40

trial, his attempts to ask certain questions in *voir dire* were thwarted.  He tried (1) to question jurors about potential motives or biases inherent in the testimony of a co-defendant, in preparation for Bartley's testimony, and (2) to ask what types of cases would justify the death penalty, so as to obtain personal beliefs about the death penalty opinions, in order to best use his peremptory challenges.  The trial court purportedly erred in choosing to use its own questions for *voir dire* and sustaining the Commonwealth's objections to these two lines of questioning during *voir dire*.

<u>Response</u>

The respondent's position is that the Kentucky courts allowed Hodge's counsel sufficient *voir dire* questioning to satisfy then-existing Supreme Court law, the respondent citing *Mu'Min v. Virginia*, 500 U.S. at 415 and *Morgan v. Illinois*, 504 U.S. at 719.

**Discussion**

As was stated by the U. S. Supreme Court in *Mu'Min v. Virginia,* 500 U.S. at 431, *voir dire* "serves the dual purposes of enabling the court to select an impartial jury and assisting counsel in exercising peremptory challenges.").  *See also Rosales-Lopez v. United States*, *supra*, 451 U.S. at 188 ("*Voir dire* plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored.").

The Kentucky Supreme Court began its discussion of the limitations which the trial court imposed on *voir dire*, as follows:

> During group voir dire, defense counsel advised that one witness for the Commonwealth (Bartley) had originally been indicted and charged as a co-defendant, then begain asking jurors individually whether they would be inclined to think that this witness would "possibly get a benefit for his testimony."  The trial judge sustained an objection to this line of questioning and advised the jurors that in weighing the evidence they should take into account the motive of a witness for testifying.  In *Ward v. Commonwealth*, *supra*, we noted that the trial judge has broad discretion in the area of questioning on voir dire and held that the judge did not abuse his discretion in limiting a similar line of questioning in that case.

*Hodge I*, 17 S.W.3d at 839.  As to the remainder of this challenge to the trial court's *voir dire*

rulings, the state appellate court wrote,

> The trial judge also sustained an objection to defense counsel's questioning of the jurors as to what kinds of cases they believed would be appropriate for a death sentence.  In *Tamme v. Commonwealth*, *supra*, at 25, we upheld the trial judge's limitation of a similar line of questions.  "[Q]uestions are not competent when their evident purpose is to have jurors indicate in advance or commit themselves to certain ideas and views upon final submission of the case to them."  *Ward v. Commonwealth*, *supra*, at 407.

> Finally, Appellant tendered a motion containing fifty-seven questions regarding the death penalty and pre-trial publicity to be asked of each potential juror during individual voir dire.  The trial judge declined.  However, except as discussed above, defense counsel was not limited in his own questioning of prospective jurors on issues related to the death penalty and pre-trial publicity.  The trial judge did not abuse his discretion in refusing to ask each juror each of the fifty-seven questions tendered by Appellant.

*Id.,* 17 S.W.3d at 839.

This Court agrees with the respondent on this claim.  The petitioner cites to no authority for

an entitlement to pursue the two lines of questioning as he wished.  The record of his trial shows that

in the *voir dire* held in chambers, the defense had a sufficient opportunity to examine each of the

jurors, to satisfy the aforediscussed Supreme Court precedent.  This Court finds that the Kentucky

courts' decisions on these limitations are not unreasonable applications of, nor contrary to, then-

existing federal law as determined by the Supreme Court of the United States in the aforecited

authority.  Accordingly, this issue shall not serve as a basis for granting habeas relief to Petitioner

Hodge.

16.   Petitioner Was Denied His Right To A Trial By An Impartial And Randomly Selected Jury When An Excused Juror Deliberated And Participated In The Verdicts Against Him.

The Kentucky Supreme Court noted that after the conclusion of *voir dire* and excusals for

cause, thirty-five potential jurors remained.  When the parties then exercised their peremptory challenges, 15 jurors remained.  The court and both parties agreed to seat all 15.  Twelve would ultimately make the decisions at trial, but by seating three additional jurors, the court could provide for continuation of the proceedings should illness or other happenstance eliminate any jurors prior to their deliberations.  Record No. 36 at 9-5.  Days later, after the close of the evidence, the reading of instructions, and final arguments, all 15 jurors remained.

To reduce this number to 12, selected randomly, the trial court instructed the Clerk to put the numbers of all 15 jurors in a box, shake it up, and draw 3 numbers to be excused.  Record No. 39 at 77.  The Clerk did so, calling out numbers 70, 33, and 42.  Three jurors stood and were excused from further responsibilities, thus putting the deliberations into the hands of the jurors numbered 37, 85, 121, 24, 12, 23, 90, 53, 19, 56, 15, and 3 for deliberations.

After the jury of 12 completed their deliberations and announced the verdicts at the conclusion of the guilt phase of the trial, the defense called for a poll of the jurors.  As each juror number was called, the juror was to answer "yes" if that was indeed his or her verdict or "no" if not.  Record No. 39 at 93-95.  Eleven of the jurors, those numbered 37, 85, 121, 24, 12, 23, 90, 53, 19, 56, and 15, responded in the affirmative.  When Juror Number 3 was called, however, no one responded.

When the Clerk called out "3" and then again "3" without getting a response, the judge inquired, "Juror No. 3.  Is there a 3?"  One juror then spoke up, stating that he was No. 33, not No. 3.  The court and the parties thus discovered that Juror 33, who was supposed to have been excused, had ended up serving on the jury; and that Juror 3, who was supposed to be serving on the jury, had left excused.  *Id*. at 96 - 97.

On the defense's motion for a mistrial based on Juror Number 33's serving on the jury panel

rather than Juror Number 3, the trial court found that the parties had not raised the discrepancy at the time the 15 jurors were culled to 12; characterized it as a clerical error; and ruled that if there was error, it was harmless, as all jurors had been duly qualified and there was no prejudice to the defendant. *Id*. at 97 - 98.

The petitioner now claims that the finding of guilt by a jury so composed violates Hodge's Fifth, Sixth, and Fourteenth Amendment rights.

<u>Response</u>

The respondent explains that there is no such thing as an alternate juror under Kentucky's criminal rules. Excess jurors are qualified and hear the evidence, and the number who are left when it is time for deliberations is to be reduced to 12 by a random draw. Pointing out that Jurors 3 and 33 had mistakenly traded places with one another but each one had been as qualified as the other and had heard all the evidence, the respondent claims that the error is only a technical one.

Moreover, the respondent maintains, any error was essentially an error of state law, which is not reviewable in a habeas proceeding; and the Kentucky Supreme Court's determination that the jury remained impartial is a finding of fact to which this Court is to defer, the respondent again citing to *Patton v. Yount*, 467 U.S. at 1036-1038 and quoting from *McQueen v. Scroggy*, 99 F.3d 1302, 1326-28 (6th Cir. 1996), *cert. denied*, 520 U.S. 1257 (1997), *overruled on other grounds*, *In re. Abdur'Rahman*, 392 F.3d 174 (6th Cir. 2004). And any rule to the contrary, he also argues, would be barred by *Teague*.

**Discussion**

On Hodge's direct appeal, the Supreme Court of Kentucky recounted the facts as to the mistake which occurred and then discussed the defense's claim as follows:

Appellant asserts he is entitled to a new trial because this unexpected turn of events

44

constituted a substantial deviation from jury selection procedures and denied him his right to a randomly selected jury. The procedure used to excuse the alternate jurors was in accordance with CR 47.02.[15] The problem was not the procedure, but the fact that two jurors apparently misunderstood the clerk with the result that the wrong juror was excused. We agree that preservation of randomness is a central principle in the jury selection process. However, "[r]andomness means that, at no time in the jury selection process will anyone involved in the action be able to know in advance, or manipulate, the list of names who will eventually compose the . . . jury." *Williams v. Commonwealth*, Ky.App., 734 S.W.2d 810, 812-13 (1987). Appellant does not suggest that this irregularity occurred because of any premeditation or manipulation of the jury selection process.

Nor does Appellant assert that he was prejudiced by the fact that Juror No. 33 deliberated his guilt or innocence instead of Juror No. 3. Appellant did not move during voir dire to strike either of these jurors for cause and does not claim on appeal that Juror No. 33 was unqualified to serve on his case. The purpose in seating alternate jurors in a lengthy trial is to protect against the unexpected and thereby ensure that at least twelve qualified jurors will still be available to deliberate a verdict at the conclusion of the trial. . . .[16] The result here is the same as if Juror No. 3 had become ill during the trial or had simply failed to show up on the last day. He would have been *declared* an alternate juror, two additional jurors would have been randomly excused, and the trial would have proceeded, as it did, with twelve qualified jurors. "[A defendant] does not have a constitutional right to have a particular person sit as a juror. He merely has the right to have a particular class of persons on the jury and the right to exclude certain individuals." *McQueen v. Scroggy*, *supra*, at 1327. This inadvertent error in the proceedings, though bizarre, was harmless.

*Hodge I*, 17 S.W.3d at 840-41 (citing *McQueen v. Scroggy*, 99 F.3d at 1327).

That one juror was as qualified as another and that the jury selection process was not tainted are reasonable factual determinations in light of the record of the state proceedings. As to the then-existing federal law, the *McQueen* opinion cited by the state court contains abundant citation to statements regarding juror impartiality from U.S. Supreme Court precedent, including *Irvin*, *Patton*, and *Ross*. The Kentucky Supreme Court's decision about this claim in Hodge's case was neither

---

[15] The appellate court here foot-noted that Hodge did not complain that three alternate jurors were seated rather than two.

[16] Citations to state law omitted.

contrary to or an unreasonable application of the U.S. Supreme Court's law.  Accordingly, habeas relief on this claim is denied.

## EVIDENTIARY ISSUES

The U.S. Supreme Court said many years ago, "The Fourteenth Amendment leaves [the states] free to adopt [their own] rules of relevance." *Lisenba v. California*, 314 U.S. 219, 227-28 (1941).  This constitutes broad authority for states to promulgate rules that exclude evidence, so long as they are not arbitrary or disproportionate to the purposes they are designed to serve.  *United States v. Scheffer*, 523 U.S. 303, 308 (1998).  Therefore, habeas review does not encompass state court rulings on the admission of evidence unless there is a constitutional violation.  *Estelle v. McGuire*, 502 U.S. at 62 (a federal court may not grant habeas corpus relief simply on the basis that a trial court incorrectly interpreted state evidence rules to allow admission of prior bad acts evidence).

Generally, to rise to the level of a constitutional violation, the state court evidentiary ruling complained of must be so prejudicial that it renders a fair trial impossible (*Lisenba*, 314 U.S. at 228-29); restated, the standard is that the evidentiary ruling was so egregious as to be a denial of fundamental fairness.  *Estelle*, 502 U.S. at 67; *see also Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). This is a high standard.  *See e.g., Baze v. Parker*, 371 F.3d at 318.  And it is one which, in the Court's opinion, the instant petitioner did not meet.  The Court now addresses the individual evidentiary claims in the order in which they were presented by Petitioner Hodge.

1.    The Admission of Donald Bartley's Previous Testimony Violated The Confrontation Clause of the Sixth Amendment.

At Hodge's 1987 trial, Donald Bartley testified under oath and was cross-examined by both Hodge's counsel and counsel for Roger Epperson.  When he was to be called as a witness at the petitioner's 1996 re-trial, Bartley appeared with counsel at an October 11, 1996 pre-trial conference

and refused to testify, claiming his Fifth Amendment right not to be compelled to incriminate himself.  Record No. 32 at 35-36.  His attorney explained that Bartley had an RCr 11.42 motion pending in Letcher County for relief from his sentence for the *Acker* crimes, and that motion was scheduled for a hearing soon.

Therefore, Bartley's counsel urged the court to permit the reading of his prior 1987 testimony.  Hodge, however, argued then and argues to this Court now that the pending RCr 11.42 motion cannot not serve as a basis for invoking the privilege since Bartley had pled guilty to the charges; and that the inability of Hodge's defense to cross-examine Bartley at the re-trial violates the Confrontation Clause.

When the trial court asked Bartley directly if he would continue to refuse to testify if the Court determined that he had no valid claim under the Fifth Amendment, Bartley indicated that he would.  The trial judge found that Bartley had refused his order to testify and his refusal rendered him unavailable; further, the judge reasoned that Hodge had ample opportunity to cross-examine Bartley in the previous trial and the issues were the same.  Therefore, the court allowed the Commonwealth to read to the jury a redacted version of his 1987 testimony.

The petitioner contends that Bartley's situation did not satisfy any of the requirements for use of a deposition under Kentucky's RCr 7.20(1).  Hodge insists that Bartley was available under Kentucky law; he lied at the first trial; and by permitting his first testimony to be read at the petitioner's re-trial, Hodge was denied an opportunity to cross-examine him on his later lies and the jury could not hear about the consideration which he received for testifying for the Commonwealth against Hodge.  Additionally, Bartley's psychiatric records were denied the defense, further hindering an effective cross-examination.  The petitioner argues that, because there was no physical evidence tying Hodge to the murders, the testimonies of Donald Bartley and Sherry Hodge Hamilton

47

were crucial to the convictions and so the ruling that Bartley was unavailable constituted reversible error, the petitioner having been denied his rights under the Sixth Amendment's Confrontation Clause.

<u>Response</u>

The respondent warden points out that the Kentucky courts' findings of fact about Bartley are binding on this Court under the presumption of correctness. "[I]n any event, this Court would be required to defer to the Kentucky Supreme Court's interpretation on matters of State law." Record No. 22 at 48. Also, the respondent refers the Court to *Gregory v. Shelby County, Tenn*., 220 F.3d 433, 448-49 (6th Cir. 2000), wherein the Sixth Circuit upheld a similar finding of unavailability when another prisoner serving a life sentence refused to testify, the appellate court explaining that any threat of sanctions would have been pointless.

The respondent specifically disagrees that Hodge was not allowed to present sufficient evidence to the jury on the matters of Bartley's credibility and his deal with the Commonwealth, the respondent citing the Kentucky Supreme Court's opinion on direct appeal, *Hodge I*, 17 S.W.3d at 842-43. He insists that the Kentucky court's resolution of this issue meets none of the conditions warranting habeas relief under 28 U.S.C. §2254(d) (1) and (2).

**Discussion**

On Hodge's direct appeal, the Kentucky Supreme Court noted that it did not have enough information to decide Bartley's true unavailability under state law.[17] The appellate court also noted

_____

[17]   In a footnote in the opinion affirming Hodge's conviction for the Morrises' killings, the Kentucky Supreme Court wrote as follows as to Bartley's ability to invoke the Fifth Amendment privilege at Hodge's re-trial:

> The record is unclear whether there was also pending a petition to vacate his guilty pleas with respect to his involvement in the offenses committed against the Morrises. If not, then he was not entitled to invoke the privilege. *Shelton v. Commonwealth*, Ky., 471 S.W.2d 716 (1971). But if . . . an RCr 11.42 motion with respect to his guilty pleas in the Morris case was pending at the time of

that at the time of the first trial Bartley had been cross-examined by counsel for Epperson and

counsel for Hodge, and that when called as a witness for Hodge's re-trial, Bartley was declared

unavailable only after he persisted in his refusal to testify, despite the trial court's orders that he

could not claim the self-incrimination privilege.  The highest court in Kentucky wrote further:

> The trial judge's ruling was in accord with KRE [Kentucky Rule of Evidence] 804(a)(2) and KRE 804(b)(1), which specifically permit the prior testimony of a witness to be read in a subsequent trial if the witness persists in refusing to testify despite an order of the court to do so.  However, the offenses for which Appellant was being tried were committed prior to July 1, 1992, the effective date of the Kentucky Rules of Evidence, so the issue becomes whether Bartley's prior testimony would have been admissible under pre-existing law. . . .

*Hodge I*, 17 S.W.3d at 842.  The Court then examined an earlier state statute, KRS 422.150, which

had  provided that the testimony of a witness may be used as evidence in a subsequent re-trial, "but

no testimony so taken shall be used in any criminal case without the consent of the defendant."  As

to this state evidence law, the Kentucky court wrote as follows:

> . . . Although no pre-1992 Kentucky case addressed whether prior testimony could be used when a witness persistently refuses to obey a court order to testify, we specifically adopted in *Crawley v. Commonwealth*, Ky., 568 S.W.2d 927, 931 (1978), *cert. denied*, 439 U.S. 1119, 99 S.Ct. 1028, 59 L.Ed.2d 79 (1979) the definition of unavailability contained in Rule 804(a) of the Federal Rules of Evidence. FRE 804(a)(2) was then and is now identical to KRE 804(a)(2) in declaring a witness unavailable who "persists in refusing to testify concerning the subject matter of the declarant's statement despite an order of the court to do so." Since Bartley's prior testimony would have been admissible under pre-1992 law,

---

Hodge's 1996 re-trial, and if that motion was subsequently granted, Bartley could have been tried for his involvement in this case; and any testimony given by him in the Hodge trial could have been used against him at his own subsequent trial. It has been held that the possibility of further incrimination under those circumstances is not so remote as to deprive the witness of the right to assert the privilege. *Ottomano v. United States,* 468 F.2d 269, 273-74 (1st Cir.1972), *cert. denied,* 409 U.S. 1128, 93 S.Ct. 948, 35 L.Ed.2d 260 (1973); *see also People v. Edgeston,* 157 Ill.2d 201, 191 Ill.Dec. 84, 623 N.E.2d 329 (1993), *cert. denied,* 512 U.S. 1246, 114 S.Ct. 2766, 129 L.Ed.2d 879 (1994); *cf. State v. Marks,* 194 Wis.2d 79, 533 N.W.2d 730 (1995).

*Hodge I*, 17 S.W.3d 842, fn 2.

there was no error in admitting it at Appellant's 1996 trial.

*Id.  See* Robert G. Lawson, *The Kentucky Evidence Law Handbook*, §8.45, at 430-431 (3rd ed. Michie 1993); *Crawley*, 568 S.W.2d at 931.  Since the matter of Bartley's unavailability was decided under Kentucky law, to that extent, it is shielded from this Court's review.

With regard to the petitioner's Constitutional claim, the Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. Const. Amend. VI.  In U.S. Supreme Court jurisprudence, it has long been held that the Confrontation Clause provides two protections to criminal defendants:  the right to physically face the witnesses and the right to cross-examine witnesses.  *See Pennsylvania v. Ritchie*, 48 U.S. 39, 51 (1987); *see also Davis v. Alaska*, 45 U.S. 308, 315 (1974); *California v. Green*, 399 U.S. 149 157-58 (1970).  The Court has emphasized, however, that the Confrontation Clause guarantees the accused only an "opportunity" for effective cross-examination, not necessarily in the manner which the defense may wish.  *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985).

There is "an exception to the confrontation requirement where a witness is unavailable and has given testimony at previous judicial proceedings against the same defendant which was subject to cross-examination by that defendant."  *Barber v. Page*, 390 U.S. 719, 722 (1968).  Generally, to decide the "unavailability" of the witness, the courts have followed the procedure of the Supreme Court in *Barber*, examining the nature of his or her unavailabilitiy and whether "the prosecutorial authorities have made a good-faith effort to obtain [her/his] presence at trial."  *Id.* at 724-25.  Then comes the second prong, an evaluation of the desired testimony, as to whether it has sufficient indicia of reliability to be put into evidence.  *Ohio v. Roberts*, 448 U.S. 56, 66 (1980).

Hodge's prosecutor clearly carried his burden of making a good faith effort to obtain the witness's presence at trial.  When the witness then refused to testify on Fifth Amendment grounds,

the trial court examined the nature and validity of his refusal.  Finally, the court looked to Bartley's earlier testimony, which (1) was given under oath, (2) included cross-examination by the petitioner's attorney of that time, and (3) could be redacted to prevent certain undesirable information from being heard.  That it was reliable was not an unreasonable determination.

Regardless of the admissibility of Bartley's prior testimony under Kentucky law, this Court finds that the Kentucky courts' decision to use Bartley's previous, redacted, testimony at Hodge's re-trial is not contrary to nor an unreasonable application of any U.S. Supreme Court precedent.

2.   The Trial Court Improperly Refused To Allow Petitioner To Introduce Donald Bartley's RCr 11.42 Motion for Impeachment Purposes.

The petitioner's next claim with regard to the reading of Bartley's 1987 testimony is that the trial court wrongly denied the defense request to impeach Bartley with his pending 11.42 motion. In the document, Bartley swore that he was promised early release in exchange for his testimony but the prosecutor did not keep his promise.  This would contradict Bartley's 1987 trial testimony that there was no deal with the prosecutor.   Because the old testimony was read without defense counsel's being able to impeach Bartley on this later inconsistent statement, the petitioner argues, his rights to due process under the Fifth and Fourteenth Amendments were violated and he is entitled to a new trial.

Response

The respondent describes the Kentucky Supreme Court's scrutiny of this issue, reminds the Court that the state court's findings must be presumed correct, and maintains that its rejection of this claim was not contrary to nor a clearly unreasonable application of U.S. Supreme Court precedent.

The respondent summarizes the issues admitted by Bartley in the cross-examination as it was read aloud, and he points out that, although the defense at the re-trial was deprived of being able to

51

impeach him with contradictory statements made in the intervening years, Hodge also benefitted

from the intervening years.  He was able to present the videotaped deposition of Tammy Gentry who

further attacked Bartley's credibility, recounted his admission to her of his culpability in the crimes,

and gave evidence that Bartley did make a deal with the prosecutor for testifying on behalf of the

Commonwealth.

### Discussion

The Kentucky Supreme Court noted that during the direct examination of Bartley at the 1987

trial, he answered "No sir," twice when asked if he knew of or was offered any deal in exchange for

his testimony in Hodge's trial; and during cross-examination, the following occurred between the

witness and defense counsel:

> Q. Mr. Bartley, you testified that there was no deal offered to you in this case is that
> correct?
> A. I testified Mr. Craft offered me no deal.
> Q. Well, isn't it true that someone has offered you a deal on behalf of the
> Commonwealth?
> A. I talked with Ronnie Gay and an Assistant Commonwealth Attorney from Jackson
> County and they said that they would try to have it run concurrently with the *Acker*
> case.

*Hodge I,* 17 S.W.3d at 842-43.  The Kentucky Supreme Court then noted that after Epperson's

attorney objected to any reference to the *Acker* case, Hodge's attorney had actually questioned

Bartley "at length" regarding other deals he had made with the Commonwealth with respect to

charges brought in other cases.  *Id.*

Next, Kentucky's highest appellate court examined how Bartley's prior testimony was

handled when it was read to the jury at the re-trial and the court also examined his 11.42 documents

themselves:

> . . . At the 1996 trial, Bartley's prior testimony was redacted to substitute the words
> "another case" for "the *Acker* case," so that the petitioner was able to impeach

52

Bartley's "no deal" testimony without being prejudiced by mention of the Letcher
County case.

[Hodge] then sought to introduce a copy of a verified RCr 11.42 petition filed by
Bartley on October 9, 1996 in the Letcher Circuit Court with respect to the *Acker*
case, the petition containing the following language:

> That the Commonwealth Attorney refused to honor his plea
> agreement to wit: a sentence of 200 years, all other charges were to
> run concurrent with the 200 years making a total of 200 years. The
> Commonwealth specifically stated that Mr. Bartley would receive
> parole after serving 8 years in the Kentucky State Penitentiary.

An unverified memorandum filed in support of the petition refers to Bartley's
agreement to cooperate with the Commonwealth on charges brought in *Clay County*
against Appellant and Epperson, but makes no mention of these Jackson County
charges which were tried in Laurel County. To reiterate, the verified petition makes
no reference to any charges except those in Letcher County, and the unverified
memorandum discusses a deal only with respect to charges brought in Clay County.
Appellant claims the reference to Clay County was an error and that the deal actually
pertained to these charges which originated in Jackson County. Perhaps; but (1) there
is nothing in the record to prove that assertion, and (2) the memorandum is
unverified and does not even contain Bartley's signature.

*Id.* at 843 (emphasis of the Kentucky Supreme Court).  The court concluded, "The trial judge did

not abuse his discretion in overruling the motion to introduce these documents to further impeach

Bartley's 'no deal' testimony."   *Id.*   This is a state law ruling, to which this Court defers.

With regard to federal law, the petitioner points to, and this Court finds, no authority in U.S.

Supreme Court jurisprudence to which the Kentucky courts' resolution of this issue is contrary, nor

a Supreme Court case which the Kentucky courts unreasonably applied.  The petitioner's counsel

had ample opportunity to attack Bartley at the first trial, and the second jury heard the impeachment

when his cross-examination was read aloud.  Additionally, at the second trial, defense counsel was

able to throw negative light on Bartley in the cross-examination of Sherry Hamilton; the direct

testimony of Tammy Gentry; and the introduction of Bartley's convictions obtained in the interim.

The petitioner has not shown that he was deprived of his confrontation rights because the trial court

53

denied him yet another opportunity to attack Bartley, with two documents about other crimes.

> 3.      The Admission of Sherry's Testimony Regarding Co-Defendant, Donald Terry Bartley's Statement That The TV Story About the Morris' Death Was Referring To What "We [Bartley And Hodge] Did" Violated Petitioner's Right To Due Process And To Confrontation As Announced In *Bruton v. U.S.*, 391 U.S. 123 (1968).

Thus citing to *Bruton* and alleging violations of the Fifth, Sixth, and Fourteenth Amendments, Petitioner Hodge claims that he originally had no notice that the Commonwealth intended to introduce any statement which the petitioner or Bartley made to Hodge's ex-wife, Sherry Hamilton.  Although he got tardy notice that she would testify to a statement made by him, he got no notice that she would testify as to what Bartley stated as they watched television.  This was allegedly a discovery violation which prevented him from filing a motion to exclude such testimony.

Moreover, Hodge complains that the statement violated the Confrontation Clause because the defense could not cross-examine Bartley, and he contends that Bartley's confession is hearsay, subject to well known problems such as inaccuracy and improper motives of the utterance.  Yet Sherry (Hodge) Hamilton's testimony about Bartley's confession was permitted.

<p align="center">Response</p>

The respondent refers this Court to the Kentucky Supreme Court's characterization of Bartley's statements as adoptive admissions.  *Inter alia*, the response contains the following argument:

> . . .    The Sixth Circuit has ruled that adoptive admissions do not violate the Confrontation Clause . . . United States v. Jinadu, 98 F.3d 239, 244-247 (6th Cir. 1996).  The United States Supreme Court has not ruled to the contrary.  Therefore, the Kentucky Supreme Court's ruling was not contrary to nor a clearly unreasonable application of then-existing United States Supreme Court precedent.

Record No. 22 at 52.  Further, since Sherry's testimony included an even more incriminating statement by Hodge, the admission of Bartley's statement would be harmless error.

<p align="center">54</p>

As to the discovery claim, the respondent claims that the matter is procedurally defaulted, as it was not raised on direct appeal.  Additionally, under *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977), there is no federal constitutional right to pre-trial discovery; and this claim is barred under the non-retroactivity doctrine of *Teague v. Lane*, 489 U.S. at 288.

## Discussion

The Supreme Court of Kentucky quoted Sherry Hamilton's testimony about watching television news of the crimes with Hodge and Bartley, as follows:

> And Donnie Bartley was jumping around saying, "[t]hat's what we did, man, that's, that's, they're talking about us. They're talking about us." And Benny Hodge told Donnie Bartley to go outside. He said, "[g]o outside for awhile, man." So, he went outside and I asked Benny what he was talking about. He said, "[t]hat's what we did last night."

*Hodge I*, 17 W.W.3d at 846-47.  The Court then addressed the merits of this purported *Bruton* claim:

> Appellant characterizes this testimony as a *Bruton* violation . . . because Bartley did not testify in person at the 1996 trial and was not subject to cross-examination with respect to this out-of-court statement. We disagree. Bartley's statement was properly admitted as an adoptive admission both under KRE 801A(b)(2) and under pre-1992 evidence law. [citations to pre-1992 Kentucky Supreme Court opinions omitted]
>
> > When accusatory or incriminating statements are made in the presence and hearing and with the understanding of the accused person and concerning a matter within his knowledge, under such circumstances as would seem to call for his denial and none is made, those statements, and the fact that they were not contradicted, denied, or objected to, become competent evidence against the defendant... [sic]. Related to this specific rule is that which admits evidence of the circumstances when the accused makes a reply which of itself is to be regarded as an admission....
>
> *Griffith v. Commonwealth*, *supra*, at 596.

*Id.* at 847 (citing *Griffith v. Commonwealth*, Ky., 63 S.W.2d 594, 596 (1933), *overruled on other grounds*, *Colbert v. Commonwealth*, Ky., 306 S.W.2d 825 (1957)).

The Kentucky Supreme Court thus characterized Bartley's statements as adoptive

55

admissions.  Adoptive admissions are permissible under Kentucky evidence law, and this Court defers to state courts' determinations of their own law.

The Kentucky Supreme Court thereby also explicitly rejected the federal claim based on *Bruton*.  It was in *Bruton* that the U.S. Supreme Court held that a defendant is deprived of his confrontation rights when his non-testifying co-defendant's incriminating confession, explicitly referring to the defendant, is introduced at their joint trial.  The Kentucky Supreme Court did not discuss its rejection of this claim in *Hodge I*, but that court's finding that *Bruton* is not violated is not contrary to or an unreasonable application of *Bruton*, its progeny, or other Supreme Court law. See *Douglas v. Alabama*, 380 U.S. 415, 418 (1965) ("A primary interest secured by [the confrontation clause] is the right of cross-examination").

The respondent is correct with respect to another, related issue herein.  In *United States v. Presser*, 844 F.2d 1275 (6th Cir. 1998), the Sixth Circuit noted that the U.S. Supreme Court had consistently held that there is no general constitutional right to discovery in a criminal case.  *Id.* at 1281 (quoting from *Weatherford v. Bursey*, 429 U.S. at 559).  Rather, all the Constitution requires, under the due process clause, is that the defendant not be deprived of a fundamentally fair trial.  *Id.* The instant petitioner has not demonstrated how the admission, without notice, of Bartley's confession to Sherry Hamilton could have rendered Hodge's trial fundamentally unfair, especially when, as the respondent points out, Hodge's admission to her that it was he who fired fatal shots into the Morrises is more damaging than Bartley's version of the crimes.

This Court finds that the state courts' ruling on this claim was not contrary to nor a clearly unreasonable application of  U.S. Supreme Court law of the time.  The rejection of this claim is, in fact, consistent with *United States v. Jinadu*, 98 F.3d at 245-46 (relying on *Poole v. Perini*, 659 F.2d 730 (6th Cir. 1981), *cert. denied*, 455 U.S. 910 (1982) and quoting from *Williamson v. United States*,

56

512 U.S. 594 (1994)).

>    4.    The Failure Of The Trial Court To Allow Petitioner To Have Access To Sherry Hamilton's Psychiatric Records Denied Petitioner Rights To Confront A Witness, To Due Process And Fair Trial.

A few months before trial, the petitioner learned that his ex-wife would be a witness against him, and he also discovered that she had twice been in mental health counseling, in 1984 and 1986. When the defense moved for production of her mental health records, the trial court reviewed the records *in camera* and denied the motion.

On appeal and herein, Hodge suggests that had he been granted access to the records, he could have sought funds for an expert, and he could have hired an expert, and the expert could have evaluated how her mental health "affected Sherry's ability to accurately assess matters about Petitioner."

The petitioner claims that the mental health information was critical for the jury's assessment of Sherry Hamilton's credibility, particularly given the facts that it was contrary to Bartley's testimony and that there was no physical evidence of Hodge's participation in the crime. Without the records, the petitioner argues, he could not effectively impeach Sherry on the stand and his rights under the Fifth, Sixth and Fourteenth Amendments were violated.

<div align="center">Response</div>

The respondent emphasizes that the trial court personally reviewed the records in chambers and found them not to be material. Further, the trial court ordered them sealed and they evidently remain so. Therefore, counsel for the Commonwealth has been unable to review them and discuss the contents before the state appellate courts and this Court. The Kentucky Supreme Court did not address this issue but if this Court wishes further briefing on the issue, then the respondent requests appropriate orders so as not to open himself to liability for violating a court order and releasing

confidential information.

On the merits, the respondent's position is that the Kentucky Supreme Court made findings of fact about this issue, and these findings are subject to the presumption of correctness. Further, that court's interpretation of state law is binding on the federal habeas court. To the extent that the petitioner has urged constitutional claims, the Kentucky court's ruling was not contrary to or clearly unreasonable in light of then-existing Supreme Court law. Also, since the petitioner was able to cross-examine Sherry on a number of credibility issues and her testimony included so much admitted negative information about her own past bad conduct, if there was any constitutional error, it was harmless.

### Discussion

Both the trial court and the Supreme Court of Kentucky examined the psychiatric records of Sherry Hamilton. The appellate court wrote, "Sherry Hamilton was treated at Ridgeview Psychiatric Hospital and Center, Inc., in Oak Ridge, Tennessee, from May 9, 1984 to May 21, 1985 and from July 30, 1986 to January 19, 1987." The court continued, as follows:

> . . . The records were furnished under seal to the trial judge, who, pursuant to *Eldred v. Commonwealth*, Ky., 906 S.W.2d 694, 702 (1994), *cert. denied*, 516 U.S. 1154 . . . (1996), reviewed the records *in camera* and determined that they did not contain information sufficiently relevant to overcome the psychotherapist-patient privileges set forth in the laws of both Kentucky and Tennessee. KRE 507 and former KRS 421.215 and KRS 319.111 (both repealed by 1990 Ky.Acts ch. 88 §§ 92, effective July 1, 1992 pursuant to 1992 Ky.Acts ch. 324 §§ 33); Tenn.Code Ann. §§ 24-1-207. While the applicable laws of both states contain exceptions to the privilege, there is no exception applicable to a scenario where the patient is merely a witness in a civil or criminal case.

*Hodge I*, 17 S.W.3d at 843-44. Having rejected the claim on state law grounds, the Court, nonetheless, continued its consideration under the Constitution, as follows:

> However, in *Eldred, supra,* at 701-03, we recognized that the privilege is subject to a criminal defendant's right to obtain exculpatory information, *Brady v. Maryland,*

58

373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and to confront the witnesses against him. U.S. Const. amend. VI; Ky. Const. §§ 11. Exculpatory evidence includes information regarding the credibility of a prosecuting witness, *Eldred, supra,* at 701-02, and the right to confrontation includes the right to meaningful cross-examination, particularly the right to impeach a witness's credibility. *Davis v.. Alaska,* 415 U.S. 308, 315-17, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974); *Harris v. Commonwealth,* Ky., 315 S.W.2d 630 (1958).

Nevertheless, having reviewed the psychiatric records in question, we find that the trial judge correctly concluded that they contain no information sufficiently relevant to overcome the claim of privilege.

*Id.* at 844.

Kentucky's highest court went on to describe the information in the records in detail and ultimately affirmed the trial judge's conclusion they contained no information sufficiently relevant to overcome the claim of privilege.  As to the petitioner's speculation that he might have found an expert to examine the records from the 1980's and then testify in 1996 that Hamilton was mentally unable to testify truthfully against Hodge and thereby impeach her credibility as a witness, the court decided, "This claim is simply a reach too far."  *Id.*

Finally, the Supreme Court of Kentucky studied the defense's impeachment of Ms. Hamilton at trial, without the psychiatric records:

We note in passing that defense counsel was able to mount a substantial attack on Hamilton's credibility despite the absence of any assistance from her psychiatric records. Hamilton admitted during cross-examination that she had often lied while living with Appellant; that she had lied to her parents about an automobile accident when she was a teenager; that she had forged receipts of mortgage payments to deceive her previous husband; that she lied to the police, to attorney Elizabeth Shaw, and to the news media when she said Appellant was not involved in the Morris murders; that she lied to the FBI when she said that she had not seen Appellant on the date of the homicides; that she had counseled others on how to lie effectively; and that she was paid $10,000.00 and other benefits to enter into a fraudulent marriage to a foreign national while she was living with Appellant. She also admitted to being extremely jealous of Appellant's relationships with other women and that she had once threatened Appellant with a firearm. All of this evidence was admitted without objection despite the proscription in CR 43.07 against impeachment by evidence of "particular wrongful acts."

59

*Hodge I,* 17 S.W.3d at 844-45.  In short, the Kentucky courts found that the psychiatric records of Sherry Hamilton were privileged and therefore, inadmissible; that even if admissible, they would have had little bearing on her credibility in 1996; and that the defense was effectively able to cross-examine her without them.  *Id.*

This Court finds that the Kentucky courts' findings on this matter are not unreasonable determinations in light of the state record.  Nor is Kentucky Supreme Court's treatment of this issue contrary to or a clearly unreasonable application of then-existing Supreme Court law.  *See Jaffee v. Redmond*, 518 U.S. 1, 9-10 (1996) (recognizing that communications with a mental health professional are privileged under federal law).  This conclusion is similar to the facts and law discussed in *Newton v. Kemna*, 354 F.3d 776,782-83 (8th Cir.) (discussing U.S. Supreme Court law), *cert. denied*, 125 S.Ct. 485 (2004).

Moreover, even if the denial of access to these records would be deemed a constitutional error, it is harmless.  As the Kentucky appelleate court noted in the last two paragraphs above-quoted, as a practical matter, the impeachment of Sherry was extensive and she harmed her own credibility.  Consequently, the omission of this additional information about her mental health is indeed harmless, as it cannot be said to have a "substantial and injurious effect or influence in determining the jury's verdict."  *Brecht v. Abrahamson,* 507 U.S. at 637.

Accordingly, there is no basis for granting habeas relief on this claim.

17.    There Is Insufficient Evidence To Show That Petitioner Killed the Morrises.

The petitioner claims that the jury was instructed that it could find him guilty of the murders of the Morrises if they found that he killed them by shooting them with a pistol but there was no physical evidence of his being in the Morris home.  The only evidence of his presence was in the

contradictory and biased testimonies of Bartley and Sherry Hamilton, and this is insufficient for a reasonable jury to find Hodge guilty of killing the Morrises by shooting them. Therefore, a conviction based on such insufficient evidence violates his due process rights under the Fifth and Fourteenth Amendments and warrants relief.

<div align="center">Response</div>

The respondent counters that the Kentucky Supreme Court correctly rejected this claim and that the same court's findings of fact must be deferred to under the presumption of correctness. Citing to the proper standard of review for a sufficiency of the evidence claim, as set out in *Jackson v. Virginia*, 443 U.S. 307 (1979), and several subsequent Supreme Court cases stating then-existing federal law, the respondent contends that the fact that co-perpetrators disagreed as to the role each one played in the criminal events does not preclude a conviction.

Also, the respondent maintains that the Kentucky Supreme Court found that the evidence presented at Hodge's trial was sufficient to sustain the conviction; this finding is presumed correct; and the court's rationale was not contrary to or a clearly unreasonable application of then-existing U.S. Supreme Court precedent.

<div align="center">**Discussion**</div>

The Kentucky Supreme Court analyzed Hodge's claim of insufficiency of the evidence, as follows:

> Appellant claims that the testimonies of Donald Bartley and Sherry Hamilton were so contradictory as to be insufficient to support the verdicts returned in this case. He points out that there was no physical evidence to prove that he was even present when these crimes occurred. The test is whether, drawing all fair and reasonable inferences from the evidence in favor of the Commonwealth, the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty. *Commonwealth v. Benham*, Ky., 816 S.W.2d 186 (1991). A conviction can be sufficiently supported even by the uncorroborated testimony of an accomplice. *Murphy v. Commonwealth*, Ky., 652 S.W.2d 69 (1983), *cert. denied*,

<div align="center">61</div>

465 U.S. 1072. . . (1984).  The testimonies of Bartley and Hamilton were substantially consistent with respect to Appellant's participation in the crimes, and were consistent with the findings of the medical examiner and the ballistics expert.  The absence of physical evidence is partially explained by the testimony that Appellant disposed of the weapons and his bloody clothing.  The evidence was sufficient to support the convictions.

*Hodge I*, 17 S.W. 3d at 841.

In *Jackson v. Virginia*, 443 U.S. 307 (1979), the Supreme Court of the United States set the now-well-known standard for a sufficiency of the evidence claim:  whether "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Id.*, at 319.  In the above-quoted portion of the *Hodge I* opinion, the test was re-stated as "whether, drawing all fair and reasonable inferences from the evidence in favor of the Commonwealth, the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty."

The words of the Supreme Court of Kentucky clearly mirror the constitutional standard set by the Supreme Court of the United States.  Consistent with then-existing precedent, the state appellate court concluded that the prosecution had presented sufficient evidence to support the conviction of Petitioner Hodge for the shooting deaths of the Morrises.  Regardless of the lack of physical evidence of Hodge's participation, in view of Bartley's eyewitness testimony, Hamilton's admissions, and experts' opinions on certain physical evidence, the state court's holding that the evidence was sufficient to support the conviction is not an unreasonable determination in light of the record; nor is it contrary to a clearly unreasonable application of the well-known precedent of *Jackson v. Virginia* and its progeny.

18.    The Trial Court's Failure to Exclude The Evidence Of Other Crimes And Other Irrelevant Bad Acts Substantially Prejudiced Petitioner And Denied Him His Rights To Due Process Of Law And A Fair Trial.

62

The petitioner alleges that he filed numerous pre-trial motions to exclude the evidence of Hodge's other crimes and bad acts. At one hearing on a defense motion *in limine* regarding prior bad acts, the trial court directed that the only such evidence which would be permitted was that about which the Commonwealth had given notice[18] or that which the court had earlier, specifically found admissible. On the opening day of trial, the court also directed counsel to tell their witnesses that there were to be no mention of the prior trial and "no witnesses will talk about any other crimes or any other bad acts evidence, unless we have a hearing . . . ." Record No. 36 at 18.

Nonetheless, Petitioner Hodge complains, witness Sherry Hamilton made multiple references to prior bad acts. He lists examples of her improper testimony, including, *e.g.*, over her adult years she had told a lot of lies to protect Hodge and herself from the law; Hodge would shave his beard in preparation to commit a crime; "[h]e smoked pot every day;" and at one time, Hodge had been "on the run from the State of Georgia." All of these references were of prior bad acts and none had been in the Commonwealth's pre-trial notice of the bad acts it intended to raise. At the end of her testimony, the defense moved for a mistrial for Sherry's references to prior bad acts.

In denying his motion for a mistrial, the petitioner complains, the trial court purportedly "placed the blame for the improper references on the defense, and faulted Petitioner for failing to ask for an admonition during her testimony." When defense counsel explained that he did not seek an admonishment because he did not want to direct the jury's attention to and by reference to repeat the references, the trial court denied the motion again. The petitioner then and now argues that he was not given notice of the prior bad acts evidence; the information was clearly inadmissable; and its introduction denied Hodge his right to due process under the Fifth and Fourteenth Amendments.

---

[18]   The prosecutor gave notice of his intent to present the following prior bad acts:  prior convictions, certain prior testimony of Bartley, and the petitioner's pre-sentence report.

<u>Response</u>

The respondent quotes the Kentucky Supreme Court's ruling, contends that the court's findings of fact are binding under the presumption of correctness, and he repeats the tenet that errors of state law are not reviewable in federal habeas corpus proceedings.  Further, counsel's failure to object during the testimony was an additional procedural default under Kentucky's RCr 9.22.  Even were the claim not defaulted, the Kentucky High Court's ruling is not contrary to or an unreasonable application of Supreme Court precedent then existing.  Further, if the ruling were contrary or unreasonable, any error would be harmless in light of the other evidence against Hodge.

**<u>Discussion</u>**

The Kentucky Supreme Court first noted that the trial court had ordered the Commonwealth to disclose to the defense all "evidence of prior bad acts of the defendant" and to file a written statement in the record as to compliance with the Order.  Yet, "[n]o such written statement is found in the record."  *Hodge I*, 17 S.W.3d at 845.

As to the objectionable testimony itself, the Kentucky Supreme Court found as follows: "None of this evidence was elicited during the direct examination of Hamilton. . . ."  *Id.*  Further, the state court set forth 10 sets of questions posed and answers obtained during the defense's cross-examination of Sherry Hamilton and the Commonwealth's re-direct examination.  The seven which occurred on cross-examination included the following:

> (a)  Was it true that she had told many lies in her life?  Hamilton responded that she had told a lot of lies when she was living with Appellant in order to protect him from the law.
> . . .
> (f)  Did Appellant frequently wear a beard?  Hamilton responded that Appellant normally wore a beard, but that he would shave it off if he was "fixing to do a job."

*Id.*  Three responses on re-direct examination included Hamilton's explanations for certain conduct,

such as her lying to the FBI about the day of the murders was because Hodge "was 'on the run' from

the state of Georgia;" and stating that the majority of her lies "was to protect Appellant from the

law." *Id.*

> The Kentucky Supreme Court then proceeded to decide the following with regard to this prior bad acts testimony:

> Since the Commonwealth did not introduce any of this evidence in its case in chief, there was no violation of the pre-trial order.  KRE 404(c).  The answers given by Hamilton on cross-examination were responsive to the questions asked by defense counsel. "One who asks questions which call for an answer has waived any objection to the answer if it is responsive." *Mills v. Commonwealth,* Ky., 996 S.W.2d 473, 485 (1999) (quoting *Estep v. Commonwealth,* Ky., 663 S.W.2d 213, 216 (1983)).

> At no time during or after the cross-examination of Hamilton did defense counsel object to her answers, request that the witness be admonished against testifying about "other crimes," or request that the jury be admonished to disregard her answers. Nor did defense counsel object or ask for an admonition during the prosecutor's inquiries on redirect examination. It was only after Hamilton had been excused and the jury had been discharged for the weekend that defense counsel moved for a mistrial on the basis of an alleged violation of the pre-trial order.

*Id.* at 845-46.   It is true that the petitioner's failure to voice timely objections constitutes procedural

default under Kentucky law, a procedural rule which is enforced in Kentucky (RCr 9.22; *West v.*

*Commonwealth*, 780 S.W.2d 600, 602 (Ky. 1989)).

> As the state supreme court explained in approaching another of Hodge's claims:

> [If a] claim of error is unpreserved, it is reviewed in accordance with the standard enunciated in *Cosby v. Commonwealth,* Ky., 776 S.W.2d 367, 369 (1989), *cert. denied,* 493 U.S. 1063, 110 S.Ct. 880 (1990), *overruled on other grounds, St. Clair v. Roark* [10 S.W.3d 482 (Ky. 2000)]*, supra, i.e.,* whether there was a reasonable justification or explanation for defense counsel's failure to object, tactical or otherwise, and whether the totality of the circumstances is persuasive either that the defendant would not have been found guilty of the capital offense or that the death penalty may not have been imposed but for the unpreserved error.

*Hodge I*, 17 S.W.3d at 837.  Proceeding, therefore, to look at the explanation for defense counsel's

failure to object to the prior bad acts testimony, the Kentucky Supreme Court did not have to look

far.  That court wrote,

> When the judge pointed out that counsel had not objected or requested an admonition, counsel stated that he believed such would have only further emphasized the witness's allegedly improper statements. Regardless of the wisdom of that strategy, the real damage was done during Hamilton's testimony on cross-examination, and counsel clearly made a tactical decision to continue attempting to impeach the credibility of this obviously hostile witness without requesting judicial intervention.  *Cosby v. Commonwealth, supra*.

*Id.* at 846.  Thus, the state supreme court decided this issue under state law and state law is not reviewable in habeas.  *See McGuire*, 502 U.S. at 72 (holding that a federal court may not grant habeas corpus relief simply on the basis that a trial court incorrectly interpreted state evidence rules to allow admission of prior bad acts evidence).

Because of the procedural default resulting from counsel's failure to object, the only way to obtain review of his claim herein, under §2254, is for the petitioner to demonstrate cause and prejudice for the default or an actual innocence claim.  *Wainwright v. Sykes*, 433 U.S. at 87-88; *Murray v. Carrier*, 477 U.S. at 496 (1986).  He does not do so.  To the extent that the instant petitioner claims that cause for the default was the ineffective assistance of trial counsel, that claim will be rejected in the discussion of No. 3 of the 14 complained-of acts/omissions of counsel which purportedly constitute ineffective assistance in Issue #35, *infra*.  Nor does the petitioner show prejudice or make an actual innocence claim.

This Court cannot find that the Kentucky Supreme Court's decision affirming the trial court on this matter is contrary to U.S. Supreme Court due process law or involves an unreasonable application of said law.  Rather, the result is consistent with the result affirmed in this circuit in another habeas case, *Schoenberger v. Russell*, 290 F.3d 831, 836 (6th Cir.  2002).

19.    The Trial Court's Failure To Grant The Requested Mistrial When Sherry Hamilton Made Reference To Petitioner's Prior Trial Denied Petitioner His Rights To Due Process And A Fair Trial.

The petitioner claims that despite the trial court's having directed counsel to admonish their witnesses not to make reference to the previous trial, the Commonwealth's witness, Sherry Hamilton, twice stated that she decided to come forward to testify when she discovered there was to be a re-trial.

Hodge now complains that the Commonwealth had a duty to admonish her beforehand and that the court had a duty afterwards to take curative action, when she referred to this being a re-trial. He contends that these two references tainted both the guilt and penalty phases of the trial and interfered with the jury's ability to make their decisions, in violation of his due process rights.

<div align="center">Response</div>

The respondent relies upon the rationale of the Supreme Court of Kentucky and the legal principles it set out in response to the preceding section herein, Claim #18.

<div align="center">**Discussion**</div>

The Supreme Court of Kentucky first noted that the references to a prior trial occurred only upon Hamilton's cross-examination by defense counsel and then it put the two references in context:

> a.  When asked when she first decided to testify at the trial of this case, Hamilton responded that she first decided to testify when she found out there was going to be a re-trial.

> b.  When asked if the bottom line was that she had waited four years before she contacted Mr. Kincaid (an FBI agent), Hamilton responded that she contacted Kincaid when she found out that "they were going to be retried."

*Hodge I*, 17 S.W.3d at 846.  The state court then turned to the merits:

> The answers were responsive to the questions.  As with the "other acts" evidence, there was neither an objection nor a request for an admonition.  We do not believe that the jury must have concluded from these isolated references that Appellant had been previously convicted of murder and sentenced to death for these same charges.

*Hodge I*, 17 S.W.3d at 846 (concluding with a citation to *Tamme v. Commonwealth*, 973 S.W.2d 13,

<div align="center">67</div>

34 (Ky. 1998), *cert. denied*, 525 U.S. 1153 (1999), wherein the Supreme Court of Kentucky rejected a similar claim about four references to a prior trial in similar language).

This Court again finds procedural default with no excuse therefor.  Even if not defaulted, however, this Court agrees with the Kentucky Supreme Court's conclusion and defers to it under the presumption of correctness as to factual findings and the binding nature of state law.  Further, the petitioner has not shown that the state court's decision is contrary to or an unreasonable application of any then-existing U.S. Supreme Court precedent.

> 20.    The Admission Of Highly Inflammatory, Cumulative Evidence, Including A Videotape Of The Scene At The Morris Residence; Gory Photographs Of The Victims' Bodies; And Physical Evidence Taken From The Scene Denied Petitioner's Rights To A Fair Trial And Due Process.

The petitioner lodged objections to the showing of a police crime scene video and to the introduction of a number of the Commonwealth's exhibits, *i.e.*, photographs of Mr. Morris lying on the floor (Exhibits [hereinafter "Ex."] 6 - 10); photographs of Mrs. Morris on the bed (Ex. 13, 16, and 17); photograph of Mr. Morris on the autopsy table (Ex. 12); photograph of the gag found in Mr. Morris' mouth (Ex. 23); a bloody pillow (Ex. 27); sock material found in Mr. Morris' mouth (Ex. 41); and the binding found on Mrs. Morris (Ex. 42).

Hodge argues that the video was gory, was partially irrelevant (twice focusing on knives despite their not being involved in the crime), and was cumulative.  Having allowed the video nonetheless, the trial court should have then excluded the remaining cumulative and inflammatory photographs and physical evidence.  The photographs of the victims were intended to arouse the passions of the jurors and did so, having a substantial and injurious effect upon the petitioner's trial.  Thus his due process right to a fair trial has allegedly been violated.

<u>Response</u>

Again the respondent refers to the Kentucky Supreme Court's ruling that the evidence had

probative value and was properly admitted.  He also reminds this Court that the state court's finding

is binding under the presumption of correctness and its result is not contrary to or a clearly

unreasonable application of U.S. Supreme Court law.

## **Discussion**

The Kentucky Supreme Court treated this issue on appeal in two paragraphs, writing:

> The jury was permitted to view crime scene photographs and a videotape of the crime scene, all made at the time of the initial police investigation, and one photograph of Edwin Morris's body laying on the autopsy table.  The latter photograph was taken before any dissection of the body occurred and revealed only the victim's head and chest areas.  It was introduced to show the jury both the location of the gunshot wounds and the sock which had been stuffed into the victim's mouth as a gag.  Though gruesome, the photographs and videotape were of probative value and, thus, admissible into evidence.  *Dillard v. Commonwealth*, Ky., 995 S.W.2d 366, 370 (1999), *cert. denied*, 528 U.S. 1009 . . . (1999); *Bedell v. Commonwealth*, Ky., 870 S.W.2d 779 (1993); *Epperson v. Commonwealth*, *supra*, at 843; *Milburn v. Commonwealth*, Ky., 788 S.W.2d 253 (1989).

> Although the videotape did depict several knives at the scene, no suggestion or insinuation was made that they belonged to Appellant or his accomplices, or that they were used in the murders.  *Compare Rowe v. Commonwealth*, Ky., 269 S.W.2d 247 (1954).  The pillows through which gunshots had been fired were relevant and admissible to show the execution-style manner in which the victims had been murdered.

*Hodge I*, 17 S.W.3d at 846.

Like the majority of evidentiary rulings, this issue also was decided on state law grounds;

and the state court's interpretation of state law is binding on this Court.  *See Epperson v.*

*Commonwealth*, 809 S.W.2d 835 (1990) (even gruesome photographs are admissible if they have

probative value), *cert. denied,* 502 U.S. 1037 (1992); *see also Estelle v. McGuire*, 502 U.S. at 71-72

(state law claims not reviewable in habeas); *Seymour v. Walker*, 224 F.3d 542 (6th Cir. 2000).

Additionally, the petitioner has failed to demonstrate that the Kentucky Supreme Court's

determination about these exhibits contravenes or misapplies any U.S. Supreme Court law clearly

established at that time.  *See Payne v. Tennessee*, 501 U.S. 808 (1991).

> 22.    Petitioner Was Denied A Fair Trial And Rational Sentencing By The Introduction Of Improper Victim Impact Evidence In Violation Of The Due Process Clause Of The Fourteenth Amendment.

Petitioner Hodge charges that despite his pre-trial motion to omit the outpourings of emotion which occurred at the first trial, the Commonwealth persisted in getting such emotional information into evidence.  The prosecutor called the Morrises' family members to the stand who had nothing significant to say about the charges.  This included one of the Morrises' sons, Jerry Morris, as the state's first witness and another son, Bobby Morris, on the last day, allegedly in order to improperly use impact evidence as tearful, emotional "bookends" for a weak case.

Further, the prosecutor repeatedly asked about the victims' hard work, devotion, industry, love of flowers, and church-going and also referred to the victims in emotionally charged, glowing, and sympathetic terms designed solely for pulling on the jury's heartstrings.  Through such tactics the prosecution was purportedly able to prejudice the jury against Petitioner Hodge and thereby deny his right to due process under the Fifth and Fourteenth Amendments.

<div align="center">Response</div>

The respondent again responds that this Court must presume the state court's findings of fact to be correct and must defer to the state court's ruling because the matter was decided on state law grounds.  Therefore, this Court is bound by the Kentucky Supreme Court's findings and ruling.  Further, the Kentucky Supreme Court's ruling meets neither standard for relief set out in 28 U.S.C. §2254(b)(1); even were there constitutional error in the admissibility of this evidence, it would be harmless, the respondent citing *Byrd v. Collins*, 209 F.3d 486,532 (6th Cir. 2000) (victims' background not constitutionally prohibited in the guilt or penalty stage).

<div align="center">**Discussion**</div>

<div align="center">70</div>

The Kentucky Supreme Court discussed this issue as follows:

Appellant claims it was prejudicial error for the victims' sons to testify, *e.g.*, that their parents had worked hard to accumulate the money and jewelry for which they were killed and that Bessie Morris cherished the ring and earrings that were stolen from her; that the victims were elderly and infirm, thus unable to resist an armed robbery; that they had attended church earlier on the day they were killed (father's day); and that the four-leaf clovers which Bessie Morris collected were found scattered on her deathbed.  Appellant characterizes this type of evidence as "glorification" of the victims.  We characterize it as no more than "humanization" of the victims.

> A murder victim can be identified as more than a naked statistic, and statements identifying the victims as individual human beings with personalities and activities does not unduly prejudice the defendant or inflame the jury.  Just as the jury visually observed the appellant in the courtroom, the jury may receive an adequate word description of the victim as long as the victim is not glorified or enlarged.

*Bowling v. Commonwealth*, Ky., 942 S.W.2d 293, 303-03 (1997), *cert. denied*, 522 U.S. 986 . . . (1997) (citation omitted).  Appellant was not unduly prejudiced by the introduction of this testimony.

*Hodge I*, 17 S.W.3d at 846.

The petitioner has failed to demonstrate to the Kentucky appellate court or this Court how the accurate description of the victims and their lives and deaths has unconstitutionally prejudiced him.  Additionally, as with the immediately preceding claim, this Court finds that the Kentucky Supreme Court's ruling is not contrary to nor an unreasonable application of clearly established U.S. Supreme Court precedent, including *Payne v. Tennessee*, 501 U.S. at 825-27 (no *per se* bar to presentation of victim impact evidence or argument; to violate due process, it must be so unduly prejudicial that it renders the trial fundamentally unfair).

23.   The Trial Court Improperly Allowed Objectionable Portions Of Tammy Gentry's Testimony To Be Played To The Jury.

The petitioner challenges several aspects of the testimony of another of Bartley's confessors, Tammy Gentry, beginning with the fact that when she failed to appear in response to a subpoena,

71

the court permitted her prior deposition to be read aloud to the jury *in toto*.  He complains of three specific objections in the Commonwealth's questioning therein, which should have been sustained during the reading of her testimony.  The petitioner also claims that the Commonwealth was permitted to identify all of this witness's prior convictions despite her having admitted them verbally, a violation of Kentucky evidence law.[19]  In addition to violating Kentucky law, Hodge argues, these errors rendered the petitioner's trial fundamentally unfair and thereby violated his due process rights.

<div align="center">Response</div>

The respondent points to the Kentucky Supreme Court's discussion of this matter and reminds the Court that it must defer to the admissibility of evidence under state law.  Additionally, he argues that the state supreme court's ruling was neither contrary to nor an unreasonable application of precedent from the United States Supreme Court.  Finally, even had there been constitutional error, he argues, it was harmless.

<div align="center">**Discussion**</div>

The Kentucky Supreme Court examined the Commonwealth's cross-examination of Ms. Gentry in depth.  As to the denial of the defense's three objections, the Court found no error on the merits; but as to the inquiry into her convictions for felonies, it did find error, the court writing,

> A more difficult issue is presented by the prosecutor's inquiry as to both the number and the nature of her prior convictions. . . .  Pursuant to [*Commonwealth v.* ] *Richardson* [674 S.W. 2d 515 (Ky. 1984)], an interrogator can impeach a witness with all prior felony convictions only if the witness first denied having been convicted of any prior felonies.  Since Gentry did not deny being a convicted felon, it was error to permit the Commonwealth's attorney to question her as to the number and nature of all of her prior felony convictions.

---

[19] The petitioner cites Kentucky Rule of Evidence 609(a), which provides that "the identity of the crime may not be disclosed on cross-examination unless the witness has denied the existence of the conviction."

Nevertheless, the error was harmless in this case, because there is no reasonable possibility that, absent the error, the verdict would have been different.  RCr 9.24; *Harman v. Commonwealth*, Ky., 898 S.W.2d 486, 489 (1995); *Renfro v. Commonwealth*, Ky., 893 S.W.2d 795 (1995).   The harmless error doctrine "recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence . . . and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error."  *Delaware v. Van Arsdall*, 475 U.S. 673, 681 . . . (1986).  The jury knew that Gentry was a criminal.  She readily admitted that she had "led a life of crime."  She was serving time in the Laurel County Jail at the time of her alleged discussion with Bartley.  Even the proper impeachment inquiry would have elicited the fact that she was a convicted felon.  More importantly, her status was only that of a witness; thus, there was no danger that the improper evidence would be considered for any purpose other than to affect her credibility.  Compare *Commonwealth v. Richardson*, *supra*, in which the defendant was on trial for burglary and was impeached by evidence of his prior conviction of another burglary.  We further note that defense counsel was permitted to elicit during cross-examination of the Commonwealth's key witness, Bartley, that he had been convicted of four prior felonies, including three burglaries, in the Harlan Circuit Court.  Under these circumstances, we do not believe that the admission of evidence of Gentry's prior convictions so prejudiced Appellant as to deny him a fair trial.  *Cf. Bennett v. Commonwealth*, Ky., 978 S.W.2d 322, 326 (1998).

*Hodge I*, 17 S.W.3d at 848-49.  Thus, the Kentucky Supreme Court found one violation of state law but no violation of federal law.

The petitioner has identified no then-existing U.S. Supreme Court precedent which was contrary to or unreasonably applied in the state court's treatment of this matter.  Even in finding the one error, the state court's conclusion that it was harmless and its reliance on the U.S. Supreme Court's decision in *Delaware v. Van Arsdall* is, in fact, a reasonable application of and not contrary to the law therein.  *See also Brecht v. Abrahamson*, 507 U.S. at  637 (to amount to constitutional proportions, the court must find that the error had a "substantial and injurious effect or influence in determining the jury's verdict").

24.     Petitioner Was Denied A Fair Trial Because The Trial Court Refused To Allow The Jury To Hear That Sherry Hamilton Told Elizabeth Shaw That Donald Bartley Killed Ed And Bessie Morris In Violation of *Chambers v. Mississippi*, 410

73

U.S. 284 (1973).

The petitioner called his attorney from his first trial, Elizabeth Shaw, to testify to conversations with Sherry Hamilton, who had purportedly told her that Donald Bartley had confessed to her that it was he who had killed the Morrises, not Epperson or Hodge. Her testimony was intended to support the testimony of Tammy Gentry and to directly implicate Bartley, rather than Hodge, as the perpetrator of the crimes. Upon the Commonwealth's objection, however, the trial court ruled that such testimony was "double hearsay," and Shaw then presented her testimony by avowal.

The petitioner admits that the testimony is, indeed, hearsay, but that it should have been admitted under exceptions to the hearsay rule. Barley's statement would be admissible as a statement against interest under KRE 804(b)(3) and as a prior inconsistent statement under KRE 801A(a)(1). Because of the court's ruling barring admission of this testimony, Petitioner Hodge argues, he was denied his due process right to present a defense, the petitioner citing *Chambers v. Mississippi*.

<center>Response</center>

The respondent notes that the Kentucky Supreme Court rejected this claim because defense counsel had failed to lay a proper foundation by asking Sherry Hamilton whether Bartley had ever told her that he killed the Morrises. To this extent, the claim is procedurally defaulted. Even were it not defaulted, this Court must defer to state court findings of fact and interpretations of state law. Finally, the state court's ruling was neither contrary to nor an unreasonable application of Supreme Court law.

<center>**Discussion**</center>

The Supreme Court of Kentucky wrote as follows:

<center>74</center>

Appellant asserts error in the trial judge's refusal to permit his former attorney, Elizabeth Shaw, to testify that Sherry Hamilton told her that Bartley had told Hamilton that he killed the Morrises. Double hearsay is admissible only if each part of the combined statements conforms with an exception to the hearsay rule. KRE 805; *Thurman v. Commonwealth*, Ky., 975 S.W.2d 888, 893 (1998), *cert. denied*, 526 U.S. 1009, 119 S.Ct. 1150, 143 L.Ed.2d 217 (1999); *cf. Askew v. Commonwealth*, Ky., 768 S.W.2d 51 (1989). Bartley's part of the statement would have been admissible as a prior inconsistent statement, since he denied killing the Morrises. KRE 801A(a)(1); *Jett v. Commonwealth*, Ky., 436 S.W.2d 788 (1969). However, Hamilton's part of the statement does not fall within any exception to the hearsay rule. Hamilton's alleged statement to Shaw was not inconsistent with her testimony since she never testified that Bartley told her that he did *not* kill the Morrises. Furthermore, since neither Bartley nor Hamilton were confronted at trial with their alleged prior inconsistent statements, the proper foundation was not laid for Shaw's proposed testimony. KRE 613(a); CR 43.08; *Norton v. Commonwealth*, Ky., 471 S.W.2d 302 (1971).

*Hodge I*, 17 S.W.3d at 849 (emphasis in the original).

This matter was clearly decided under state evidence law, the holding being an interpretation thereof. As such, this Court defers to the state Supreme Court's ruling. State courts retain some discretion to apply their rules of evidence. *See Green v. Georgia*, 442 U.S. 95, 97 (1979). In *Crane v. Kentucky*, 476 U.S. 683 (1986), the U.S. Supreme Court wrote, "[W]e have never questioned the power of States to exclude evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability – even if the defendant would prefer to see the evidence admitted." *Id* at 690.

As to Petitioner's federal claim, not mentioned by the state supreme court, this Court has studied *Chambers v. Mississippi* and other relevant law as it existed in the first half of 2000, just before Kentucky's supreme court wrote the above-quoted passage and affirmed Hodge's convictions and sentences. It is true that in *Chambers*, the U.S. Supreme Court stated that the rights to confront and cross-examine witnesses and to call witnesses in one's own behalf have long been recognized as essential to due process, but "[i]n appropriate cases, the right must yield to other legitimate

75

interests in the criminal trial process," including a state's rules of evidence, thus "trumping" the state rule against hearsay. 410 U.S. at 302. The evidence excluded must be "vital" to the presentation of the defense to rise to a Constitution violation. *Id.*; *see also, e.g., Rock v. Arkansas*, 483 U.S. 44 (1987).

The U.S. Supreme Court itself has written of *Chambers*, *Rock*, and other relevant then-existing precedent, that the exclusion of evidence therein was deemed unconstitutional because the denials were broad, automatic, blanket denials and the exclusion therefore, "significantly undermined fundamental elements of the accused's defense." *United States v. Scheffer*, 523 U.S. 303, 315 (1998). *See also Crane v. Kentucky*, 476 U.S. at 690; *Alley v. Bell*, 307 F.3d at 380.

The testimony of ex-counsel herein cannot be said to be vital to the defense herein nor to have undermined the fundamental elements of Hodge's defense. Rather, had the testimony been allowed, it would have been a cumulative attack on the credibility of Hamilton and Bartley, both of whom had already been impeached and shown to be untruthful felons. Further, it would also raise the fact of there having been a prior trial, a troublesome topic which the trial court was trying to avoid.

This Court finds that the state appellate court's decision about Shaw's testimony in the case *sub judice* is neither contrary to nor an unreasonable application of the then-existing law of the United States Supreme Court, including *Chambers*.

25.   Benny Hodge Was Denied A Fair Trial And The Right To Present A Defense When The Trial Court Refused To Grant A Continuance To Secure The Testimony Of Darcy O'Brien.

The petitioner had contacted the author of *A Dark and Bloody Ground*, Darcy O'Brien, who purportedly had numerous conversations with Sherry Hodge Hamilton while he was writing the book about the *Acker* crimes. Through him, the defense wished to attack Sherry Hamilton's

76

credibility and show that Sherry had told others that Hodge was not the murderer.  The petitioner points out that O'Brien had previously been determined to be a sufficiently necessary witness to warrant the expenditure of funds; and he claims that it was not until October 14, 1996, when this witness was scheduled to fly to Rome the next day, that counsel discovered he would not agree to return to testify at trial or in a deposition.

Because Mr. O'Brien's testimony could not be presented from any other source and undermining Sherry Hamilton's credibility was vital to the defense, the petitioner claims a due process violation for the court's refusal to grant a continuance to obtain this man's testimony.

<u>Response</u>

The respondent points out that the motion for a continuance was made within days of the scheduled trial date; much of what the defense wanted to introduce had been admitted by Sherry Hamilton during her cross-examination; and other matters he wished to present would not be admissible under Kentucky law, even had Darcy O'Brien testified.  Additionally, the Kentucky Supreme Court's findings of fact and interpretations of state law must be deferred to.  The respondent also relies upon his legal argument in responding to Evidentiary Issue Number 7[20] as to the due process standard justifying postponement of a state criminal trial, as cited in *Morris v. Slappy*, 461 1, 11 (1983) and two cited Sixth Circuit cases.  The respondent insists that under such authority the instant case does not rise to constitutional error.   Finally, "the absence of O'Brien's testimony was harmless."

**<u>Discussion</u>**

---

[20]   Issue Number 7 is the petitioner's challenge to the trial court's refusal to grant a continuance in order to obtain the testimony of a mitigation specialist at the penalty phase of the trial.  Issue 7 will be addressed, *infra*, in the Penalty Phase portion of this opinion.

The Supreme Court of Kentucky first set forth the facts, which it found in the record in a series of relevant dates leading up to the trial:

> Appellant wished to present the testimony of Darcy O'Brien, who had interviewed Sherry Hamilton while writing a book about the Acker case. The trial was scheduled to begin on October 21, 1996. The record reflects that on October 6, 1996, Appellant obtained an order providing funds to pay for O'Brien's transportation from Oklahoma to Kentucky to give a deposition. On October 11, 1996, Appellant obtained an order pursuant to KRS 421.230, *et seq.*, to secure O'Brien's attendance at the proposed deposition. On October 16, 1996, Appellant learned that O'Brien was on his way to Rome, Italy, thus was unavailable for the proposed deposition.

*Hodge I*, 17 S.W.3d at 850. The state court then ruled on the legal issue, as follows:

> Appellant now claims it was reversible error to deny his last minute motion for a continuance in order to secure O'Brien's testimony. In support of the motion, Appellant filed an affidavit listing twenty-five incidents and/or statements related to O'Brien by Hamilton which would impugn Hamilton's character and thereby impeach her credibility. The absence of O'Brien's testimony did not prejudice Appellant's defense because (1) a witness may not be impeached by "particular wrongful acts," CR 43.07; and (2) virtually all of the incidents and/or statements in question were admitted by Hamilton during her cross-examination.

*Id.* at 850-51. Thus did the Kentucky court decide this matter based on Kentucky evidence law, and this Court is bound to the state's interpretation of its own law.

As to the constitutional claim, the standards for such claims have long been set. In *Washington v. Texas*, 87 U.S. 14 (1967), the U.S. Supreme Court clearly established the Sixth Amendment right to present a defense, including "the right to present his own witnesses to establish a defense." *Id.* at 22. As the respondent points out, the Sixth Circuit has specifically held that adoptive admissions do not violate the Confrontation Clause. *Poole v. Perini*, 659 F.2d at 730; *see also Baze v. Parker*, 371 F.3d at 323-24 (citing cases).

Denial of a continuance rises to the level of a constitutional violation only when there is "an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay'...." *Morris v. Slappy,* 461 U.S. 1, 11-12, (1983) (quoting *Ungar v. Sarafite* 376 U.S. 575, 589

78

(1964)).  In *Ungar*, the U.S. Supreme Court wrote that the circumstances of a particular case determine whether the denial of a continuance is so arbitrary as to violate due process, with particular attention to the reasons presented to the trial judge at the time the request is denied.  *Id.* at 591.  "These matters are, of course, arguable, and other judges in other courts might well grant a continuance in these circumstances.  But the fact that something is arguable does not make it unconstitutional."  *Id.*

In the circumstances of the instant case, the trial court was dealing with a murder trial which had already been continued twice in 1996; the petitioner's request was made at the eleventh hour; and the witness's testimony, as described in an affidavit to the trial court, would only be cumulative or would be barred by state law to the extent they are about Sherry Hamilton's wrongful acts.  This Court finds that the state courts' decision on this issue is neither contrary to nor an unreasonable application of U.S. Supreme Court precedent of the time.

26.    The Charges Against Petitioner Should Have Been Dismissed Because The Prosecution Never Adequately Explained What Happened To The Missing Pages Of the Uniform Offense Report.

Before Hodge's first trial in 1987, the trial court issued a discovery order which required the Commonwealth to furnish Appellant with, *inter alia*, a "list of names and addresses of all persons who have knowledge pertaining to the case and/or who have been interviewed by the police or prosecution in connection with this case."  The defense received a copy of the official Uniform Offense Report which had several pages missing.  The chief investigating officer admitted at that time that he had deleted, and ultimately destroyed, portions of the Uniform Offense Report, but that he deleted nothing which would be of evidentiary value to the defense.

The petitioner contends that the Commonwealth's destruction of material which is unilaterally determined to be unusable, but which might be crucial, violates a defendant's due

79

process rights and the only remedy is to dismiss the charges.

<div align="center">Response</div>

The respondent traces this claim from October 7, 1994, two years before the re-trial, when the trial court held a hearing on the defense motion to dismiss, based on the destruction of this material.  Police Officer Ronnie Gay testified at the hearing on this date and testified live at the re-trial [Record No. 38], but in the latter instance, the defense did not ask him about the missing pages.

The respondent points to the Kentucky Supreme Court's rejection of this claim under state law and its conclusion that the trial court did not abuse its discretion in denying the motion to dismiss.  He repeats that a state's findings of fact and interpretation of state law are binding on this Court.  As to any federal claim, citing to *Corraine v. Coyle*, 291 F.3d 416, 440-42 (6th Cir. 2002) (quoting *Weatherford v. Bursey*, 429 U.S. at 559), the respondent insists that there is no federal constitutional right to pre-trial discovery in a criminal case and the Kentucky High Court's decision is not contrary to or an unreasonable application of federal law, as established by the U.S. Supreme Court.  The respondent further argues that this claim is barred by the *Teague* non-retroactivity doctrine and that if any error is deemed to have occurred, it was harmless

<div align="center">**Discussion**</div>

The Supreme Court of Kentucky's rejection of this claim reads as follows:

. . . Kentucky State Police Detective Ronnie Gay had unilaterally deleted from his investigative report the names and addresses of confidential informants who, in his opinion, had not furnished any information relevant to the case.  Appellant's motion to dismiss the indictment because of this discovery violation apparently was denied, though a formal ruling is not found in the record.

At all times relevant to this case, RCr 7.24 specifically precluded "pretrial discovery or inspection of reports, memoranda, or other documents made by officers and agents of the Commonwealth in connection with the investigation or prosecution of the case, or of statements made to them by witnesses or by prospective witnesses (other

<div align="center">80</div>

than the defendant)." [fn][21] Thus, the trial judge exceeded his authority in entering a discovery order which essentially required the Commonwealth to furnish a witness list to Appellant. *Lowe v. Commonwealth*, Ky., 712 S.W.2d 944 (1986). Nevertheless, the order was valid until overruled and was clearly violated by the Commonwealth.  In that event, RCr 7.24(9) provides the trial judge with an array of available remedies, including "such other order as may be just under the circumstances."  Presumably, the trial judge did not believe that dismissal of the indictment would be "just-under the circumstances;" and we are satisfied that he did not abuse his discretion in that regard.

*Hodge I*, 17 S.W.3d at 849-50.

The state court thus found a violation of state law in the breadth of the judge's pre-trial order but no state court error in the judge's refusal to dismiss the charges.  This Court defers to these rulings.  As to any constitutional claim, to fall within the parameters of *Brady v. Maryland*, the withheld material must be favorable to the accused and material to guilt or punishment, to amount to a constitutional violation.  373 U.S. at 87; *United States v. Bagley*, 473 U.S. 667, 675 (1985) (disclose only "evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial").  The mere possibility that some undisclosed information might have helped the defense or affected the outcome does not establish materiality in a constitutional sense so as to constitute a *Brady* violation.  *United States v. Augurs*, 427 U.S. 97 (1976).

The instant petitioner having failed to present any support for his claim that the missing information was favorable or exculpatory or material, the Court finds that the result reached by the state appellate court is not contrary to nor an unreasonable application of federal law, as it has been pronounced by the U. S. Supreme Court.

27.     Petitioner Was Denied His Due Process Right to a Fair Trial When the Jury
        Was Not Instructed as to How it Should Treat Accomplice Testimony,

----

[21]   In the footnote, the Court merely noted that the rule was subsequently amended to allow discovery and inspection of official police reports, but otherwise remains essentially unchanged.

<u>Circumstantial Evidence and Inconsistent Statements</u>.

Petitioner Hodge tendered instructions on how the jury should treat circumstantial evidence, accomplice testimony, and inconsistent statements, but the trial court rejected them and did not instruct at all as to how to weigh such evidence. As a result, he claims, his due process rights under the Fifth and Fourteenth Amendments were violated.

<div align="center"><u>Response</u></div>

The respondent emphasizes that Kentucky law has never approved of issuing jury instructions on how to weigh or assess testimony or evidence presented during the trial; rather, these are matters to be argued in closing arguments. Additionally, the Kentucky Supreme Court's interpretation of state law is binding on this Court. Pointing to the constitutional standard on jury instructions, as stated by the U.S. Supreme Court in *Estelle v. McGuire*, 502 U.S. at 71-72, the respondent contends that the ruling of Kentucky's highest court is not contrary to nor a clearly unreasonable application thereof.

<div align="center">**<u>Discussion</u>**</div>

The Supreme Court of Kentucky ruled as follows:

> The trial judge did not err in refusing to instruct the jury with respect to the consideration which should be given to circumstantial evidence, accomplice testimony and inconsistent statements. Kentucky follows the "bare bones" principle with respect to jury instructions. Instructions such as those requested by Appellant tend to overemphasize particular aspects of the evidence. Evidentiary matters should be omitted from the instructions and left to the lawyers to flesh out during closing arguments. *Baze v. Commonwealth*, Ky., 965 S.W.2d 817, 823 (1997); *McGuire v. Commonwealth*, Ky., 885 S.W.2d 931, 936 (1994).

*Hodge I*, 17 S.W.3d at 850. Thus, the state court ruled strictly on state law grounds, to which and so this Court is to defer. To the extent that the petitioner claims a violation of his federal rights which was not addressed by the state court, the Court examines the matter further, however.

<div align="center">82</div>

In *Slack v. Cason*, 258 F.Supp.2d 727 (E.D. Mich. Cir. 2003), another district court was presented with a similar complaint in a §2254 proceeding, the Michigan petitioner claiming to be entitled to habeas relief based on the absence of a jury instruction which he had desired. That court began with a quotation from the U.S. Supreme Court's holding in *Estelle v. McGuire*, that jury instruction claims are not grounds for habeas relief unless the instruction "'so infected the entire trial that the resulting conviction violates due process.'" *Id.* at 735 (quoting *Estelle v. McGuire*, 502 U.S. at 72 and *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)). After also quoting from *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974), the *Slack* Court concluded, "Petitioner has failed to show that the absence of an instruction . . . so infected the entire trial as to violate his right to due process. Thus, Petitioner is not entitled to habeas corpus relief with respect to this claim." 258 F.Supp.2d at 735-36.

This Court similarly concludes that the instant petitioner has failed to show how the absence of instructions on how the jury should treat accomplice testimony, circumstantial evidence and/or inconsistent statements so infected the proceeding as to violate his rights to due process under the same U.S. Supreme Court standards. Therefore, because the Kentucky Supreme Court's rejection of this complaint is not contrary to nor an unreasonable application of High Court precedent of the time, this claim also fails as a ground for relief.

## PENALTY PHASE ISSUES

Any capital punishment sentencing scheme must satisfy the Fifth Amendment's due process mandate that it be neutral and principled so as to guard against bias or caprice in the sentencing decision. *Tuilaepa v. California*, 512 U.S. 967, 973 (1994). The Eighth Amendment to the United States Constitution also requires adequate sentencing procedures to ensure that the death penalty is not imposed in an arbitrary or capricious manner. *Gregg v. Georgia*, 428 U.S. 153 (1976).

83

The general rule in a capital case is that "the sentencer not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Mills v. Maryland*, 486 U.S. 367, 374 (1988).

> 7.   The Trial Court's Failure To Grant A Continuance To Allow The Relevant Mitigation Testimony Of Ann-Marie Charvat, Ph.D., Denied Petitioner Rights To An Individualized Sentencing Determination.

One year prior to his re-trial, late in 1995, the petitioner was granted funds to hire a "Defense Mitigation Investigator/Analyst," and counsel obtained Dr. Ann-Marie Charvat, Ph.D. After the re-trial had been postponed first from a March 18th date to July 8th and then postponed again from the July 8th date to October 21st, defense counsel learned from Dr. Charvat that she was due to deliver a child on October 21st, and he moved the trial court for a continuance, with an attached affidavit of Dr. Charvat. The motion was overruled. The Supreme Court of Kentucky describes additional motions for continuances, one on the opening day of trial and one on the day when the penalty phase began, October 30th:

> Ann-Marie Charvat was the defense's "mitigation specialist." She was unable to attend the trial because she gave birth to a child on October 21, 1996, and her physician would not permit her to travel. . . . On the morning of trial, October 21, 1996, Appellant renewed a previous motion for a continuance and tendered an affidavit of Charvat, which did not state what her proposed testimony would be or when she might be available to testify. The motion was overruled. On October 30, 1996, Appellant renewed his motion and submitted an additional affidavit stating that, if present, Charvat would testify that Appellant was raised in a physically abusive environment which adversely affected development of his "bonds of attachment;" that frequent school transfers adversely affected development of his "bonds of commitment;" that inconsistences in his life course adversely affected his ability to adopt conventional norms and values; and that these facts had led Charvat to conclude that it was unlikely that Appellant intentionally or personally committed these murders.

> The trial judge also overruled the October 30th renewed motion, stating that Charvat was not an essential witness (presumably because other witnesses were available to

84

testify to Appellant's childhood experiences and Charvat's testimony in that respect would be hearsay), and because he had not ruled that she was qualified to render an expert opinion with respect to Appellant's mental condition at the time these offenses were committed . . . .

*Hodge I*, 17 S.W.3d at 851.  The petitioner's position is that Dr. Charvat had conducted an extensive investigation into mitigating factors relating to the petitioner; possessed the ability to explain these factors to the jury; and had obtained other witnesses, including neuropsychologists, whom she intended to call at trial.  Having found during her investigation that Hodge "was respected by both guards and inmates" during a previous incarceration in a Tennessee prison, "Dr. Charvat intended to testify as to Hodge's adjustment to prison life.  *See Skipper v. South Carolina*, 476 U.S. 1 (1986)."

The petitioner claims that he used due diligence with regard to Dr. Charvat and that the delivery of her child was the only bar to her attendance at trial.  He insists on the importance of her lost testimony as to Hodge's excellent reputation in prison and her vital assistance otherwise, in marshaling the defense's mitigation case.  He claims that if he had been granted only a 6-week continuance to a later date, he and Dr. Charvat have the opinion that she could have influenced the outcome of the sentencing phase.

As it was, however, the petitioner argues, he was denied the opportunity to present relevant mitigating evidence, in contravention of his rights under the Eighth and Fourteenth Amendments.

<u>Response</u>

The respondent examines the Kentucky Supreme Court's treatment of this issue and argues that the state court's findings of fact are binding under the presumption of correctness and its interpretation of Kentucky law regarding the admissibility of evidence is binding on a habeas court. He cites this Court to Kentucky cases discussing this topic and to cases from federal courts which have recognized that state courts retain the authority to exclude hearsay testimony in the penalty

phase, absent a special reliability and necessity. Additionally, the respondent cites law from the United States Supreme Court as to state trial courts' broad discretion in ruling on requests for a postponement of trial.

Finally, the respondent contends that the absence of Charvat did not preclude Hodge's presenting mitigating evidence from witnesses who had actual knowledge of relevant events or from the psychologists who had been commissioned to evaluate the defendant's mental condition.

## Discussion

After setting out the petitioner's earlier efforts to obtain a continuance, as quoted above, the Kentucky Supreme Court focused on the trial court's last denial of a continuance, after the guilt phase concluded and before the penalty phase began:

> . . . Since the jury had already found Appellant guilty of the Morrises' murders, Charvat's opinion that it was unlikely that he had committed those murders would be irrelevant and would not assist the jury in deciding an appropriate penalty. KRE 702; *see also* R. Lawson, *The Kentucky Evidence Law Handbook* §§ 6.10 at 149-50 (2d ed. Michie 1984) for pre-1992 law ("[t]he ultimate inquiry in ruling on the admissibility of expert testimony is whether or not the jury will be aided by the opinion of the witness").
>
> Charvat's affidavit showed that she had a Bachelor of Science degree in psychology, sociology and education, a Masters of Education degree in counseling, and a Ph.D. degree in sociology; that she had been certified as a clinical sociologist for two years; and that she had been in private practice as a "mitigation specialist" for six years. Her description of the duties of a mitigation specialist indicates that her primary responsibility was to gather and coordinate penalty phase mitigation evidence and to testify "if necessary." Appellant does not claim that Charvat's inability to attend the trial prevented him from introducing the mitigation evidence which Charvat had gathered and coordinated. The decision as to the qualifications of an expert rests within the discretion of the trial judge. *Ford v. Commonwealth*, Ky., 665 S.W.2d 304, 309 (1983), *cert. denied,* 469 U.S. 984 . . . (1984). The trial judge did not abuse his discretion in ruling that Charvat was insufficiently qualified to render expert opinions with respect to Appellant's mental condition at the time he committed these offenses.
>
> Furthermore, Appellant did not offer to read Charvat's affidavit in lieu of her testimony; thus, the Commonwealth was not given the opportunity to foreclose the

request for a continuance by consenting to the reading of her affidavit. RCr 9.04; *cf.*
*Shirley v. Commonwealth,* Ky., 378 S.W.2d 816 (1964). But even if the posture of
this case were otherwise, the grant or denial of a continuance is also within the sound
discretion of the trial judge, RCr 9.04, and that discretion was not abused in this
instance. *Williams v. Commonwealth,* Ky., 644 S.W.2d 335 (1982); *see generally*
*Snodgrass v. Commonwealth,* Ky., 814 S.W.2d 579 (1991).

*Hodge I*, 17 S.W.3d at 850-51.

As the state court noted, the petitioner did not explain why he did not request to read Dr.

Charvat's affidavit, in the face of her unavailability and the trial court's denial of a continuance.

Thus, under state evidence law, he is not permitted to complain later. Also, the trial court's ruling

on Dr. Charvat's qualifications was affirmed by the trial court as being consistent with state law.

Finally, the State Supreme Court found that the trial court's denial of a continuance was not an abuse

of discretion under Kentucky rules and decisions. These rulings on state law are binding on this

Court.

However, even if this Court were not bound to the state court's decision, it is not persuaded

that Petitioner Hodge is otherwise entitled to the relief he seeks. As practical matter, in her last two

affidavits and attachments of record (found at TR 389-428 and 2118-29), Dr. Charvat reveals that

among the first things she did was to develop a list of potential mitigation witnesses and that she had

completed her "social history" of the petitioner in March of 1996. Therefore, counsel knew or

should have known the results of her investigation then, eight months in advance of trial, sufficient

time for the defense to make decisions regarding witnesses to be subpoenaed.

By July, Dr. Charvat swears, she had prepared witnesses for their testimony twice, for the

two earlier trial dates which were canceled. Also in her affidavits she states that after the first

motion for a continuance was denied, it was on August 22, 1996, that Dr. Charvat told counsel that

she could not perform her trial duties because of her pregnancy. She takes the blame for not having

provided him with a list of witnesses until October 6th, and for an investigator's inability to locate some witnesses to subpoena, just prior to trial. Additionally, Dr. Charvat states that neither of her desired experts, "Dr. Norman West and Dr. Tom Pendergrass, a neuropsychologist [sic]" would appear at trial on such short notice.

Like the Kentucky High Court, this Court notes that the petitioner has not explained why the defense could not contact the witnesses identified by Dr. Charvat. Perhaps counsel did so. Perhaps these as yet unidentified witnesses appeared. The defense presented eleven witnesses in mitigation. These included several family members, ex-family members, a school-mate, a juvenile judge, and Hodge's eighth grade teacher, through whom the petitioner's many difficulties in his early years and the witnesses' positive assessments of his value as a person, then and now, were revealed.

As to the petitioner's claim that his rights in the penalty phase were compromised to the point of violating the U.S. Constitution, this Court finds no departure from well known U.S. Supreme Court law in the result reached by the state courts. In *Skipper*, cited by the petitioner, the High Court discussed its earlier pronouncements in *Lockett v. Ohio*, 438 U.S. 586 (1978) and *Eddings v. Oklahoma*, 455 U.S. 104 (1982), and held that Petitioner Skipper was denied his right to place before the sentencing jury all relevant evidence in mitigation of punishment, when he was barred from presenting the testimony of jailers and a visitor about his good conduct in jail while awaiting trial. However, the prosecutor therein had argued that the defendant could be expected to rape inmates in prison *and* there was little other evidence for that defendant to present in mitigation. 476 U.S. at 5. The same factors are not present in the case *sub judice*. Hodge's defense counsel was able to and did present substantial evidence in mitigation. Moreover, Hodge's trial court did not rule to exclude guards' testimony about Hodge. There is no indication in the state record that prison guards were sought or subpoenaed or deposed. The defense simply did not choose to present such

88

evidence before the sentencing jury, in addition to the 11 witnesses he did present.

As previously noted, *supra*, the U.S. Supreme Court has written that the denial of a continuance rises to the level of a constitutional violation only when there is "an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay'...." *Morris v. Slappy,* 461 U.S. at 11-12 (quoting *Ungar v. Sarafite* 376 U.S. at 589). The circumstances of a particular case determine whether the denial of a continuance is so arbitrary as to violate due process. *Ungar*, 376 U.S. at 589.

After viewing the totality of the circumstances in the case *sub judice*, this Court finds that the Kentucky Supreme Court's decision denying a continuance based on Dr. Charvat's unavailability was neither contrary to nor an unreasonable application of Supreme Court precedent. Thus, no habeas relief is warranted under the terms of 28 U.S.C. §2254(d).

> 8.   <u>Petitioner Was Denied His Right To A Fair, Reliable and Individualized Sentencing Hearing When The Trial Court Refused To Allow Petitioner To Introduce Evidence Mitigating His Previous Conviction For A Capital Offense</u>.

On Hodge's direct appeal, the Supreme Court of Kentucky summarized the facts of this claim as follows:

> The Commonwealth was permitted to use Appellant's prior conviction for a capital offense, *i.e.,* the Acker murder, as an aggravating circumstance authorizing imposition of the death penalty in this case. By the time of the 1996 trial, that conviction and sentence had been affirmed. *Sub nom., Epperson v. Commonwealth, supra.* However, Appellant's RCr 11.42 petition to vacate that sentence was still pending. Appellant claims (1) a prior conviction cannot be used as an aggravator during the pendency of a motion to vacate that conviction, and (2) he should have been permitted to collaterally attack that conviction during the penalty phase of this trial.

*Hodge I*, 17 S.W.3d at 852. The petitioner explains that his intent was to call into question the reliability of the *Acker* conviction, as his then-pending 11.42 motion was grounded in certain improprieties committed by the prosecutor in that case. Because the trial court would not permit

such a challenge and the jury would not know of irregularities in the *Acker* case, the petitioner argues, his rights under the Fifth, Eighth and Fourteenth Amendments were violated and relief is mandated.

<u>Response</u>

The respondent points out that Hodge's convictions and sentences in *Acker* had been affirmed on appeal and were final, when the RCr 11.42 motion was offered in the penalty phase of Hodge's trial; and there is no right to attack a prior conviction which is offered as sentencing evidence in a trial for a subsequent offense. Moreover, an RCr motion is nothing more than an affidavit which cannot testify. Therefore, it is hearsay which Kentucky law excludes generally and there is no federal right for a defendant to present documents whereby he can avoid being subjected to cross-examination. The respondent relies on the Kentucky Supreme Court's resolution of this issue and several circuit and United States Supreme Court cases.

**<u>Discussion</u>**

After setting out this claim, as quoted above, the Supreme Court of Kentucky ruled on the matter as follows:

> A conviction which is still on appeal is not a final judgment and cannot be used as an aggravating circumstance. *Thompson v. Commonwealth,* Ky., 862 S.W.2d 871 (1993). However, a conviction which has been affirmed on appeal or for which the time for appeal has expired is a final judgment until and unless it is set aside. The pendency of a collateral attack by motion under RCr 11.42 does not preclude use of the conviction as an aggravating circumstance. *Cf. Melson v. Commonwealth,* Ky., 772 S.W.2d 631, 633 (1989). A petition for relief under RCr 11.42 must be filed in the court that imposed the sentence. RCr 11.42(1). Thus, Appellant could not collaterally attack his Letcher Circuit Court conviction during the penalty phase of his Laurel Circuit Court trial. *Cf. Webb v. Commonwealth,* Ky., 904 S.W.2d 226, 229 at 936-37.

*Hodge I*, 17 S.W.3d at 852. Having been decided on state law grounds, the Kentucky Supreme Court's interpretation of state law is binding on this Court. To the extent the petitioner asserts a

violation of the petitioner's constitutional right to a fair sentencing, the Court finds that the Kentucky court's decision was not contrary to and was not an unreasonable application of Supreme Court precedent of the time, as cited by the respondent. *See, e.g., Custis v. United States*, 511 U.S. 485 (1994).

> 9.    Petitioner Was Denied Due Process, A Fair And Reliable Sentencing Proceeding, And Individualized Sentencing When The Judge Refused To Allow Relevant Mitigating Evidence From Two Unavailable Witnesses To Be Read During the Penalty Phase.

At the petitioner's first trial, the defense presented the testimony of Avery Johnson and Kay Daniels as mitigation witnesses. At the mitigation phase of Hodge's 1996 trial, defense counsel informed the re-trial court that these witnesses had been subpoenaed again, but they had failed to appear. He, therefore, sought leave to read their testimonies from the previous trial. Because the trial court refused this request, the petitioner was allegedly robbed of his rights to "due process, a fair and reliable sentencing hearing, and individualized sentencing as guaranteed by the Fifth, Eighth and Fourteenth Amendments." Record No. 6 at 33.

<div align="center">Response</div>

In response, the warden points out that the trial court's grounds for denying the motion was affirmed by appellate court on appeal, *i.e.*, that the petitioner failed to make an adequate showing that they were unavailable; their testimony would only be cumulative; the decision was grounded in state law, to which this Court must defer; and the result was not contrary to or a clearly unreasonable application of then-existing U.S. Supreme Court precedent.

<div align="center">**Discussion**</div>

With regard to the trial court's refusal to permit the reading of Johnson's and Daniels' nine-year-old testimony at the re-trial, the Kentucky Supreme Court wrote:

<div align="center">91</div>

. . . Appellant claimed that a Tennessee judge had excused Johnson from attending the trial because of hardship, KRS 421.240(2), but did not produce any documentation to prove that assertion (and has yet to do so). Nor could Appellant prove that Daniels was "unavailable" as defined in KRE 804(a) and *Crawley v. Commonwealth, supra,* [568 S.W.2d 927 (1978), *cert. denied*, 439 U.S. 1119 (1979)] at 931.

Johnson's 1987 testimony concerned Appellant's previous incarceration, and service as a jail trusty in an Anderson County, Tennessee, jail, to the effect that he worked in the kitchen, performed adequately, and got along with the other inmates and jail employees. At the 1996 re-trial, a stipulation was read to the jury that while Appellant was incarcerated at the Brushy Mountain State Penitentiary in Tennessee, he got along well with the other inmates and guards. Kay Daniels was one of Appellant's ex-wives and the mother of his daughter, Crystal Dawn Hodge. Her 1987 testimony was that Appellant was a good father and that he wrote her frequently while he was incarcerated. Although Daniels did not appear at the 1996 trial, Crystal Dawn Hodge did appear and testified that Appellant was a good father. Furthermore, another ex-wife, Glenda Johnson, and another daughter, Sharon Hodge, both testified that Appellant was a good father. Thus, Appellant was not prejudiced by the absence of Johnson and Daniels, as their testimonies would have been merely cumulative.

*Hodge I*, 17 S.W.3d at 852.

The Kentucky Supreme Court's ruling that defense counsel had failed to make an adequate showing that these witnesses were unavailable is a ruling on state law, and, as such, it is not subject to this Court's review. The accompanying ruling that these witnesses' testimony would be cumulative with that of others is a factual determination which has the presumption of correctness; which is not unreasonable in light of the record; and which the petitioner has not rebutted by clear and convincing evidence. Nor has the petitioner pointed to any U.S. Supreme Court authority to which the state supreme court's rulings are contrary or which were unreasonably applied.

Therefore, relief is not available to Hodge on this claim.

28.   The Prosecutor's Improper Penalty Phase Closing Argument Denied Petitioner Due Process And A Fair And Reliable Sentencing Hearing.

The petitioner characterizes the prosecutor's closing argument as being improper and unconstitutional in that (1) he denigrated the defense's mitigation evidence about Hodge's

92

childhood, as in his asking, "if I am whipped as a child, I have the freedom to commit murder?" Hodge also complains that  (2) the prosecution glorified the victims as he had in the earlier phase of the trial, calling them "good people," pointing to their children's love for them, and arguing that the petitioner deserved to die because the Morrises deserved to live.

Additionally, (3) the jury was allegedly urged to consider improper aggravating factors in its sentence determination, *i.e.*, Hodge's previous murder conviction and Sherry Hamilton's testimony about Hodge's future dangerousness, neither of which is a statutory aggravating factor. Also, after the judge told defense counsel in front of the jury  not to object again and the judge had thereby "effectively muzzled" defense counsel, (4) the prosecutor purportedly misstated the law in telling the jury that it did not have to deliberate on whether the Commonwealth had proved the aggravators because the jury had already found them.

These improper tactics, the petitioner argues, rendered the penalty phase of his trial fundamentally unfair, in violation of the Fifth, Eighth and Fourteenth Amendments.

<u>Response</u>

The respondent points to the Kentucky Supreme Court's finding that the prosecutor's remarks were not improper and to the rule that a federal habeas court must defer to a state court's findings of fact and interpretations of state law.  Further, he argues that state court's ruling is neither contrary to nor inconsistent with any then-existing U.S. Supreme Court decision.

**<u>Discussion</u>**

This Court will deal with Ms. Hamilton's testimony and the prosecution's reference to it in the next section.  As for the other of Petitioner's claims about the prosecutor's closing argument in the penalty phase, the Kentucky Supreme Court rejected his claims as follows:

. . . The prosecutor did not glorify the victims during closing argument, but only

93

depicted them as normal human beings who did not deserve to have their lives ended prematurely or in such brutal fashion.  Nor is it improper to discuss victim impact evidence during the penalty phase closing argument.  *Bowling v. Commonwealth, supra*, 942 S.W.2d at 303; *see also Payne v. Tennessee*, 501 U.S. 808, 825 . . . (1991); *cf. Bennett v. Commonwealth, supra*, [978 S.W.2d 322 (Ky. 1998)] at 325-26.  Finally, while it would be improper in closing argument to attack the concept of mitigating circumstances, a prosecutor may question the validity and the propriety of the specific evidence offered in mitigation in a particular case.  *Tamme v. Commonwealth, supra*, [973 S.W.2d 13, 25 (Ky. 1998), *cert. denied*, 525 U.S. 1153 (1999) at 39; *Sanborn v. Commonwealth*, Ky., 892 S.W.2d 542, 555 (1994), *cert. denied*, 516 U.S. 854 . . . (1995).  Here the prosecutor argued to the jury that the fact that the Appellant had been disciplined as a child did not mitigate his commission of two brutal murders as an adult.  We regard this as fair comment, which is permitted in closing argument.  *Halvorsen v. Commonwealth*, Ky., 730 S.W.2d 921, 925 (1986), *cert. denied*, 484 U.S. 970 . . . (1987).

*Hodge I*, 17 S.W.3d at 852-53.  Later, in conjunction with Hodge's complaint that the trial court admonished him to stop objecting during the prosecutor's closing argument, the Kentucky Supreme Court revisited issue, writing,

. . . [W]e have reviewed all claims of error raised by Appellant and have found no impropriety with respect to the prosecutor's argument.  KRS 532.075(2); *Ice v. Commonwealth, supra* [667 S.W.2d 671, *cert. denied*, 469 U.S. 860 (Ky. 1984)], at 674. . . .

*Hodge I*, 17 S.W.3d at 854.  The Kentucky Supreme Court again rejected this issue in considering Hodge's "general claim of prosecutorial misconduct," the court writing,

. . .  To the extent that misconduct is attributed to the prosecutor's closing argument, we repeat what we have often said before: "A prosecutor may comment on tactics, may comment on evidence, and may comment as to the falsity of a defense position." *Slaughter v. Commonwealth*, Ky., 744 S.W.2d 407, 412 (1987), *cert. denied*, 490 U.S. 1113 . . . (1989).  The prosecutor did not exceed the bounds of fair comment in either of his closing arguments.

*Id*.  Thus, the highest court in Kentucky relied upon U.S. Supreme Court law, as well as state law, in rejecting these claims.

Under state law, the Kentucky Supreme Court found the prosecutor's argument to be "within the bounds of fair comment" and found "no impropriety with respect to the prosecutor's argument."

94

It also found that *United States v. Payne*, which was the established law of the U.S. Supreme Court at the time of the Kentucky courts' rulings, supported its conclusion that it is not improper to discuss victim impact evidence in closing arguments, even in the penalty phase.

*Payne* was decided before the AEDPA and even then, claims of prosecutorial misconduct were reviewed deferentially. *Darden v. Wainwright*, 277 U.S. 168 (1986). To warrant habeas relief, the misconduct must have "'so infected the trial with unfairness as to make the resulting conviction a denial of due process'" *Id.* at 181 (quoting *Donnelly v. DeChristoforo*, 416 U.S. at 643); *see also Boyde v. California*, 494 U.S. 370, 380 (1990) (jury must consider all evidence in mitigation).

In reviewing other petitioners' claims of improper prosecutor arguments, panels of the Sixth Circuit have noted that the degree of deference paid to the state court's decision on propriety/impropriety is now heightened by the AEDPA. *See Bowling v.* Parker, 344 F.3d at 512-13 (quoting from *Macias v. Makowski*, 291 F.3d 447, 453-54 (6th Cir. 2002): "If this court were hearing the case on direct appeal, we might have concluded that the prosecutor's comments violated [the petitioner's] due process rights. But this case is before us on a petition for a writ of habeas corpus. So the relevant question is not whether the state court's decision was wrong, but whether it was an unreasonable application of clearly established federal law").

The petitioner repeatedly claims that his trial was rendered fundamentally unfair, but does not cite any U.S. Supreme Court precedent with which the Kentucky courts' rulings conflict. Clearly established federal law at the time of the Kentucky Supreme Court's decision affirming Hodge's convictions and sentences included not only the U.S. Supreme Court's *Darden* and *Payne* opinions, but also other decisions of the High Court on the limits of particular types of prosecutorial arguments. *See Caldwell v. Mississippi*, 472 U.S. 320, 407 (1985) (prosecutor may not misstate the law and lead jury to believe the responsibility for a death sentence rests elsewhere); *United States*

95

*v.* Young, 470 U.S. 1 (1985) (prosecutorial statements and conduct must be viewed for fairness in the context of the whole trial and must be balanced against those of defense counsel); and *Viereck v. United States*, 318 U.S. 236, 247 (1943) (the incendiary nature of a prosecutor's remarks which were "irrelevant" and "could only have been to arouse passion and prejudice" jeopardized the defendant's right to a fair trial).

After addressing all of Hodge's claims about the prosecutor's comments in closing argument at the trial's penalty phase, including his repeating Sherry Hamilton's opinion that Hodge would kill again,[22] the Kentucky Supreme Court found the prosecutor's closing argument was not improper under the decisions of the highest state and federal courts. This Court defers to that finding as to state law. As to federal law, the Kentucky Supreme Court's decision that the prosecutor's comments did not violate Hodge's due process rights was not contrary to nor an unreasonable application of the afore-stated U.S. Supreme Court law. Therefore, these claims of prosecutorial misconduct cannot serve as a basis for habeas relief.

> 29.    Petitioner's Rights To Due Process And A Fair And Reliable Sentencing Proceeding Were Denied When The Prosecution Was Permitted To Use Evidence In Aggravation That Was Not Disclosed Prior To Trial; and
>
> 30.    Petitioner Was Denied Due Process And A Fair And Rational Sentencing Hearing Because The Commonwealth Was Allowed To Argue And Present Evidence Of A Nonstatutory Aggravator.

Issues 29-30 are closely related to the preceding section and with each other. Petitioner Hodge first contends that Kentucky law requires the Commonwealth to give notice of all evidence it intends to use in aggravation, and if notice is not given, that evidence is not admissible, the petitioner citing to KRS 532.025(1)(a). The petitioner complains that Sherry (Hodge) Hamilton's

---

[22] The Court will take up this claim in the next paragraphs, *infra*.

statement that she believed that Hodge would kill again was gratuitous and was not part of the statutory notice given the defense.  Moreover, the impropriety of that testimony was compounded when the Commonwealth reminded the jury of it twice in closing statements, thus making "future dangerousness" a reason to impose death, even though "future dangerousness" is not one of the statutory aggravating factors listed in KRS 532.025(2).

Petitioner Hodge claims that he could not effectively rebut this phrase because the prosecution did not give the statutory notice and because the trial court did not grant a continuance for an expert, Anne-Marie Charvat, to do so.  Therefore, the use of Sherry Hamilton's statement under these circumstances is violative of his Fifth, Eighth and Fourteenth Amendment rights and grounds to vacate the death sentences and remand for a new sentencing.

<u>Response</u>

The respondent repeats his previous arguments, pointing to the Kentucky Supreme Court's discussion of this issue; reminding the Court that findings of fact and interpretation of state law are binding on this Court; and insisting that the state court's ruling is not contrary to or an unreasonable application of Supreme Court precedent.  Additionally, the *Teague* doctrine bars this claim, and any possible error was harmless.

**<u>Discussion</u>**

On direct appeal, the Kentucky Supreme Court first set out the petitioner's claims, examined the language of Kentucky's notice statute, and then decided the first of these issues on the merits, writing,

> During the penalty phase argument, the prosecutor also reminded the jurors of Sherry Hamilton's testimony that Appellant "would kill again."  Appellant characterizes this reference as improper use of a non-statutory aggravator ("future dangerousness") of which Appellant was not given pre-trial notice as required by KRS 532.025(1)(a).  The applicable language of the statute is as follows:

97

> Upon conviction of a defendant in cases where the death penalty may be imposed, a hearing shall be conducted. In such hearing, the judge shall hear *additional evidence* in extenuation, mitigation, and aggravation of punishment, including the record of any prior criminal convictions and pleas of guilty or pleas of nolo contendere of the defendant, or the absence of any prior conviction and pleas; provided, however, that only such *evidence in aggravation* as the state has made known to the defendant prior to his trial shall be admissible. (Emphasis added.)

> Hamilton's testimony was not offered as "additional evidence" during the penalty phase of the trial. The evidence was elicited during the guilt phase *during cross-examination of Hamilton by defense counsel*. There was no objection to the testimony and no motion was made to strike it from the record. The Commonwealth is not required to give notice of aggravating evidence which it does not introduce. Once introduced, however, such evidence may be the subject of fair comment during closing argument. . . .

*Hodge I*, 17 S.W.3d at 853 (emphasis of the Kentucky court). This ruling on the admissibility of previously unnoticed evidence is clearly an interpretation of a state statute, and it is, therefore, not reviewable by this Court in a habeas proceeding.

The Kentucky Supreme Court also made a decision on the petitioner's purported constitutional claim on the merits, citing U.S. Supreme Court law and writing about the "future dangerousness" issue, as follows:

> The United States Supreme Court "has approved the jury's consideration of future dangerousness during the penalty phase of a capital trial, recognizing that a defendant's future dangerousness bears on all sentencing determinations made in our criminal justice system." *Simmons v. South Carolina*, 512 U.S. 154, 162 . . . (1974) (per Justice Blackmun with three Justices concurring in result without disagreeing with this holding). In *Simmons*, as here, future dangerousness was not a statutory aggravator.

*Id.*

In the time since the *Simmons* decision, the U.S. Supreme Court has refused to bar non-statutory information from a capital jury's consideration. More than 20 years ago, the High Court

wrote,

> [A]lthough a death sentence may not rest *solely* on a nonstatutory aggravating factor, the Constitution does not prohibit consideration at the sentencing phase of information not directly related to either the statutory aggravating or statutory mitigating factors, as long as that information is relevant to the character of the defendant or the circumstances of the crime.

*Barclay v. Florida*, 463 U.S. 939, 966-67 (1983) (Stevens, J., concurring) (emphasis in the original).

As to "future dangerousness" specifically, the Court has written as follows:

> Consideration of a defendant's past conduct as indicative of his probable future behavior is an inevitable and not undesirable element of criminal sentencing: "any sentencing authority must predict a convicted person's probable future conduct when it engages in the process of determining what punishment to impose." *Jurek v. Texas*, 428 U.S. 262, 275 (1976).

*Skipper*, 476 U.S. at 4. *See also, Johnson v. Texas*, 509 U.S. 350, 368 (1993) (upholding instructions to jury to consider whether there was "*a probability* that [the defendant] would commit criminal acts of violence that would constitute a continuing threat to society") (emphasis added).

This Court finds the Kentucky Supreme Court's treatment of these issues is consistent with and not contrary to or an unreasonable application of then-existing U.S. Supreme Court precedent, including *Simmons, Barclay,* and *Jurek,* and also *Payne v. Tennessee*, cited in the previous section. In *Payne*, the U.S. Supreme Court held that a jury can consider extraneous information, including both impact on the victim(s) and future dangerousness of the defendant. *See also* Penalty Phase Issue 33, *infra*.

> 31.   Petitioner Was Denied Due Process And A Fair And Reliable Penalty Phase When The Verdict Forms Informed A Reasonable Jury That Lesser Sentences Could Not Be Considered Once The Jury Found The Existence Of An Aggravating Circumstance.

The Petitioner next challenges the instructions and forms given to the jury at the conclusion of the penalty phase.  He first describes the forms, beginning at the top of the first page, where in

capital and bolded lettering, are the words "(**UNDER ONLY ONE**)." *See* forms at TR 2064-66 for

Edwin Morris's murder and at TR 2067-69 for Bessie Morris's murder.

The petitioner complains that the trial court's forms *required* them to impose a harsher

sentence upon the finding of an aggravating circumstance, whereas the ones he offered did not. He

also claims that the court's instructions did not inform the jury that it could impose a lighter

sentence, even if it found aggravating factors. Citing to Kentucky case law, including *Purdue v.*

*Commonwealth*, Ky. 916 S.W.2d 148, 168 (1996), the petitioner contends that verdict forms should

not have made the jury feel obligated to fix a specific punishment if an aggravator is found; rather,

the court should have used his proffered instructions, which separated the finding of the aggravators

from the imposing of a sentence.

The verdict forms used herein purportedly violated the petitioner's right to due process and

a fair penalty determination under the Fifth, Eighth and Fourteenth Amendments, and so the death

sentence should be vacated.

## Response

The respondent's position is that the jury instructions as a whole made it clear that the jury

need not impose a death sentence merely because it found the existence of an aggravating

circumstance. He refers to the Kentucky Supreme Court's ruling on this issue and the rulings of

other federal courts which have rejected similar arguments regarding "so-called combination

sentence verdict forms." The petitioner contends that implied findings of fact and rulings on state

law must be deferred to. Additionally, the state court's rejection of this claim was not contrary to

nor an unreasonable application of Supreme Court law; and the petitioner's argument is barred by

the *Teague* non-retroactivity doctrine.

## Discussion

100

In the case *sub judice*, at the conclusion of the penalty phase, the trial court instructed the jury as to the four penalties it could impose for a murder conviction.  Record No. 39.  The Court then supplied the jury with two verdict forms which were identical, except that one had Edwin Morris's name and the other Bessie Morris's name.  TR 2064-69.

Each murder form consisted of four choices from which the jury could choose for fixing a penalty.  Choice number 1, on page 1, had two lines to be completed, one for the jury to fill in the number of years' imprisonment if they chose a term of years and a blank for the foreperson's signature; option number 2 contained the choice of "confinement in the penitentiary for life" and had only one blank, for the foreperson to sign if the jury chose the life alternative; number 3 had two places to be completed, *i.e.*, one for identifying and writing in ". . . the following aggravating circumstance or circumstances exist in this case:" and the second blank for the foreperson to sign if the jury fixed the penalty at "life without benefit of probation or parole until he has served a minimum of 25 years of his sentence;" and choice number 4, for choosing death as the penalty, also contained two blanks, the first for writing in any "aggravating circumstance or circumstances" which was or were found beyond a reasonable doubt and the second blank for the foreperson to sign if the jury chose number 4, to fix the penalty at death.

The jury chose to complete verdict form number 4 as the penalty for both Edwin and Bessie Morrises' murders, the state record showing that each verdict form contained (1) a list of the jury's findings of several statutory aggravating circumstances[23] in each of the murders; and (2) the foreperson's signature, after the words fixing the penalty "at death."  TR 2066 and 2069.

---

[23]  On both murder verdict forms, the jury had found the following to be the statutory aggravating circumstances:  the offense of murder was committed by a person with a prior record of conviction for a capital offense; the murder was committed while the offender was engaged in the commission of robbery in the first degree; the murder was committed while the offender was engaged in the commission of burglary in the first degree; and the offender's acts were intentional and resulted in multiple deaths.  TR 2066, 2069; KRS 532.025(2)(a).

101

The Court has studied the forms and the parties' arguments.  With regard to the petitioner's claim that neither the trial court nor the instructions nor the verdict forms informed the jury that it could impose a penalty other than the two harshest penalties, even if it found that the prosecution proved aggravating factors, the Supreme Court of Kentucky wrote as follows:

> The penalty phase instructions included the capital penalty verdict forms at 1 Cooper, *Kentucky Instructions to Juries (Criminal)* § 12.10 (4th ed. Anderson 1993) instead of the forms at § 12.10A of that treatise.  As we stated in *Slaven v. Commonwealth*, Ky., 962 S.W.2d 845, 859-60 (1997), we prefer that the § 12.10A forms be used, but do not deem the use of the § 12.10 forms to be reversible error. *See also Foley v. Commonwealth*, Ky., 942 S.W.2d 876, 888-89 (1996); *cert. denied*, 522 U.S. 893 . . . (1997); *Haight v. Commonwealth*, Ky., 938 S.W.2d 243 (1996), *cert. denied*, 522 U.S. 837. . . (1997); *Bussell v. Commonwealth*, Ky., 882 S.W.2d 111 (1994), *cert. denied*, 513 U.S. 1174 . . . (1995).  Here, the prosecutor carefully explained to the jury during his closing argument that they were required to list the aggravating circumstances only if they decided to impose a capital penalty.

*Hodge I*, 17 S.W.3d at 854.

Like the preceding claim, this claim was clearly decided under Kentucky law, to which this Court defers.  As to the due process claim, a challenged jury instruction is not a basis for habeas relief unless "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Estelle v. McGuire*, 502 U.S. at 482 (quoting *Cupp v. Naughten*, 414 U.S. at 147 and citing other of the U.S. Supreme Court's relevant decisions over the years).  In the words of the High Court more recently, the standard for reviewing such a challenge to the jury instructions "is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. at 380.  *See also Buchanan v. Angelone*, 522 U.S. 269, 270 (1998).

The Sixth Circuit has echoed, "The proper standard is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents consideration of constitutionally relevant evidence." *Skaggs v. Parker*, 27 F.Supp.2d 952, (W.D.Ky. 1998),

*reversed in part on other grounds*,[24] 235 F.3d 261 (6th Cir. 2000). In *Skaggs*, the Court also pointed

out that the U.S. Supreme Court has applied the "reasonable likelihood" standard both in

determining whether a jury instruction violates a defendant's right to due process, under *Estelle v.*

*McGuire*, 502 U.S. at 72, and in considering whether an instruction violates a defendant's Eighth

Amendment rights, under *Boyde v. California*, 494 U.S. at 380. *Skaggs* at fn 17.

At the time that the instant petitioner's case became final, Supreme Court law also included

the Court's admonition that an instruction not be judged in isolation but in the context of the whole

record and the other instructions. *Cupp v. Naughten*, 414 U.S. at 147. Additionally, the High Court

has held that even if the habeas court finds a reasonable likelihood that the jury erroneously

interpreted the instruction, the federal court cannot grant the writ unless, after applying the harmless-

error review, the court finds that the error, "in the whole context of the particular case, had a

substantial and injurious effect or influence on the jury's verdict." *Calderon v. Coleman*, 525 U.S.

at 503-05.

As they were promised since *voir dire*, Hodge's jury was presented with four penalty options

on the murder convictions and were told that they could choose any one of the four. They could not,

however, choose and sign number 3 or 4, the most severe penalties for each murder, unless they

filled in the aggravating circumstances blanks before the foreperson signature line. An examination

of the actual instructions and forms reveals that there was no realistic chance of confusion.

The Kentucky courts found no legal problem with the verdict forms, and this Court

concludes that the state courts' rejection of the petitioner's claim was not contrary to or an

unreasonable application of any then-existing U.S. Supreme Court law. This Court's rejection of

---

[24] The denial of habeas relief in *Skaggs* was reversed on appeal on the ground that the defendant had ineffective assistance of counsel in the penalty phase of his trial which had ended with the imposition of the death penalty.

the instant claim is also consistent with the Sixth Circuit's rejection of another petition which

contained a similar verdict form and an accompanying fundamental fairness claim, *Baze v. Parker*,

371 F.3d at 327-28 (citing the due process standards in *Henderson v. Kibbe*, 431 U.S. 145, 154

(1977) and *Brecht v. Abrahamson*, 507 U.S. at 638).[25]

>    32.    There Is Insufficient Statutory Guidance For Imposition Of The Death
>    Penalty.

The petitioner complains that Kentucky's death penalty statute, KRS 532.025, contains only

general directions to the judge and jury, which amounts to insufficient guidance to pass

constitutional muster.  The statute directs only that the jury "shall hear additional evidence in

extenuation, mitigation and aggravation of punishment;" the judge then gives the jury "appropriate

instructions;" and "the jury shall retire to determine whether any mitigating or aggravating

circumstances . . . exist and to recommend a sentence for the defendant."  KRS 532.025(1)(a) and

(b).

The statue continues in pertinent part as follows:

> (2) In all cases of offenses for which the death penalty may be authorized, the judge
> shall consider, or he shall include in his instructions to the jury for it to consider, any
> mitigating circumstances or aggravating circumstances otherwise authorized by law
> and any of the following statutory aggravating or mitigating circumstances which
> may be supported by the evidence:
>  (a) Aggravating circumstances:
>       1. The offense of murder or kidnapping was committed by a person
>       with a prior record of conviction for a capital offense, or the offense
>       of murder was committed by a person who has a substantial history
>       of serious assaultive criminal convictions;
>       2. The offense of murder or kidnapping was committed while the
>       offender was engaged in the commission of arson in the first degree,

---

[25]  As in *Baze*, the instant petitioner's complaint about the penalty phase instructions also fails as a practical matter.  371 F.3d at 328.  In both, the jury had to read through the two lesser penalties before reaching the harsher ones and had to read through the first three verdict forms and fill in a list of aggravators before even being able to choose the death penalty option.  The jury could have stopped anywhere along the way in order to impose a lesser penalty.  The jury chose not to.

robbery in the first degree, burglary in the first degree, rape in the first degree, or sodomy in the first degree;

3. The offender by his act of murder, armed robbery, or kidnapping knowingly created a great risk of death to more than one (1) person in a public place by means of a weapon of mass destruction, weapon, or other device which would normally be hazardous to the lives of more than one (1) person;

4. The offender committed the offense of murder for himself or another, for the purpose of receiving money or any other thing of monetary value, or for other profit;

5. The offense of murder was committed by a person who was a prisoner and the victim was a prison employee engaged at the time of the act in the performance of his duties;

6. The offender's act or acts of killing were intentional and resulted in multiple deaths;

7. The offender's act of killing was intentional and the victim was a state or local public official or police officer, sheriff, or deputy sheriff engaged at the time of the act in the lawful performance of his duties; and

8. The offender murdered the victim when an emergency protective order or a domestic violence order was in effect, or when any other order designed to protect the victim from the offender, such as an order issued as a condition of a bond, conditional release, probation, parole, or pre-trial diversion, was in effect.

(b) Mitigating circumstances:

1. The defendant has no significant history of prior criminal activity;

2. The capital offense was committed while the defendant was under the influence of extreme mental or emotional disturbance even though the influence of extreme mental or emotional disturbance is not sufficient to constitute a defense to the crime;

3. The victim was a participant in the defendant's criminal conduct or consented to the criminal act;

4. The capital offense was committed under circumstances which the defendant believed to provide a moral justification or extenuation for his conduct even though the circumstances which the defendant believed to provide a moral justification or extenuation for his conduct are not sufficient to constitute a defense to the crime;

5. The defendant was an accomplice in a capital offense committed by another person and his participation in the capital offense was relatively minor;

6. The defendant acted under duress or under the domination of another person even though the duress or the domination of another person is not sufficient to constitute a defense to the crime;

      7. At the time of the capital offense, the capacity of the defendant to appreciate the criminality of his conduct to the requirements of law was impaired as a result of mental illness or retardation or intoxication even though the impairment of the capacity of the defendant to appreciate the criminality of his conduct or to conform the conduct to the requirements of law is insufficient to constitute a defense to the crime; and
      8. The youth of the defendant at the time of the crime.

      (3) The instructions as determined by the trial judge to be warranted by the evidence or as required by KRS 532.030(4) shall be given in charge and in writing to the jury for its deliberation. The jury, if its verdict be a recommendation of death, or imprisonment for life without benefit of probation or parole, or imprisonment for life without benefit of probation or parole until the defendant has served a minimum of twenty-five (25) years of his sentence, shall designate in writing, signed by the foreman of the jury, the aggravating circumstance or circumstances which it found beyond a reasonable doubt. . . .   In all cases unless at least one (1) of the statutory aggravating circumstances enumerated in subsection (2) of this section is so found, the death penalty, or imprisonment for life without benefit of probation or parole, or the sentence to imprisonment for life without benefit of probation or parole until the defendant has served a minimum of twenty-five (25) years of his sentence, shall not be imposed.

KRS 532.025(2) and (3).

      Complaining of both what is in and what is not in Kentucky's death penalty statute, the petitioner contends that the statute provides constitutionally insufficient standards to guide the jury in determining which cases merit life sentences and which merit death.  In addition to not directing how the jury "shall hear additional evidence in extenuation, mitigation and aggravation of punishment," Hodge claims that the statute is further flawed in that (1) with regard to mitigating factors, it fails to give the jury directions on what standard to use, whether the jurors are required to find any such factors, whether the jury may consider any mitigation not specifically enumerated, and how to weigh them against the aggravating factors; (2) it may allow the prosecution to introduce non-statutory aggravating factors; and (3) certain of the provisions on aggravating or mitigating circumstances are unconstitutionally vague, the petitioner citing both of the aforequoted portions

106

of the statute, KRS 532.025(2)(a)(1) and KRS 532.025(2)(b)(1).  Finally, he points out that the statute authorizes a death sentence without a finding of specific intent to kill.

Because the Kentucky statute violates the Eighth and Fourteenth Amendments, the petitioner argues, he must be given a new trial which will not include death as a possible punishment.

<u>Response</u>

The respondent counters that the Kentucky statue follows the Georgia model, which does not require a weighing of the mitigating against the aggravating circumstances and which has been ruled constitutional by the U.S. Supreme Court, in *Zant v. Stephens*, 462 U.S. 862 (1983).  The High Court has also rejected the idea that a specific intent to cause death is constitutionally required.  *Tison v. Arizona*, 481 U.S. 137 (1987).  Finally, he points out that the United States Court of Appeals for the Sixth Circuit has expressly held, in *McQueen v. Scroggy*, 99 F.3d at 1333, that the Kentucky statute is modeled after the Georgia model and is, therefore, constitutional.

**Discussion**

The Kentucky Supreme Court treated this matter as if it were tired of such arguments about Kentucky's statute.

> Appellant's arguments that . . . our statutory scheme does not provide constitutionally adequate guidance to capital sentencing juries, have been raised, considered and rejected by this Court on numerous occasions.  *E.g.*, *Tamme v. Commonwealth*, *supra*, at 40-41; *Bowling v. Commonwealth*, *supra*, 942 S.W.2d at 306; *Foley v. Commonwealth*, *supra*, 942 S.W.2d at 890; *Bussell v. Commonwealth*, *supra*, at 115; *Sanders v. Commonwealth*, Ky., 801 S.W.2d 665, 683 (1990), *cert. denied*, 502 U.S. 831, 112 S.Ct. 107, 116 L.Ed.2d 76 (1991).  Our views with respect to those arguments remain unchanged.

*Hodge I*, 17 S.W.3d at 854.

This Court must agree with the respondent.  The United States Supreme Court has consistently ruled that the Georgia death penalty statute, upon which the Kentucky statute is

107

modeled, is constitutional. *McCleskey v. Kemp*, 481 U.S. 279 (1987); *Zant v. Stephens*, 462 U.S. at 862; *Gregg v. Georgia*, 428 U.S. at 153. Additionally, in the 1994 decision of *Tuilaepa v. California*, *supra*, the U.S. Supreme Court recognized that states may grant a sentencing authority vast discretion to evaluate the circumstances relevant to the defendant and to the crimes committed, in deciding whether to impose the death penalty.

The Kentucky Supreme Court's rejection of this constitutional argument is not contrary to, nor an unreasonable application of such clearly established law handed down by the Supreme Court of the United States. The petitioner is, therefore, not entitled to habeas relief on this ground.

      33.   <u>Petitioner Was Denied A Fair And Reliable Sentencing Hearing Because The Jury Was Not Instructed That Aggravators Must Outweigh Mitigators Beyond A Reasonable Doubt In Order To Impose The Death Penalty</u>.

Repeating part of the preceding argument, the petitioner claims that Kentucky's death penalty statute, KRS 532.025, requires juries to weigh the aggravating factors against the mitigating factors, but Hodge's jury was not instructed on that point, thus violating his Fifth, Eighth and Fourteenth Amendment rights.

<div align="center"><u>Response</u></div>

The respondent disagrees that the Kentucky statute requires such a weighing and asserts that the Kentucky courts have recognized this "in virtually every death penalty case to be reviewed by that Court." Additionally, the respondent incorporates by reference his position on the immediately preceding claim and notes that the Supreme Court of the United States has never imposed on the states the weighing of aggravators against mitigators as a constitutional requirement for deciding on the penalty of death.

<div align="center">**<u>Discussion</u>**</div>

The Kentucky Supreme Court wrote as follows:

<div align="center">108</div>

> The trial judge is not required to instruct the jury that aggravating circumstances must outweigh mitigating circumstances. *Bowling v. Commonwealth*, *supra*, 942 S.W.2d at 306; *Sanders v. Commonwealth*, *supra*, at 682-83; *Ice v. Commonwealth*, Ky., 667 S.W.2d 671, 678 (1984), *cert. denied*, 469 U.S. 860 . . . (1984); *Smith v. Commonwealth*, Ky., 599 S.W.2d 900 (1980).

*Hodge I*, 17 S.W.3d at 854.

This Court must defer to the Kentucky Supreme Court's rulings with regard to state law. The right to have certain statutory mitigating factors considered or to have aggravating factors ignored is a creature of state statute, not the federal Constitution. *Zant v. Stephens*, 462 U.S. at 878-79. The Kentucky legislature has chosen not to impose a weighing requirement on juries.

The U.S. Supreme Court long ago held that states must limit the class of murderers to whom the death penalty may be applied. *Furman v. Georgia*, 408 U.S. 238 (1972) (*per curiam*). "This narrowing requirement is usually met when the trier of facts finds at least one statutorily defined eligibility factor [commonly called 'aggravating factors' or 'aggravating circumstances']." *Brown v. Sanders*, ___ U.S. ___, ___, 126 S.Ct. 884, 889, 2006 WL 47402 at *4 (January 11, 2006). Once this narrowing requirement has been satisfied, the fact finder may constitutionally impose death as a penalty. *Id.* (citing *Tuilaepa v. California*, 512 U.S. at 971-72)

The next decision is whether the death penalty will actually be imposed on this defendant *Id.* States differ in their statutes' requirements for this second step in the decision making process. "The distinction between a 'weighing' state and a 'non-weighing' state is a functional one, as is best illustrated by the differences between the capital punishment sentencing schemes in Georgia [like Kentucky, a non-weighing state] and in Mississippi [weighing]." *Coleman v. Ryan*, 196 F.3d 793, 797 (7th Cir. 1999), *cert. denied*, 531 U.S. 848 (2000). *Cf. Zant v. Stevens*, 462 U.S. at 862 (applicable only to non-weighing states), *with Stringer v. Black*, 503 U.S. 222, 234 (1992) (rules for weighing states). *See also Clay v. Bowersox*, 367 F.3d 993, 1004-05 (8th Cir. 2004), *cert. denied*,

125 S.Ct. 2246 (2005), and *Wiley v. Puckett*, 969 F.2d 86, 93 (5th Cir. 1992) (both discussing the effect of the non-weighing or weighing structure of the statute).

Briefly described, weighing states are those in which the only aggravating factors which are permitted to be considered are the statutory aggravating factors/circumstances (*e.g., Parker v. Dugger*, 498 U.S. 308, 313 (1991)); a non-weighing state like Kentucky, in contrast, permits the sentencer to consider additional aggravating factors, not only those listed in the statute[26] (*Brown v. Sanders*, __ U.S. at ___, 126 S.Ct at 889-90, 2006 WL 47402 at *4-5).[27]  In addition to giving states their choice of either of the statutory structures, the Court has held that an aggravating circumstance may be found at either the guilt or penalty phase.[28]  *Tuilaepa v. California*, 512 U.S. at 971-72.

This Court finds that the Kentucky Supreme Court's ruling on this matter is based upon state law, which is a permissible non-weighing scheme and is the province of the Kentucky courts to interpret.  Even if the fact finder had been instructed erroneously under state law, it would not have been a basis for habeas relief.  *Estelle v. McGuire*, 502 U.S. at 71-72.

To the extent the petitioner claims a violation of his constitutional rights, the well established federal law is that so long as the decision maker is allowed to weigh all the facts and circumstances both for and against imposing the death penalty and arrives at an individualized death sentence, the U.S. Constitution is satisfied.  *Buchanan v. Angelone*, 522 U.S. at 270; *Zant v. Stevens*, 462 U.S. at

---

[26]  *See* Penalty Phase Issue #29-30, wherein the petitioner's claims of error for allowing future dangerousness testimony, based on its not being a statutory aggravating circumstance, was rejected.  Non-statutory aggravating circumstances *can* be considered in Kentucky's scheme.

[27]  Although the holding is not applicable herein, interestingly, the Court commented that the weighing/non-weighing scheme "now seems to us needlessly complex," and went on to create a different rule to be used henceforth in the circumstances presented therein. *Brown v. Sanders*, _____ U.S. ____, ____, 126 S.Ct. 884, 891, 2006 WL 47402 at *5.

[28]  The jury instructions at the penalty phase of Hodge's trial actually required the jury to find  aggravating circumstances beyond a reasonable doubt.  Record No. 40 at 118.  Thus, there was no misstatement of federal law. *See Bowling v. Parker*, 344 F.3d 487, 518 (6th Cir. 2003), *cert. denied*, 513 U.S. 862 (1994) (same).

878-79; *Eddings v. Oklahoma*, 455 U.S. at 110.  This Court finds that the Kentucky appellate court's ruling is neither contrary to nor an unreasonable application of Supreme Court precedent of the time.

## INEFFECTIVE ASSISTANCE OF COUNSEL

### Procedures in State Court

As was stated *supra*, a Kentucky RCr 11.42 motion to vacate, set aside or correct a criminal judgment, filed in the court of conviction, initiates a collateral proceeding, and it is the main vehicle for a bringing ineffective assistance of counsel claims in the Commonwealth of Kentucky.  An RCr 11.42 proceeding is governed by its own terms and attendant case law.

An RCr 11.42 proceeding cannot be used to relitigate issues decided on direct appeal or to raise issues which could have been presented on direct appeal.  *Sanborn v. Commonwealth*, 975 S.W.2d 905, 909 (Ky. 1998), *cert. denied*, 526 U.S. 1025 (1999); *Thacker v. Commonwealth*, 476 S.W.2d 838 (Ky. 1972); *Bronston v. Commonwealth*, 481 S.W.2d 666, 667 (Ky.Ct.App. 1972); *see also Baze v. Commonwealth*, 23 S.W.3d at 626.  Nor may an issue raised and rejected on direct appeal be relitigated by claiming that it amounts to ineffective assistance of counsel.  *Stanford v. Commonwealth*, 854 S.W.2d 742 (Ky. 1993)*; Brown v. Commonwealth*, 78 S.W.2d 500 (Ky. 1990).

There is only one RCr 11.42 proceeding permitted each person convicted in Kentucky's courts.  "Final disposition of the motion shall conclude all issues that could reasonably have been presented in the same proceeding."  *Id.* at (3).  Although the Kentucky rule has exceptions for situations for an error which was not known or discoverable,[29] the instant petitioner has presented no claims which would fit under these exceptions.   Further, by the express terms of the rule, the

---

[29]  Under RCr 60.02, a defendant can raise a challenge not brought in his RCr 11.42 motion, if the errors involved were "unknown and could not have been known to the party by the exercise of reasonable diligence and in time to have been otherwise presented to the court." *Gross v. Commonwealth*, 648 S.W.2d 853, 856 (Ky. 1983). Additionally, a new 11.42 motion can be filed "upon a ground which was not known, or reasonably discoverable at the time the first motion was made." *Gilliam v. Commonwealth*, 652 S.W.2d 856, 858 (Ky. 1983).

movant must "state specifically the grounds on which the sentence is being challenged and the facts on which the movant relies in support of such grounds . . . ." RCr 11.42 (2).

The state and federal courts have recognized that the Kentucky courts actually enforce the provisions of RCr 11.42. A Kentucky court's finding that a movant did not comply with the procedure appropriately is an "adequate and independent" state ground on which the state can rely to foreclose the federal court's review of a movant's claim. *See, e.g., Hardin v. Chandler*, 36 Fed.Appx. 769, **1 (6th Cir. 2002) (unpublished)*; Marsh v. Seabold,* 27 Fed.Appx. 445 (6th Cir. 2001) (unpublished) (citing *Coleman v. Thompson*, 501 U.S. at 750). Thus, the only way in which the habeas court can review a procedurally defaulted RCr 11.42 claim is upon the petitioner's demonstrating cause and prejudice for his default in the state court or his making a colorable showing of actual innocence so as to demonstrate a fundamental miscarriage of justice. *Marsh*, 27 Fed.Appx. at 448.

<u>Constitutional Standard for Ineffective Assistance of Counsel</u>

The Sixth Amendment to the Constitution guarantees reasonably effective assistance of counsel to every criminal defendant. *Cuyler v. Sullivan*, 446 U.S. 335, 343 (1980). In order to obtain post-conviction relief due to ineffective assistance of counsel, a petitioner must satisfy the now-familiar 2-pronged test set forth by the U.S. Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). To show constitutionally ineffective assistance of counsel, "[a] petitioner must show [1] that counsel's performance was deficient, and [2] that the deficiency prejudiced the defense." *Id.* at 687.

As to the first of these requirements, deficient performance "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* To establish deficient performance, a petitioner must demonstrate

112

that counsel's representation "fell below an objective standard of reasonableness" (*Id.* at 688) or, stated differently, counsel's representation was "outside the wide range of professionally competent assistance" (*Id.* at 689).

The *Strickland* Court also cautioned that "[j]udicial scrutiny of a counsel's performance must be highly deferential" and that "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689-90.  The High Court directed courts to begin with a presumption:

> . . . Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

*Id.* at 689 (citations omitted).

Even if a petitioner carries this high burden to establish deficient performance, he must also establish the second component, prejudice, before he will be entitled to relief.  The prejudice prong "requires a showing that counsel's errors were so serious as to deprive [him] of a fair trial, a trial whose result is reliable." *Id.* at 687.  To prevail on this prong, he must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

However, "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant." *Id.* at 697.  If a reviewing court finds a lack of prejudice, it need not determine whether, in fact, counsel's performance was deficient. *Id.*  In the context of a death sentence, the prejudice prong is predicated on "whether there is a reasonable

probability that, absent the errors, the sentencer--including an appellate court, to the extent it independently reweighs the evidence--would have concluded that the . . . circumstances did not warrant death." *Id.* at 695.

The United States Supreme Court later elaborated on the prejudice component of *Strickland*. In *Lockhart v. Fretwell*, 506 U.S. 364, 369-70 (1993), the Court clarified that the prejudice analysis is not merely about the outcome but must give attention to the effect it has on the ability of the accused to have a fair trial.  *Id*. at 368.  "Thus an analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective." *Id.* at 369.  Unfairness does not result if the ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right to which the law entitles him. *Id.* at 371.

Further, in evaluating the prejudice component, counsel's actions must be considered in light of all the circumstances.  *Strickland*, 466 U.S. 695.  The reviewing court must also review the merits of the underlying claim.  *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).  *See Maples v. Stegall*, 427 F.3d 1020, 1023-25 (6th Cir. 2005).  Mixed questions of law and fact are reviewed under the "unreasonable application" prong of AEDPA.  *See Barnes v. Elo*, 339 F.3d 496, 501 (6th Cir. 2003), *cert. denied*, 540 U.S. 1164 (2004).

Finally, for a post-AEDPA petitioner to succeed, the petitioner must do more than show that he would have satisfied *Strickland*'s test if his claim were being analyzed in the first instance, because under §2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly.  Rather, the petitioner must show that the state appellate court "applied *Strickland* to the facts of his case in an objectively unreasonable manner."  *Bell v. Cone*, 535 U.S. 685, 698-99 (2002).  Post-AEDPA claims of

114

ineffective assistance of counsel brought by habeas petitioners will, therefore, succeed only in very limited circumstances. *Id.*

<p style="text-align:center">Petitioner Hodge's Claim of Ineffective Assistance of Counsel</p>

Hodge's RCr 11.42 motion containing his ineffective-assistance-of-counsel claims was denied by the trial court. Asserting that the circuit court did not follow the directions of the United States in *Strickland* and *Terry Williams v. Taylor*, the petitioner appealed the result of this collateral proceeding directly to Supreme Court of Kentucky for review. As the respondent points out, in the opinion affirming the trial court's denial of RCr 11.42 relief, *Hodge II*, the Kentucky appellate court denied some claims as having been decided on direct appeal; denied others which could have been presented on direct appeal; and rejected some as having no factual support in the record.

As to  claims to be addressed on the merits, the Kentucky Supreme Court began its discussion by writing in the first page of its opinion, "The standards which measure ineffective assistance of counsel have been set out in *Strickland v. Washington*, 466 U.S. 668 . . . (1984)." *Hodge II*, 116 S.W.3d at 468. Thereafter, the state court elaborated on the law regarding RCr 11.42 motions and the standards of *Strickland*, including its directive to be deferential and its later clarifications in *Bell v. Cone*, 535 U.S. at 685, and in  *Lockhart v. Fretwell*, 506 U.S. at 369 (the focus should be on whether the result of the trial was "fundamentally unfair or unreliable").

Before addressing the merits of any of the petitioner's claims about counsel individually, the state appellate court wrote generally, "We find the frequent enumerations of alleged departure from the federal standard to be unconvincing and contradictory in the light of the emphasis Hodge seems to place on the importance of the record."  *Hodge II*, 116 S.W.3d at 469.  That court then characterized the petitioner's presentation of his claims as a "laundry list" and as being in a presentation which is impermissible under Kentucky law:

<p style="text-align:center">115</p>

> Here, the allegations presented were essentially based on facts contained in claims raised on direct appeal but with the application of a new legal theory, ineffective assistance of counsel. . . . The presentation of ineffective assistance, which must not be based on a claim already presented on direct appeal, fixes the burden on Hodge to plead sufficient facts to establish that the conduct of defense counsel was objectively unreasonable and that a reasonable performance by counsel would have created a reasonable probability of a favorable result.

*Id.* at 469-70 (citations to Kentucky law omitted).  The Kentucky Supreme Court concluded that Hodge had not carried his burden.

The Kentucky courts having applied the *Strickland* standard in its analysis and having decided that the instant petitioner was not denied effective assistance, the first question for this Court, under AEDPA, is whether it was objectively unreasonable for the state court to hold that the attorneys' actions or inactions did not fall "below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688; *see also Bell v. Cone*, 535 U.S. at 699; *Alley v. Bell*, 307 F.3d at 400-01.

Applying AEDPA deference, the Court proceeds to examine the Kentucky Supreme Court's treatment of Hodge's ineffective assistance of counsel claims and, for those discussed and adjudicated on the merits, to adjudge whether the state appellate court's rejection of the claims was an unreasonable determination of facts or was contrary to or an unreasonable application of *Strickland* and its progeny.

<u>Specific Issues about Hodge's Counsel</u>

5.    <u>Petitioner's Trial Counsel Rendered Ineffective Assistance of Counsel During Sherry  Hamilton's Cross Examination In Violation Of *Strickland v. Washington*, 466 U.S. 668 (1984)</u>.

The petitioner's first claim about his 1996 trial counsel is grounded in his attorney's cross-examination of his ex-wife, Sherry Hamilton.  He stresses that since there was no physical evidence of the petitioner's involvement, Hamilton's testimony and that of Bartley were the primary evidence putting Hodge at the scene of the crime.  Therefore, trial counsel's failure to adequately challenge

116

Hamilton purportedly renders his assistance not only deficient, but also prejudicial, under *Strickland* and *Terry Williams v. Taylor*, 529 U.S. at 399-400.

In support of this claim, (1) Hodge describes Sherry's testimony as being fraught with references to his prior bad acts, testimony which is inadmissible under Kentucky law and in violation of a pre-trial court order barring such testimony without notice. Additionally, (2) the petitioner complains that Hamilton referred to him as a "killer" and "thief," who runs from "the law," all without counsel's lodging any objection. Finally, (3) the petitioner lists 13 additional places in Sherry's testimony where no objection was raised nor admonition sought, including her reference to the re-trial.

The petitioner contends that even the Kentucky Supreme Court recognized the deficient performance of trial counsel on Hodge's direct appeal, when it wrote as follows:

> At no time during or after the cross-examination of Hamilton did defense counsel object to her answers, request that the witness be admonished against testifying about "other crimes," or request that the jury be admonished to disregard her answers. Nor did defense counsel object or ask for an admonition during the prosecutor's inquiries on redirect examination. It was only after Hamilton had been excused and the jury had been discharged for the weekend that defense counsel moved for a mistrial on the basis of an alleged violation of the pre-trial order. . . .

*Hodge I*, 17 S.W.3d at 845. Petitioner Hodge also points out additional points in Sherry's testimony when counsel could and should have taken corrective action but did not; and he suggests that there are topics which counsel could and should have inquired into on cross-examination, but did not.[30]

According to the petitioner, these are deficiencies in counsel's performance, and particularly in view of the lack of any physical evidence tying Hodge to the murders, these deficiencies in counsel's performance were prejudicial--as they raised the reasonable probability that the result of

---

[30] These topics include her knowledge of the caliber of guns Hodge possessed before and after the crime; her involvement in the crime or its planning; her later appearance on talk shows about the *Acker* case; and what benefit she received from the proceeds of the crime.

the proceeding would have been different.

<u>Response</u>

The respondent charges that the petitioner raised this topic twice in his direct appeal and then it was "repackaged as a claim of ineffective assistance of trial counsel" and again rejected.  Because the Kentucky Supreme Court on direct appeal found that "[t]he answers given by Hamilton were responsive to the questions asked by defense counsel" (*Id.* at 845), this finding is subject to deference under the presumption of correctness and a basis for rejecting the claims of ineffectiveness of counsel.  Additionally, the state court found that the questions asked by the defense served to waive any objections to the answers, thus making a procedural default ruling.

Even if the claims were not considered defaulted, the respondent argues, the Kentucky Supreme Court did not unreasonably apply the standard of *Strickland*, and he liberally quotes from that U.S. Supreme Court decision, 466 U.S. at 689-90.  The respondent also notes that the trial court permitted the defense a broad inquiry into Hamilton's background, including inquiry as to her past criminal conduct.  As a practical matter, the respondent suggests, this could not be both an acceptable area of inquiry and barred at the same time.

**Discussion**

It is true that in its two *Hodge* opinions, the Kentucky Supreme Court pointed out several times when the defense did not come forward with an objection.  On the petitioner's direct appeal, when the state appellate court first addressed issues regarding Sherry Hamilton's testimony, it found no trial court error in the admission of her testimony, deciding the matter under state evidence law, as follows:

> Since the Commonwealth did not introduce any of this evidence in its case in chief, there was no violation of the pre-trial order.  KRE 404(c). The answers given by Hamilton on cross-examination were responsive to the questions asked by defense

118

counsel. "One who asks questions which call for an answer has waived any objection to the answer if it is responsive." *Mills v. Commonwealth,* Ky., 996 S.W.2d 473, 485 (1999) (quoting *Estep v. Commonwealth,* Ky., 663 S.W.2d 213, 216 (1983)).

*Hodge I*, 17 S.W.3d at 845.

With regard to Hamilton's two references to another trial, the Kentucky Supreme Court examined the comments she made, noted that both occurred in response to defense questions, and then concluded, "We do not believe that the jury must have concluded from these isolated references that Appellant had been previously convicted of murder and sentenced to death for these same charges." *Id.* at 846. This is not an unreasonable determination in light of the record before the court.

The state court went on to note that after not objecting or requesting an admonition at each complained-of occurrence in Hamilton's testimony, it was only after the jury was discharged for the week-end that counsel moved for a mistrial, based upon the Commonwealth's not having submitted the list of bad acts called for in a pre-trial order. The record shows that when the trial judge pointed out that counsel had not objected or requested an admonition, counsel revealed a tactical reason for not doing so. About his explanation, the Kentucky Supreme Court wrote,

> [C]ounsel stated that he believed such would have only further emphasized the witness's allegedly improper statements. Regardless of the wisdom of that strategy, the real damage was done during Hamilton's testimony on cross-examination, and counsel clearly made a tactical decision to continue attempting to impeach the credibility of this obviously hostile witness without requesting judicial intervention.

*Id.* at 846.

When defense counsel's cross-examination of Hodge's ex-wife was raised in his RCr 11.42 collateral challenge, the Kentucky Supreme Court first pointed to its earlier finding that counsel's continued cross-examination was "a tactical decision," citing to the above quote from *Hodge I.* The same court then held in *Hodge II*, "Trial strategy will not be second guessed in an RCr proceeding.

119

*Hibbs v. Commonwealth*, Ky.App., 570 S.W.2d 642 (1978)." *Hodge II*, 116 S.W.3d at 473.

The *Strickland* Court directed that a defendant must overcome the presumption that the challenged action of counsel might be considered sound trial strategy.  In the case *sub judice*, Hodge's defense admitted that he purposefully did not object to certain objectionable testimony because he had decided that he did not want to draw attention to it; and the Kentucky Supreme Court unsurprisingly found that this was a tactical decision, which was not unreasonable.  Again, this Court finds that the state court's decision with regard to this claim was not an unreasonable determination of facts; nor has it been shown to be an unreasonable application of *Strickland*.

### 34.   Petitioner Was Denied His Right To Present A Defense And Trial Counsel Failed To Obtain Necessary Expert Assistance To Challenge The Commonwealth's Case.

The petitioner recounts the testimony of the Commonwealth's expert serologist about hairs which were recovered from the crime scene but were not matched to the victims or the petitioner. He then appears to make constitutional claims under two different legal theories.  His first is that the trial court denied him an important tool to present a defense, that is, permission to hire an expert for DNA testing of unidentified hair at the murder scene, as is purportedly appropriate under *Ake v. Oklahoma*, 470 U.S. 68 (1985); and he also claims that trial counsel was ineffective for failing to ask for and secure expert assistance.

According to the petitioner, expert DNA testing could have shown that the hair fibers belonged to Donald Bartley, and then "Petitioner would have been exonerated and either acquitted or, at least, avoided the death penalty."  Because Petitioner Hodge was "denied the basic tools to present a defense" and because counsel gave ineffective assistance in obtaining this tool, he is allegedly entitled to a new trial.

Response

120

The respondent's position is that this claim is speculative.  Further, he insists that *Ake* is limited to mental health experts in certain types of cases and is permitted only upon a showing of sufficient facts to justify the request prior to trial, which the instant petitioner did not present. Moreover, even were *Ake* relevant and an error found, it would be subject to the harmless error analysis, which would end with a determination that it was harmless.

Additionally, the respondent points to the Kentucky Supreme Court's rejection of the *Ake* claim and its finding that even if Hodge did not go inside the house, he could still be convicted under Kentucky's complicity statute, KRS 502.020.  As to the ineffective assistance of counsel claim, the Kentucky court found that  the petitioner failed to establish prejudice under *Strickland*, thus procedurally defaulting the claim.  The respondent also reminds the Court that it is bound to that court's factual determinations and legal interpretations of state law.  Even if the petitioner had established an *Ake* violation, the claim would be subject to a harmless error analysis, which would result in a conclusion of harmlessness.

## Discussion

The Kentucky Supreme Court first scrutinized the need for an expert to test hair evidence which was found at the scene and the reasons therefor, *i.e.* that a hair fiber DNA expert may have matched unidentified hair to Bartley, thus point to Bartley as the killer.  The state court then wrote, as follows:

> . . .  Bartley was also at the crime scene.  There was testimony from the former wife of Hodge that he made a pretrial statement that Hodge and Bartley went inside the residence when they each robbed the victims and each of them shot one of the residents.  Any evidence that hairs of Bartley were inside the home would not demonstrate that Hodge was not also inside and helped to kill and rob the two victims and burglarize the residence.

*Hodge II*, 116 S.W.3d at 470.

Later, with regard to the two legal theories, the Kentucky Supreme Court ruled as follows:

> We have held that when a defendant claims his counsel is ineffective by not making an *Ake* motion for expert assistance he must establish how he was prejudiced by the alleged failure of counsel. *Haight* [*v. Commonwealth*, Ky., 41 S.W.3d 436 (2001)]. In claiming that the defense was deficient, the accused must establish that the performance by the attorney was objectively unreasonable and how the alleged error prejudiced his defense. *Ake*, *supra*, does not apply to a collateral attack, nor does it require that the trial judge appoint experts simply to allow the collateral proceedings to attempt to discover possible evidence. *Sanborn v. Commonwealth*, Ky., 975 S.W.2d 905 (1998). . . .
> . . .
> . . . Testimony at the trial established that Hodge and two accomplices committed the crimes. As stated earlier, testimony that others were present inside the residence or assisted him in committing the crimes would not have influenced the jury to find him not guilty. It is possible that the complicity statute, KRS 502.020, would have supported his convictions in any event. *See Marshall v. Commonwealth*, Ky., 60 S.W.3d 513 (2001) and *Perdue v. Commonwealth*, Ky., 916 S.W.2d 148 91996). Even when *Ake* is raised as an independent constitutional violation, federal courts have determined that a harmless error analysis must be applied. *See White v. Johnson*, 153 F.3d 197 (5th Cir. 1998). Here, any error was certainly harmless.

*Hodge II*, 116 S.W.3d at 472-73. In short, the Kentucky Supreme Court found that *Ake* was inapplicable and Hodge's *Ake* claim meritless; the two *Strickland* standards for ineffective assistance of counsel were not met; and even if the conduct of counsel were deficient, it was not prejudicial, but only harmless error.

Again the instant petitioner has presented no factual or legal support for his claim. He has failed to show that the Kentucky Supreme Court's conclusions are contrary to or an unreasonable application of then-existing Supreme Court law.

35.    Petitioner's Trial Counsel Rendered The Ineffective Assistance of Counsel During Petitioner's Culpability Phase In Violation Of Strickland v. Washington, 466 U.S. 668 (1984).

With regard to the guilt phase of Hodge's trial, the petitioner lists another fourteen purported errors of trial counsel which reached the level of violating his Sixth Amendment rights, as defined in *Strickland,* "in that counsel acted deficiently and there is a reasonable probability sufficient that

the errors undermine confidence in the outcome." Petition at 88.  This Court will list and consider them below individually.

<u>Response</u>

The respondent's position is that all of these claims were rightfully rejected in appeal of the collateral action, on the ground that they had been rejected on the merits on appeal; or should have been raised on appeal; or were insufficiently pled in the collateral proceedings.  Those which should have been raised on appeal or were rejected for the petitioner's failure to plead sufficient facts are procedurally defaulted.  Again the respondent relies on the truism that state courts' findings of fact and state interpretation of state law are both binding on this Court.  He also maintains that the rulings about counsel by the state court were not contrary to or unreasonable applications of then-existing U.S. Supreme Court precedent, the respondent citing to *Strickland* and to *Bell v. Cone*, 535 U.S. at 698-99.

**<u>Discussion</u>**

The Kentucky Supreme Court's opinion affirmed the trial court's denial of relief on collateral review in all respects.  After setting out the requisites of a RCr 11.42 motion and the requisite standards of *Strickland*, the Court introduced its analysis with the following:  "A careful study of the proceedings indicates that the actions of defense counsel were the result of trial strategy and the alleged errors did not prejudice Hodge in his right to a fair trial.  *See Strickland; Taylor v. Commonwealth*, Ky., 63 S.W. 3d 151 (2001)."  *Hodge II*, 116 S.W.3d at 469.

As this Court noted, *supra*, under state law, an RCr 11.42 movant may not raise on collateral review any claim which was or could have been decided on direct appeal.  Of his fourteen assertions of error herein, on the petitioner's following first four (4) claims, the state court ruled that re-litigation was barred and so, under state law, it would not consider the claims that counsel:

123

(1)     failed to secure Darcy O'Brien's attendance or deposition testimony in a timely manner, to his detriment, as he was a material witness.  On direct appeal this issue was presented as a claim that the trial court erred in not granting an continuance so as to obtain O'Brien's testimony so as to use it against Hamilton's credibility and it was rejected on the merits.  This Court has quoted the Kentucky Supreme Court's treatment of the issue in Evidentiary Issue #25, *supra*, the state court finding that O'Brien's absence did not prejudice the defense.  *Hodge I*, 17 S.W.3d at 851.

Upon the reconstruction of this claim as a complaint of ineffective assistance of counsel, the Kentucky Supreme Court wrote, "Hodge contends that defense counsel was both deficient and prejudiced under *Strickland* principles because he failed to secure the attendance of Darcy O'Brien at the re-trial.  This issue was considered on direct appeal and will not be reconsidered."  *Hodge II*, 116 S.W.3d at 473.

(2)     failed to utilize Bartley's RCr 11.42 motion to impeach him.  On direct appeal, this claim was presented as the error of the trial court in refusing to permit the document to be used by the defense (see Evidentiary Issue #2); and the Kentucky Supreme Court found no error, noting several problems with the document, including its not being signed.

In the later opinion on collateral review, that court recounted its earlier disposition and ruled that the claim "will not be considered at this time."  *Id.* (referring to *Hodge I*, 17 S.W.3d at 843).

(3)     failed to lay a proper foundation for the testimony of Hodge's former attorney, Shaw, as to Sherry Hamilton's having told her in 1987 that she heard Bartley confess to the crimes.

With regard to this evidentiary claim on direct appeal, the Kentucky Supreme Court noted that even though Bartley's part of the statement would have been admissible as a prior inconsistent statement, since he denied killing the Morrises, "Hamilton's part of the statement does not fall within

any exception to the hearsay rule.  Hamilton's alleged statement to Shaw was not inconsistent with her testimony since she never testified that Bartley told her that he did *not* kill the Morrises." *Hodge I,* 17 S.W.3d at 849; Evidentiary Issue #24 herein.

To the petitioner's reconfigured claim on collateral review, *i.e.*, that it was counsel's fault that Shaw's testimony was not admitted, the state Supreme Court wrote, "On direct appeal this court held that the testimony was properly excluded as double hearsay.  We decline to reconsider it in this proceeding.  In any event, compliance with KRE 613 would not have cured the violation of KRE 805." *Hodge II*, 116 S.W.3d at 473.

(4)  did not object to Sherry Hamilton's testimony that Benny Lee Hodge would kill again.  As with the preceding claims, this claim of counsel's deficient performance in investigating and cross-examining of Sherry Hamilton springs from an evidentiary challenge to the admissibility of her testimony.  The complaint about Sherry Hamilton's objectionable testimony was addressed on the merits herein (See Evidentiary Issues #5, 3, 18).  On Hodge's collateral challenge, the Kentucky Supreme Court wrote:

> . . . The issue on direct appeal was the admission of KRE 404(b) evidence.  We held that counsel's continued cross-examination of an obviously hostile witness was a tactical decision . . . .  Trial strategy will not be second guessed in a RCr 11.42 proceeding.

*Id.* at 473 (citing *Hodge I*, 17 S.W.3d at 846).

Thus, Kentucky law constituted an adequate and independent state ground for the decision on these claims.  Another aspect of the law of RCr 11.42 proceedings bars the next two claims, the first being that counsel

(5)  could not meet with his client during trial because he had to drive 90 minutes to the prison where he was being held and because he needed a three-day notice to the warden, which had

to be approved.

This was not addressed in *Hodge I*.  However, after the petitioner's collateral challenge, the

Commonwealth's highest court ruled both that this claim could and should have been raised on

appeal under state law and also ruled that there was no support for this claim in the record:

> . . . There are no specific facts presented as to how Hodge was prejudiced by the
> prison assignment.  His defense counsel did not indicate that the prison arrangement
> prevented him from preparing for trial or consulting with Hodge.  This claim could
> have and should have been raised with the trial judge on direct appeal.  It was not,
> and we decline to consider it now.

*Id.* at 474.

The rejection of these initial claims was, therefore, on state law grounds, *i.e.*, the afore-

referred provisions of RCr 11.42, which are actually enforced in Kentucky.  The court summarized

its position as to the foregoing claims as follows:

> . . . Hodge presents numerous alleged separate instances of ineffective assistance of
> counsel during the guilt phase.  We have examined the record in detail and find that
> none of them are the proper subject for a RCr 11.42 motion because they were or
> could have been raised on direct appeal as trial errors.  All of them pertain to trial
> testimony or to trial proceedings that were in the record at the time of the direct
> appeal.

*Id.* at 473.

   Counsel also purportedly

(6)     refused to let the petitioner testify in his own behalf, in contravention of his rights

under the Fifth Amendment and *Rock v. Arkansas*, 482 U.S. at 44.

Like the preceding claim, this sixth claim also had not been raised on direct appeal.  In its

opinion affirming the trial court on collateral review, the Supreme Court of Kentucky wrote,

"Regarding the assertion by Hodge that his trial defense attorneys deprived him of the right to

testify, the circuit judge concluded that the allegation is not supported in the record.  We must

agree." *Hodge II*, 116 S.W.3d at 468.

The state court rejected this claim as having no factual support in the record, presentation of supporting facts being another requirement of RCr 11.42, which the Kentucky courts routinely enforce. The state court also elaborated as to its findings on this matter, as follows:

> . . . Hodge claims he sought to testify in his own behalf at trial but that his lawyer refused his request. Thus he asserts he was deprived of his constitutional right to testify even if it was against advice of counsel.
>
> Hodge has failed to identify what specific facts he would have testified to that the jury was not already aware of or of how his testimony would have influenced the jury to reach a different verdict. He was a convicted felon and subject to impeachment on that basis at the time this case was tried. We find no error.

*Id.* at 472. Additionally, the Kentucky Supreme Court found the petitioner's "frequent enumerations of alleged departure from the federal standard to be unconvincing and contradictory in the light of the emphasis Hodge seems to place on the importance of the record." *Id.* at 469.

Therefore, with regard to these first six (6) claims, the state court has clearly made rulings on independent and adequate state law grounds, *i.e.*, RCr 11.42 bars re-litigation, requires "the facts on which the movant relies in support of such grounds," and does not permit re-characterization of old claims as ineffective assistance of counsel claims. *See Sanborn*, 975 S.W. 2d at 909 (citing Kentucky cases). Decisions on state law are binding on and shielded from review by this Court.

Even if the Court were to address these claims on the merits, to warrant habeas relief, the Court must find that counsel's actions, even if deliberate strategy, were so unreasonable as to be an affront to standards of *Strickland*; the habeas petitioner was actually prejudiced thereby; and the Kentucky Supreme Court's application of *Strickland* in affirming the trial court was an unreasonable application of *Strickland* and its progeny. This Court cannot make such a conclusion with regard to any of these claims of ineffective assistance.

As to the claim of purportedly being denied his right to testify, even if true, not testifying is a valid, oft-used strategy. Hodge's cross-examination could have been devastating to his cause. Also, the record shows that it was the court who refused to allow the defense to use Bartley's 11.42 document–for valid evidentiary reasons–and not counsel's failure to make the request. And it may have been perfectly reasonable strategy for counsel not to extend Bartley's testimony any longer. *Rock*, which involved a blanket ban on certain types of testimony, is simply inapplicable to the instant claim.[31] How can counsel's performance be deficient with regard to Ms. Shaw's testimony when state law contains no authority for admitting double hearsay? Additionally, what prejudice has been shown in O'Brien's absence?

Trial counsel's failure to object to several circumstances can be explained as valid strategy, which is not unreasonable, *e.g.*, Hodge's counsel's deliberate refusal to object to several parts of Hamilton's testimony so as not to draw attention to it, as was discussed, *supra*. For a discussion of reasons which the Sixth Circuit has considered may explain an attorney's deliberate choice to remain silent rather than make an issue of it, see *Mackey v. Russell*, 205 WL 2175926 (6th Cir. 2005) (unpublished)*; West v. Seabold*, 73 F.3d 81, 84-85 (6th Cir.), *cert. denied*, 518 U.S. 1027 (1996). This Court finds the state courts' ultimate conclusion that there was no *Strickland* violation in the guilt phase of Hodge's trial is neither contrary to nor an unreasonable application of *Strickland* or any other U.S. Supreme Court precedent.

The Supreme Court of Kentucky did not specifically mention the majority of the petitioner's 11.42 claims about counsel in the culpability stage. The state record shows that the following were

---

[31] In *Rock,* relief was appropriate because a state law barred all hypnotically refreshed testimony, with the result that the defendant, the only eyewitness to a killing, was barred from testifying in her own defense at trial for the killing.

raised but the state highest court's opinion is silent as to the claims that counsel

(7)     failed to object to substance or manner of the tearful testimony of son Bobby Morris;

(8)     failed to challenge certain portions of Bartley's testimony from the petitioner's prior trial;

(9)     did not object to an expert's testimony that sandpapering could remove a person's fingerprints, although no evidence was ever presented that Hodge sandpapered his fingertips;

(10)     objected but did not seek an admonishment when there was testimony that Petitioner refused to have his blood tested, and yet he had never been asked to provide a blood sample;

(11)     failed to investigate and explore that other individuals had been under investigation for the crimes;

(12)     failed to preserve the Commonwealth's misconduct, including the detective's destruction of initial statements made by Bartley, a violation of *Brady v. Maryland*, as well as being an illustration of deficient and prejudicial performance by trial counsel; and

(13)     did not object to the use of the word "Commonwealth" in the place of the name of the former prosecutor, James Wylie Craft, when Bartley's testimony was read aloud. The petitioner claims that deleting the name of the by-then disbarred prosecutor deprived Hodge of "an argument as to the credibility of the case and the testimony of Donald Bartley."

Finally, the petitioner claims that counsel (14) rendered ineffective assistance because his attorneys failed to present an informed and reasonable argument on the availability of Sherry Hamilton's psychiatric records for impeachment purposes.

Because these specific claims were argued in briefs to the Kentucky Supreme Court and that the court's RCr 11.42 opinion is silent on them, even while concluding no *Strickland* violation, this Court examines the merits thereof, albeit deferentially, as part of its evaluation as to whether the

129

state court decision about the assistance of counsel was contrary to or an unreasonable application of U.S. Supreme Court law, *i.e.*, *Strickland*. *Harris v. Stovall*, 212 F.3d at 942.

   In doing so, the Court notes that the petitioner's claim about counsel's failure to argue successfully for admission of Shaw's testimony is similar to his claim of deficiency for counsel's failure to argue successfully for access to Hamilton's psychiatric records. With regard to both, the petitioner himself has provided no legal authority upon which trial counsel, then or now, could rely in order to obtain a different result. As to Bobby Morris' testimony, which was not lengthy and had been determined to be acceptable on direct review, the defense strategy may have been to just get it over with, not prolong or draw additional attention to the understandable display of emotions.

   This Court finds no factual basis provided for the rest of these claims. Counsel's not exploring other theories of the crime is not unreasonable when no other theories are posited. The sandpapering of fingerprints, testimony about blood, the purported *Brady* issue, and impact of using the word "Commonwealth" in place of ex-prosecutor Craft's name can be accurately described as a shotgun spray of speculative claims. It would not be unreasonable for the defense to prefer to concentrate his efforts on other trial matters, such as preparing witness testimony, than going on a fishing expedition.

   Regardless of which claims merited mention in the opinion of the Kentucky Supreme Court, the state court was presented with all fourteen of these claims and ultimately found that trial counsel's performance in the guilt phase of Hodge's trial did not amount to a *Stickland* violation:

> . . . At the conclusion of the prosecution phase and after the jury left the courtroom, defense counsel moved for a mistrial based upon the objections he had made. This motion was also overruled. The performance of defense counsel was reasonable.

*Hodge II*, 116 S.W.3d at 473.

   This Court finds that the state court has not made an unreasonable determination of facts in

its analysis of the ineffective assistance of counsel claims regarding the guilt phase of Hodge's trial; nor is that court's conclusion contrary to or an unreasonable application of well-known U.S. Supreme Court precedent. Accordingly, habeas relief is unavailable on this compilation of claims.

> 36. <u>Petitioner's Trial Counsel Rendered The Ineffective Assistance of Counsel During Petitioner's Penalty Phase In Violation of *Strickland v. Washington*, 466 U.S. 668 (1984)</u>.

The petitioner also claims that he received ineffective assistance in the penalty phase of the trial, as his attorneys purportedly failed to prepare and present important evidence in mitigation. Hodge specifically alleges that in the penalty phase, trial counsel (1) failed to secure the presence of Dr. Ann-Marie Charvat or anticipate and prepare for her absence, thus providing representation in mitigation which purportedly falls below the standard in *Terry Williams v. Taylor*, *supra*. The petitioner also faults counsel because he (2) failed to obtain the services of a mental health expert to testify as to how certain hardships in Hodge's childhood would have impacted him; (3) presented only the testimony of family members; and (4) failed to adequately prepare the family witnesses to present mitigation testimony.

<u>Response</u>

The respondent's position is the same as presented in his response to the allegations of ineffective assistance in the guilt phase. See preceding section, Penalty Phase Issue No. 35.

**<u>Discussion</u>**

The Kentucky Supreme Court had already found that even if Charvat had been ruled qualified, her opinion about his committing the crime would be "irrelevant" in the penalty phase and would not assist the jury in determining an appropriate penalty. *Hodge I*, 17 S.W.3d at 851. The same court wrote of the presentation of the same arguments redressed as ineffective assistance of counsel claims as follows:

> Hodge now claims ineffective assistance during the penalty phase.  All the matters
> complained of were or could have been raised on direct appeal and thus are not the
> proper subject of a RCr 11.42 motion.  We find the performance of counsel was
> reasonable under the circumstances.  There is no *Strickland* violation.

*Hodge II*, 116 S.W.3d at 473.  Thus, the state court found both that state law barred consideration

of such re-dressed claims and that no *Strickland* violation occurred during the penalty phase.

To the extent the state court found no fault in counsel's assistance with regard to Charvat,

this finding is not unreasonable.  The record shows that without Dr. Charvat, counsel provided

mitigating testimony not only of family members, but also of a neighbor, school teacher, boyhood

comrade, and ex-judge.  As to preparing these witnesses for trial testimony, Dr. Charvat swore in

her affidavit that she prepared mitigation witnesses for trial twice, for the earlier two trial dates in

1996, so the importance of having a third preparation is diminished and its omission not

unreasonable.

Additionally, the petitioner fails to demonstrate that the 11 mitigation witnesses who did

testify were not adequately prepared, that they omitted any relevant information in mitigation, or

that any one of them would have testified any more favorably with more preparation.  *See Hill v.

Mitchell*, 400 F.3d 308, 319 (6th Cir. 2005) (citing cases and noting that in order to establish

prejudice, the desired evidence that a habeas petitioner wishes to present must differ from the

evidence actually presented at sentencing), *cert. denied*, 126 S.Ct. 744 (2005); *Martin v.  Mitchell*,

380 F.3d 594, 613-15 (6th Cir.  2002).

With regard to whether counsel's performance was deficient or whether Hodge was

prejudiced by not having Dr. Charvat or another expert's testimony in mitigation, the information

contained in  her October 29, 1996 affidavit shows what a two-edged sword experts can be for the

defense.  While Dr. Charvat therein traces severe treatment in his youth as leading to Hodge's

distorted perceptions of life, as a mitigating circumstance, she also provides an expert evaluation that "[t]he distortion of perceptions which has ensued is often characterized by psychologists as an 'anti-social personality disorder,'" a characterization which could have damaged the petitioner in the eyes of the jury.  Record on appeal, Vol. III at 424.  Therefore, the omission of expert testimony may have been trial strategy and/or part of counsel's decision to put his efforts into presenting more helpful evidence, neither of which is unreasonable.

The Court concludes that the state court's resolution of the ineffective assistance of counsel claim regarding the penalty phase is not contrary to or an unreasonable application of *Strickland*, *Williams,* or other U.S. Supreme Court precedent.  Additionally, this Court's conclusion herein is consistent with such federal law as discussed by the appellate court in this circuit in *Moore v. Parker*, 425 F.3d 250, 254-55 (6th Cir. 2005), and *Lorraine v. Coyle*, 291 F.3d 416, 436-39 (2002) (citing cases), *cert. denied*, 538 U.S. 947 (2003).

37.   Petitioner's Trial Counsel Rendered The Ineffective Assistance of Counsel In Failing To Object To Improper Prosecutorial Argument In Violation Of *Strickland v. Washington*, 466 U.S. 668 (1984).

The petitioner complains separately that counsel failed to object when, during closing arguments in the penalty phase, the prosecutor improperly (1) characterized the petitioner's mitigation argument as, "If I'm whipped I can commit murder;" (2) shifted the burden of proof to the defendant by stating that there was no evidence to dispute that Hodge had a .38 and fired it to kill the Morrises; and (3) argued that the petitioner had not provided a blood sample for testing, when the Commonwealth could have obtained it on motion but did not ask.

Response

The respondent again relies on his arguments made in the section on ineffective assistance in the guilt phase.  *See* Response to Issue No.  35, *supra*.

133

**Discussion**

On Hodge's direct appeal, the Supreme Court of Kentucky originally wrote as follows about the claim that the prosecutor's closing arguments amounted to misconduct:

> . . . [W]e have reviewed all claims of error raised by Appellant and have found no impropriety with respect to the prosecutor's argument. . . . To the extent that misconduct is attributed to the prosecutor's closing argument, we repeat what we have often said before: "A prosecutor may comment on tactics, may comment on evidence, and may comment as to the falsity of a defense position." *Slaughter v. Commonwealth,* Ky., 744 S.W.2d 407, 412 (1987), *cert. denied,* 490 U.S. 1113 (1989). The prosecutor did not exceed the bounds of fair comment in either of his closing arguments.

*Hodge I*, 17 S.W.3d at 854.

Later, on Hodge's appeal of the denial of his RCr 11.42 motion, Kentucky Supreme Court first noted that "[a]gain, the penalty phase arguments by the prosecutor were challenged on direct appeal and resolved by this Court." *Hodge II*, 116 S.W.3d at 473. Nonetheless, the court also addressed the constitutional matter, ruling that "the performance of counsel was reasonable" and that there was no *Stickland* violation. *Id.* The trial transcripts show that during the prosecution's closing statement in the penalty phase, even after being told by the trial court not to make more objections, defense counsel continued to object – three additional times. How then was he muzzled? The petitioner has failed to support this claim of counsel's purported deficient performance.

This Court concludes that the Kentucky Supreme Court's decision with regard to counsel's performance during the prosecutor's closing arguments was not an unreasonable determination; and that court's rejection of these claims is consistent with, not contrary to or an unreasonable application of, *Strickland*. It is also consistent with the Sixth Circuit's decision in *West v. Seabold*, wherein the Kentucky appellate court found the prosecutor's conduct to be egregious. Nonetheless, the court found that "[a]lthough the egregious conduct of the prosecutor would cause concern to

134

counsel, a competent attorney might, for a number of reasons, decide to submit the case to the impaneled jury despite the misconduct;" and as a reviewing court, it was "in no position, on this record, to second-guess defense counsel's conduct as not being within the range of reasonable professional assistance." 73 F.3d at 85.  Same may be said herein.

<div align="center">Conclusions Regarding Counsel</div>

The Supreme Court of Kentucky clearly applied the law of the U.S. Supreme Court throughout its consideration of the petitioner's claims of ineffective assistance of counsel.  Early in its opinion, the state court wrote as follows:

> . . .  A careful study of the proceedings indicates that the actions of the defense counsel were the result of trial strategy and the alleged errors did not prejudice Hodge in his right to a fair trial.  . . . As noted in *Strickland,* no particular set of detailed rules for counsel's conduct can satisfactorily take into account the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.  Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions.

*Hodge II*, 116 S.W.3d at 469.  Again, in its conclusion, Kentucky's highest court wrote:

> Hodge received reasonably effective assistance of defense counsel.  Any of the alleged ineffectiveness was not so serious as to deprive him of a fair trial and there is no reasonable probability that a different result could have been achieved by even the best counsel.  A complete review of the record in this case demonstrates that Hodge received a fundamentally fair trial with a reliable and fair sentence.

*Id.* at 475.

In addition to the instant arguments, counter-arguments, and state court's opinion, this Court has before it the state record, including defense counsel's substantial pre-trial motions practice.  The state court's ultimate decision has not been shown to be based on an unreasonable determination of facts in light of the record.  Additionally, Petitioner Hodge has failed to show that the Kentucky courts unreasonably applied *Strickland* in denying his ineffective assistance of counsel claims.  In

<div align="center">135</div>

the context of the totality of the state's case, this Court cannot conclude that there exists a reasonable probability that, but for the alleged errors of counsel, the result of either the guilt or penalty phases would have been different.

Therefore, the petitioner is not entitled to habeas relief on the ground that his counsel rendered ineffective assistance.

## MISCELLANEOUS CLAIMS

15.     The Trial Court's Delegation Of Security Decisions To The AOC Resulted In A Visible And Excessive Security Presence In The Courtroom Made The Trial Process Inherently Unfair And Denied Petitioner His Due Process Rights.

Referring to the Fifth and Fourteen Amendments to the U. S. Constitution, the petitioner asserts a violation of his right to a fair trial because he was tried in a biased atmosphere created by the use of excessive security.  As he did on appeal, Hodge claims that the courtroom security provided at his trial was an excessive, visible police presence which created an impression on the jury that he was a dangerous and guilty man.

Petitioner Hodge charges further that, by leaving security matters in the hands of the AOC Kentucky's Administrative Office of the Courts, the trial court breached its constitutional duty to question the need for additional security measures and to regulate the security force so that it was not excessive.  The petitioner cites to several statements made by the trial court at a pre-trial conference, including, "I have already had the discussions with the Administrative Office of the Courts, who assists the Court in any capital case. . . . I have basically left [security] in their hands." Record No. 32 at 75.

Response

The respondent points to the Kentucky Supreme Court's treatment of this issue on the petitioner's direct appeal and contends that this treatment consisted of the proper application of--not

136

violations of--the principles of the United States Supreme Court, as set forth in *Holbrook v. Flynn*, 475 U.S. 560 (1986).

### Discussion

On the petitioner's appeal, the Supreme Court of Kentucky described the security force at Hodge's trial as follows:

> . . . [C]ourtroom security detail consisted of two uniformed bailiffs, two uniformed state police officers, and several additional officers who were not in uniform. The two uniformed state troopers were located ten feet away from the defendant. The non-uniformed officers were located either in the gallery or in the back of the courtroom.

*Hodge I*, 17 S.W.3d at 839. The court then ruled on the issue as follows:

> We do not view this security force as excessive in view of Appellant's previous conviction and sentence to death in this case and his previous conviction and sentence to death for a similar burglary/murder committed in August 1985. *Sub nom., Epperson v. Commonwealth*, Ky., 809 S.W.2d 835 (1990), *cert. denied*, 502 U.S. 1037 . . . (1992) Nor do we believe that the presence of armed policemen in the courtroom constitutes prejudice *per se*.

> > [T]he presence of guards at a defendant's trial need not be interpreted as a sign that he is particularly dangerous or culpable. Jurors may just as easily believe that the officers are there to guard against disruptions emanating from outside the courtroom or to ensure that tense courtroom exchanges do not erupt into violence. Indeed, it is entirely possible that jurors will not infer anything at all from the presence of the guards. If they are placed at some distance from the accused, security officers may well be perceived more as elements of an impressive drama than as reminders of the defendant's special status. Our society has become inured to the presence of armed guards in most public places; they are doubtless taken for granted so long as their numbers or weaponry do not suggest particular official concern or alarm.

> *Holbrook v. Flynn*, 475 U.S. [at] . . . 569. . . . We would add to those observations that the jury might even believe that the officers were in the courtroom to protect the presumptively innocent defendant from violent retribution by the family or friends of the victims. In *Holbrook v. Flynn*, there were twelve uniformed officers in the courtroom, *i.e.*, two bailiffs, four uniformed state troopers sitting in the first row of the gallery behind defense counsel table, and six uniformed Committing Squad

137

officers deployed around the courtroom.   The security measures employed at Appellant's trial were far less pervasive than those upheld in *Holbrook v. Flynn*.

*Id.* at 839-40.

Thus, it is clear that the security measures at Petitioner Hodge's trial, which included only four uniformed officers, were compared to those in Supreme Court's *Holbrook v. Flynn* opinion, in which the number of uniformed officers was twelve.   *Holbrook* was then-existing U.S. Supreme Court law, and the Kentucky appellate court's decision that Hodge's security did not offend the *Holbrook* standards was not contrary to nor an unreasonable application of it or other Supreme Court precedent.   Therefore, the petitioner is not entitled to habeas relief on this ground, pursuant to 28 U.S.C. §2254(d)(1).

6.   Petitioner Was Denied An Impartial Tribunal In Violation Of Petitioner's Rights Under Due Process.

The petitioner complains that the trial judge crossed the line between impartiality and advocacy throughout the trial.

Hodge claims that the court improperly assisted the prosecution from the beginning.   He specifically complains that the judge rehabilitated potential jurors when a response to defense counsel was inconsistent with answers he had elicited; directed the prosecutor how best to handle the crime scene video; called a bench conference to advise the Commonwealth to ask the medical examiner to re-identify the bullet from one of the victims; sent the jury out in order that the prosecution could refresh a witness' memory with a document without revealing that there had been an earlier trial; and when the defense's objections to leading questions were sustained, instructed the prosecution on how to formulate questions without leading the witness.

The petitioner further alleges that the judge's initial hostility toward the defense increased as the trial progressed, beginning with blaming defense counsel for obtaining inconsistent answers

138

from jurors during *voir dire* and then rehabilitating the jurors by conducting further questioning himself.  Additionally, the judge purportedly "taunted" and "admonished" defense counsel during an argument concerning documents with which to impeach Bartley; directed an examination of Ms. Shaw himself after the defense's questioning in her testimony by avowal; and harshly lectured the defense when counsel did not have his list of aggravators and his mitigation witnesses ready immediately after the guilty verdict.

The trial court's complained-of conduct is alleged to have continued in the penalty phase, with that court's purported venting toward the defense team.  Also, the judge grew irritated at the pace of the testimony in mitigation; showed his impatience; and later wrongly directed defense counsel, in front of the jury, as follows:  "Mr. Tustaniwsky, no more objections, do not interrupt anymore.  These are closing arguments, they've been admonished what closing arguments are." Record No. 40 at 130.

Petitioner Hodge further claims that the court's hostility extended not only to him (thus the strict rules for defense counsel's access to him) but also to his family (particularly his mother, who was singled out and lectured by the court for making grimaces and other expressions while witnesses testified).  Because the trial court did  not preside impartially, the petitioner claims, his due process rights under the Fifth and Fourteenth Amendments were violated.

<u>Response</u>

The respondent counters that Hodge raised part of this claim on direct appeal, wherein he conceded that only one of his complaints about the trial court's treatment was reserved for review. The respondent also recites the portion of the Kentucky Supreme Court's opinion rejecting the "stop objecting" claim as a basis for relief and again reminds this Court that the state court's findings of fact must be deferred to under the presumption of correctness.  He insists that the state court's

rejection of this claim was consistent with then-existing Supreme Court law.

Additionally, the respondent notes that the petitioner sought to "raise an expanded complaint" about the judge in his RCr 11.42 appeal, but the Kentucky Supreme Court rejected it, on the ground that part was raised on direct appeal and the rest should have been raised then. Therefore, this part of the claim is procedurally defaulted. Finally, the respondent submits that this claim would require a new rule of federal constitutional law beyond that at the time his appeal became final and is, therefore, barred under the *Teague* non-retroactivity doctrine.

## Discussion

The court agrees with the respondent on this claim. On the direct appeal of the petitioner's claim regarding the prosecutor's closing argument and his claim that the trial court unfairly muzzled him, the Supreme Court of Kentucky wrote, "While we do not condone the trial judge's momentary lapse into testiness, no prejudice resulted, since defense counsel ignored the judge's admonition and continued to register objections during the remainder of the prosecutor's argument." *Hodge I*, 17 S.W.3d at 854.

In its subsequent opinion affirming the denial of RCr 11.42 relief, the Kentucky High Court wrote that the petitioner "alleges that the trial court failed to maintain neutrality and made disparaging remarks about his lawyer. This complaint was made on direct appeal and rejected by this Court." *Hodge II*, 116 S.W.3d at 474; *see also* at 473 (this issue referred to as having already been "resolved by this Court").

The petitioner omitted much of this claim on direct review, and the Kentucky Supreme Court enforced the RCr 11.42 bar to re-litigation in the appeal of the collateral proceeding, thus rendering all but the original claims procedurally defaulted. The petitioner does not show cause or prejudice, or a miscarriage of justice so as to excuse the default. To the extent that the State Supreme Court

140

rejected the claim of judicial bias initially, the conclusion of that court is not an unreasonable determination of facts in light of the record before it at that time.

This Court examines the relevant law only to assure that the state court result is not contrary to U.S. Supreme Court precedent. A federal judge has wide discretion in monitoring the flow of a criminal trial. See discussions in *Mu'Min*, 500 U.S. at 423; *United States v. Donato*, 99 F3d 426, 434 (D.C. Cir. 1997). A state judge has no less so long as he conducts a fair trial. See discussion in *Allen v. Hawley*, 74 Fed.Appx. 457 (6th Cir.), *cert. denied*, 541 U.S. 1046 (2004). In any instance of alleged bias, the courts must focus on the ultimate issue, *i.e.*, whether a fair trial was received.

In this regard, even though it directly concerns a federal statute, the case of *Liteky v. United States*, 510 U.S. 540 (1994), cited by the respondent, provides a discussion of the U.S. Supreme Court's continuing concerns about any judicial bias. A claim of judicial bias has a high standard for the petitioner to meet, *i.e.*, "such a high degree of favoritism or antagonism as to make fair judgment impossible." *Id*. at 555. The Court therein further explained:

> [J]udicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge . . . . *Not* establishing bias or partiality . . . are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display.

*Id.* (emphasis of the United States Supreme Court). Long ago, the High Court also wrote that there is a "modicum of quick temper that must be allowed even judges." *Offutt v. United States*, 348 U.S. 11, 17 (1954).

In the case *sub judice*, the Court agrees with the Kentucky Supreme Court that no judicial bias has been shown to have robbed the petitioner of a fair trial on this record. For instance, as to *voir dire*, early on, before the start of trial, the trial court warned the attorneys that he would control

141

*voir dire*, which he did, beginning and ending the questioning of jurors himself.  The judge's other alleged "assistance" was in the same vein, directing the proper introduction of a video and a bullet from one of the victims into evidence; sending the jury out in order to discuss a document without revealing that there had been an earlier trial; and lecturing on formulating questions without leading the witness, so as to get through the testimony.

However, even were the Court to disagree with the Kentucky Supreme Court, this Court does not have the authority to grant habeas relief based on a disagreement.  It can grant relief only if it finds that the Kentucky Supreme Court made an unreasonable decision about facts in light of the record or unreasonably applied federal law or came to a determination which was contrary to federal law, as pronounced by the U.S. Supreme Court.  This Court cannot so conclude on this claim. Therefore, habeas relief is unavailable.

> 21.  Petitioner Was Denied A Fair Trial And A Fair Sentencing Hearing Due To Prosecutorial Misconduct.

 On his direct appeal and herein, the petitioner has complained of the prosecutor's conduct from his opening statement, through both phases of the trial, to his closing argument at the end of the penalty phase.  In addition to his complaints in Penalty Phase Issue #28, *supra*, the petitioner charges that as early as opening statements, the prosecutor repeatedly sprinkled dramatic words like "brutality" and "heinous" to characterize the nature of the crimes even though neither heinousness nor brutality is an aggravating factor in Kentucky's statute.  Further, the petitioner contends, the use of "heinousness" as an aggravator raises constitutional problems, the petitioner citing *Maynard v. Cartwright*, 486 U.S. 356 (1988).

Hodge also complains that the prosecution continually glorified the Morrises; used improper victim impact testimony and argument to inflame the jury; elicited and stressed the "habit evidence"

about Hodge from Sherry (Hodge) Hamilton; and let his experts suggest that the petitioner had filed

off his fingerprints and had refused to give hair or blood evidence, when, in fact, he had done

neither.

With no physical evidence against the petitioner, the prosecutor allegedly used improper

tactics and such "egregious" conduct that the petitioner had neither a fair determination of his guilt

nor an appropriate sentence.  Therefore, on the whole, the petitioner claims, the prosecutor violated

Hodge's rights under the Eighth, Fifth and Fourteenth Amendments, and re-trial or re-sentencing

is required.

<div align="center">Response</div>

The warden responds that this Court must defer to the state court's implied findings of fact

under the presumption of correctness.  Additionally, the Kentucky Supreme Court's rejection of this

claim was not contrary to nor a clearly unreasonable application of U.S. Supreme Court law; and

even if it were, any error was harmless.

<div align="center">**Discussion**</div>

The Supreme Court of Kentucky wrote of this claim as follows:

> Appellant also makes a general claim of prosecutorial misconduct, mostly a repeat
> of other claims of error which have been separately addressed and rejected in this
> opinion.  To the extent that misconduct is attributed to the prosecutor's closing
> argument, we repeat what we have often said before: "A prosecutor may comment
> on tactics, may comment on evidence, and may comment as to the falsity of a
> defense position."  *Slaughter v. Commonwealth*, Ky., 744 S.W.2d 407, 412 (1987),
> *cert. denied*, 490 U.S. 1113 . . . (1989).  The prosecutor did not exceed the bounds
> of fair comment in either of his closing arguments.

*Hodge I*, 17 S.W.3d at 854.  The state court again relied on state law, which is binding on this Court.

As to any due process claim springing from prosecutorial conduct, *Maynard* is inapposite

to the claim presented herein, as the *Maynard* Court merely invalidated a statutory aggravating

<div align="center">143</div>

factor which had used the language "especially heinous, atrocious, or cruel" to qualify as a circumstance permitting the death penalty in another state's death penalty statute. The instant petitioner claims prejudicial misconduct for the prosecutor's mere use of one of these words in his argument. It is *Berger v. United States*, 295 U.S. 78 (1935), which sets the constitutional standard imposed on prosecutors, *i.e.*, prosecutorial misconduct must be so pronounced and persistent that the prejudicial effect on the jury was highly probable. *Id.* at 89. Further, misconduct can be a basis for habeas relief only if the conduct was so egregious as to render the entire trial fundamentally unfair based on the totality of the circumstances. *Donnelly v. DeChristaforo*, 416 U.S. at 643-46; *Bowling v. Parker*, 344 F.3d at 512-13.

The Sixth Circuit has set forth a two-step approach for determining whether a defendant's due process rights were violated by prosecutorial misconduct. In *Boyle v. Million*, 201 F.3d 711 (6th cir. 2000), the Sixth Circuit instructed the courts to first determine if the prosecutor's conduct and remarks were improper. Then, if the court finds impropriety, then the court must go further to the 4-factor test for prejudice, set out in *United States v. Carroll*, 26 F.3d 1380, 1385 (6th Cir. 1994).

In the instant case, the Kentucky courts found no improper conduct. The instant prosecutor's conduct cannot be said to rise to the level condemned in *Berger*. "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982); *see also Darden v. Wainwright*, 477 U.S. at 181 (quoting *Donnelly v. DeChristoforo*, 416 U.S. at 643); and *Viereck v. United States*, 318 U.S. at 247-48.

The Kentucky Supreme Court having found no prosecutorial misconduct in Hodge's trial, with regard to any particular instance or on the whole, and that court's ruling not being contrary to or an unreasonable application of then-existing U.S. Supreme Court law, this Court cannot grant habeas relief to Petitioner Hodge on this ground.

144

38.   Cumulative Error Renders The Verdict And Sentence In This Case Unreliable.

The petitioner's final claim is that if none of the foregoing issues is deemed sufficient cause to vacate his convictions, then the cumulative effect of these errors amounts to sufficient cause. He does not cite any case law in support of this claim.

<div align="center">Response</div>

The respondent points out that the petitioner lost on this claim in his direct appeal; and he did not raise this claim in the appeal of the claims in his RCr 11.42 motion. The respondent also relies on and discusses the way this matter was handled in *Lorraine v. Coyle*, 291 F.3d at 447, another post-AEDPA death case wherein the Sixth Circuit noted that the Supreme Court has not held that distinct constitutional claims can be cumulated so as to grant habeas relief. Therefore, the respondent concludes, to the extent that the "cumulative error" claim was presented to Kentucky's highest court, that court's rejection of it on appeal is not an unreasonable application of or a holding contrary to existing U.S. Supreme Court precedent.

<div align="center">**Discussion**</div>

Upon the presentation of this claim in the petitioner's direct appeal, the Supreme Court of Kentucky responded, "No cumulative error occurred which requires reversal of this case. *Compare Funk v. Commonwealth*, Ky., 842 S.W.2d 476 (1992)." *Hodge I*, 17 S.W.3d at 855.

This Court questions whether there can ever be such accumulation. In the afore-cited decision, *Lorraine v. Coyle, supra,* the Sixth Circuit summarized its position on a cumulative claim brought on habeas review. "The Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief. Thus, it cannot be said the judgment of the [state] courts is contrary to *Berger* [295 U.S. at 78], or to any other Supreme Court decision so as to warrant relief

<div align="center">145</div>

under the AEDPA." *Lorraine v. Coyle*, 391 F.3d at 447.  In a more recent opinion, the Sixth Circuit was faced with a similar claim and relied on its *Lorraine* decision, writing, "Because [the petitioner] can cite no Supreme Court precedent obligating the state court to consider the alleged trial errors cumulatively, we cannot grant relief on this ground."  *Moore v. Parker*, 425 F.3d at 257.

Consistent therewith, this Court has determined that the Kentucky Supreme Court's holding that "[n]o cumulative error occurred which requires reversal" is not contrary to nor an unreasonable application of any U.S. Supreme Court precedent.  Thus, the petitioner's final claim provides no basis for habeas relief under 28 U.S.C. §2254, and his petition will be denied.

## CERTIFICATE OF APPEALABILITY

This Court having ruled on all of the petitioner's claims, another provision of the AEDPA is now triggered.

For all §2254 petitions filed after April 24, 1996, as a part of the AEDPA legislation, Congress has dictated that there is no appeal of right for the state petitioner.  In order to take an appeal of a district court's decision denying habeas relief in a 28 U.S.C. §2254 proceeding, a certificate of appealability [hereinafter "COA"] must issue on each claim which the petitioner wishes to appeal.  28 U.S.C. §2253(c)(1)(a); Federal Rule of Appellate Procedure 22(b).  In the words of the statute, a certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. §2253(c)(2).

In *Slack v. McDaniel*, 529 U.S. 473, 484 (2000), the High Court addressed the new statutory requirement and stated that it is a codification of the standard of *Barefoot v. Estelle*, 463 U.S. at 893. The *Slack* Court then held that therefore, for any claim decided on the merits, the "substantial showing" threshold is met if the petitioner demonstrates that reasonable jurists would find the

146

district court's assessment of the constitutional claim debatable or wrong.  529 U.S. at 484-85.[32]
Later, in *Miller-El v Cockrell*, 537 U.S. 322 (2003), the Court fleshed out the "substantial showing"
standard.  In cases where the district court has rejected constitutional claims on the merits, the
petitioner must have demonstrated that "jurists could conclude the issues presented are adequate to
deserve encouragement to proceed further."  *Id.* at 327.

In applying the U.S. Supreme Court's substantial showing standard, a district court is to limit
its examination to a threshold inquiry into the underlying merit of the of the petitioner's claims.  *Id.*
at 336-37.  The Sixth Circuit has ruled that *Slack* requires an individualized, reasoned assessment
of each claim, as blanket grants or denials of COA's are unhelpful and contrary to the letter and
spirit of Congress' mandate.  *See Frazier v. Huffman*, 343 F.3d 780 (6th Cir. 2003)*; Murphy v. Ohio*,
263 F.3d 466 (6th Cir. 2001); *Porterfield v. Bell*, 258 F.3d 484 (6th Cir. 2001).

In the case *sub judice*, each of Hodge's claims has been considered individually and this
Court has decided that none warrant habeas relief on the merits.  Nonetheless, a certificate of
appealability shall issue on the petitioner's ineffective assistance of counsel claims, as this Court
finds that the petitioner has arguably made a substantial showing of the denial of his constitutional
rights only with regard to counsel's performance and its impact, from counsel's pre-trial motions
through later acts and/or omissions at the trial.

In other words, this Court is of the opinion that with regard to the ineffective assistance of
counsel claims, the petitioner has arguably demonstrated that reasonable jurists would find this
Court's assessment of these claims herein to be debatable or wrong.  *Slack*, 529 U.S. at 484.

---

[32] When the district court denies a habeas petition on procedural grounds without reaching the prisoner's
underlying constitutional claims, however, a COA should issue "when the prisoner shows, at least, that jurists of
reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* that
jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  *Id.*
(emphasis added).

147

_____**CONCLUSION**

Accordingly, **IT IS HEREBY ORDERED** as follows:

(1)      The instant  28 U.S.C. §2254 petition for writ of habeas corpus, filed on behalf of

Benny Lee Hodge, is **DENIED**;

(2)      the Stay of Execution Order [Record No. 8], entered on July 15, 2004, is **VACATED**;

(3)      this 28 U.S.C. §2254 habeas corpus proceeding is **DISMISSED WITH**

**PREJUDICE** and Judgment shall be entered contemporaneously with this Memorandum Opinion

and Order;

(4)      A certificate of appealability hereby **ISSUES** as to the petitioner's claims of

ineffective assistance of trial counsel.

Dated this 10th day of July, 2006.

**Signed By:**

**_Karen K. Caldwell_**

**United States District Judge**

148